No. 26-8001

_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____

CRYSTAL ROBERTSON, *et al.*,
PLAINTIFFS-APPELLEES,

v.

DISTRICT OF COLUMBIA,
DEFENDANT-APPELLANT.

_____

ON PETITION FOR PERMISSION TO APPEAL FROM AN ORDER OF THE
UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

_____

**PETITION FOR PERMISSION TO APPEAL
UNDER FEDERAL RULE OF CIVIL PROCEDURE 23(f)**

_____

A decade ago, this Court vacated a class certification order that combined different types of claims under the Individuals with Disabilities Education Act (IDEA) simply because all of the classmembers alleged a violation of the same provision of law. *D.L. v. District of Columbia* ("*D.L. I*"), 713 F.3d 120 (D.C. Cir. 2013). As this Court acknowledged, *Wal-Mart* requires more: a class must be bound together by a "single or uniform policy or practice that bridges all their claims" such that the same proof suffices for each member of the class. *Id.* at 127. Following *D.L. I*, on remand the district court certified "far more precise" subclasses centered around "common harms" that were "susceptible to common proof" and curable by

targeted injunctions. *D.L. v. District of Columbia* ("*D.L. II*"), 860 F.3d 713, 724-25 (D.C. Cir. 2017) (citation modified).

Here, the district court certified a class that is far more sweeping and varied than the class rejected in *D.L. I*, when it should have taken cues from *D.L. II*. This case involves students with disabilities who receive transportation services from the District to get to and from school. The gravamen of plaintiffs' complaint is timeliness: the named plaintiffs all asserted that their buses were frequently late, depriving them of important educational opportunities. But the district court certified a class that stretches far more broadly than just timeliness issues. The class includes every child who will experience *any* issue related to their transportation being "unsafe, unreliable, or inappropriate." That includes complaints, for example, that a student was on a bus too long, that a staff member was not properly trained to manage behaviors, or that a safety harness was not properly utilized—issues that *could* be individual IDEA violations, but ones that plainly are not connected to the experiences of *all* other putative class members or to bus timeliness generally.

The only thread connecting all of these unrelated injuries is that they allegedly violate "the same provision of law," which is not enough. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). A student who experiences an IDEA violation because her bus was late experiences a different kind of harm—and requires a different remedy—than a student whose bus was never late but lacked a sign-

language interpreter.  Because those claims are not susceptible to common proof and are not remediable through a single injunction, they should not be part of the same class.  The result of the class certification decision here is a sprawling class involving many discrete issues that will make this litigation unmanageable.  The decision is manifestly erroneous and merits the rare step of interlocutory review.

## BACKGROUND

### I.     Statutory Background.

The IDEA requires that students with qualifying disabilities be provided with a free appropriate public education (FAPE), which includes "special education and related services"—such as transportation—"designed to meet their unique needs." 20 U.S.C. § 1400(d)(1)(A).  The primary mechanism for providing a FAPE is through a student's individualized education program (IEP).  *See Fry v. Napoleon Cmty. Schs.*, 580 U.S. 154, 158 (2017).  The IEP lays out a personalized plan to meet the student's specific "educational needs," 20 U.S.C. § 1414(d)(1)(A)(i)(II)(bb), including transportation and transportation-related services, *see id.* § 1414(d)(1)(A)(i)(IV).  Only "a *material* failure to implement an IEP violates the IDEA," meaning that "a minor discrepancy" between the IEP and the services actually provided does not deny the student a FAPE.  *Van Duyn ex rel. Van Duyn v. Baker Sch. Dist. 5J*, 502 F.3d 811, 822 (9th Cir. 2007).

## II.    Factual Background.

The named plaintiffs are parents or guardians of five students with disabilities who, through their IEPs, are entitled to various transportation services by the District of Columbia Office of the State Superintendent of Education (OSSE). *Robertson v. District of Columbia*, No. 24-cv-656, 2026 WL 125237, at *1 (D.D.C. Jan. 16, 2026). OSSE employs more than 1,000 drivers and attendants and operates a fleet of roughly 650 vehicles to transport children with disabilities to and from school. *Id.* at *2. As of January 2024, OSSE provided transportation services to more than 4,000 students on approximately 550 twice-daily bus routes. *Id.*

In late 2023, the named plaintiffs filed administrative complaints alleging the denial of a FAPE, in addition to violations of the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101 *et seq.*, Section 504 of the Rehabilitation Act, 29 U.S.C. § 794 *et seq.*, and the District of Columbia Human Rights Act (DCHRA), D.C. Code § 2-1401.01 *et seq. See Robertson*, 2026 WL 125237, at *2. They asserted a variety of transportation-related problems, including that OSSE buses regularly arrive late or not at all, that routes often experience delays, that buses occasionally lack necessary equipment for transporting specific students, and that requisite staff are not always present. *Id.* While some of these issues allegedly led to decreased instructional time, others did not. The named plaintiffs sought individualized relief and an order requiring OSSE to provide all transportation-eligible students with safe

4

and reliable transportation to and from school. *Id.* In each case, the hearing officer granted the named plaintiffs individualized relief for the denial of a FAPE. *Id.* In three of the cases, the hearing officer also ordered prospective relief for that student in the form of an order directing OSSE to provide "consistent, reliable, and appropriate transportation" pursuant to that student's IEP. *Id.* In all five cases, the hearing officers dismissed the named plaintiffs' non-IDEA claims and their claims for relief on behalf of others because they were not cognizable in an administrative forum. *Id.*

### III.  Procedural History.

In March 2024, the named plaintiffs and the Arc, a disability-rights organization, sued the District under the IDEA, ADA, Rehabilitation Act, and DCHRA. *Id.* at *3. Plaintiffs sought a preliminary injunction, which the district court denied. *Id.* The District then moved to partially dismiss the complaint, which the court granted in part by dismissing plaintiffs' IDEA claims related to communications and reimbursement procedures, their claims for compensatory education, and their unjustified-isolation discrimination claims. *Robertson v. District of Columbia*, 762 F. Supp. 3d 34, 51-53, 58 (D.D.C. 2025).

In May 2024, plaintiffs sought to certify a class defined as:

All students with disabilities aged 3-22 who, from March 7, 2022, until judgment is issued in this case, require transportation from the District of Columbia to attend school and have experienced and will continue

5

to experience Defendant's failure to provide safe, reliable, and appropriate transportation.

*Robertson*, 2026 WL 125237, at *3. On January 16, 2026, the district court granted the certification motion, although it expanded the class definition from students experiencing the District's "failure to provide safe, reliable, and appropriate transportation" to students experiencing "unsafe, unreliable, *or* inappropriate transportation services from the District of Columbia." *Id.* at *22 (emphasis added).

On commonality, the court determined that despite the tendency of IDEA cases to turn on "individualized assessments and relief," plaintiffs had sufficiently alleged "systemic defects" with the District's transportation services that were conducive to class-wide resolution. *Id.* at *14 (quoting *Robertson*, 762 F. Supp. 3d at 51). And even though the purported transportation failures varied—from allegedly "faulty bus route planning," to "untimely bus arrivals and departures," to "insufficient driver, attendant, and aide staffing and training," among others—and those failures "affect[ed] different students in different ways," *id.* at *14, the court believed it could resolve whether the deficiencies denied all plaintiffs a FAPE "in one stroke," *id.* at *15 (quoting *Wal-Mart*, 564 U.S. at 350).

The district court further found that plaintiffs had satisfied the requirements of Rule 23(b)(2). It reasoned that "if plaintiffs are correct that there are systemic deficiencies in the District's transportation system, then the District's alleged conduct . . . is 'generally applicable to the class.'" *Id.* at *20 (quoting *O.A. v. Trump*,

404 F. Supp. 3d 109, 157 (D.D.C. 2019)).     Although plaintiffs themselves acknowledged that the District "may have to perform an individualized inquiry to determine how best to individually accommodate class members," the court nonetheless determined that it could issue injunctive relief affecting the entire class simultaneously.  *Id.* at *21.  The court did not explain how a single injunction could cure the varied harms alleged by the named plaintiffs and other individuals covered by the expansive class definition.

Following the court's certification of the modified class definition, the District timely filed this petition seeking Rule 23(f) review.

## QUESTIONS PRESENTED

1.     Whether the district court manifestly erred in concluding that the class satisfied commonality where the only link between plaintiffs' claims is the law under which those claims are brought.

2.     Whether the district court manifestly erred in certifying a class under Rule 23(b)(2) when plaintiffs acknowledged that no single injunction could remedy the classmembers' alleged harms.

## REASONS FOR GRANTING THE PETITION

Under Rule 23(f), this Court may permit an interlocutory appeal from an order of a district court granting class certification if the district court's decision is "manifestly erroneous" or if the appeal raises "an important and recurring issue of

law." *In re White*, 64 F.4th 302, 307 (D.C. Cir. 2023); *see In re Lorazepam & Clorazepate Antitrust Litig.*, 289 F.3d 98, 102, 105 (D.C. Cir. 2002). Here, the district court's certification order directly conflicts with the Supreme Court's decision in *Wal-Mart* on "fundamental issue[s] of law relating to class actions," making immediate review appropriate. *Lorazepam*, 289 F.3d at 105.

While there are many issues with the district court's reasoning—including its findings on numerosity, typicality, and adequacy—its holdings with respect to commonality and Rule 23(b)(2) are the most glaring and should be corrected before this case proceeds further. Rather than require plaintiffs to identify a "uniform policy or practice," *D.L. I*, 713 F.3d at 127, or present a way of establishing their claims through "common proof," *D.L. II*, 860 F.3d at 724, the district court aggregated multiple, disconnected allegations of harm—some of which are unrelated to timely transportation—to find commonality. The result is a sprawling class definition encompassing children who may have experienced issues with safety *or* bus reliability *or* other "inappropriate" services. The district court also concluded that a single injunction could simultaneously afford relief to all class members, despite plaintiffs' acknowledgment that further individualized proceedings would be needed given their diverse injuries. Both of these conclusions were manifestly erroneous and serve as independent bases to grant the petition.

The result of these errors is an amorphous class definition that will make the litigation unmanageable and the issuance of appropriate and tailored relief impossible.  This Court should intervene now.  Otherwise, the litigants and the district court will spend years wrestling with an ill-defined and endless list of potential grievances, only to risk having the case sent back for a do-over under a class definition that comports with *Wal-Mart*.

## I.    The District Court's Commonality Finding Contravenes *Wal-Mart*.

Commonality requires class-action plaintiffs to present "significant proof," *Wal-Mart*, 564 U.S. at 353, that they all suffered "a common harm . . . as a result of a policy or practice that affects each class member," *D.L. I*, 713 F.3d at 128.  There must exist "a common contention . . . capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart*, 564 U.S. at 350.  Put in the simplest terms, plaintiffs must be able to demonstrate that they have all "suffered the same injury," not "merely that they have all suffered a violation of the same provision of law." *Id.* (citation modified).

*Wal-Mart* also makes it abundantly clear that the common injury must be tightly circumscribed. *See id.* at 349-50.  Class-action plaintiffs cannot simply cast a wide net to find an expansive common denominator.  "Rule 23 does not allow for . . . a 30,000 foot view of commonality." *White*, 64 F.4th at 314.  Instead, class-

9

action plaintiffs asserting that they have been harmed must be able to present a "specific thread [that] tie[s] [their] claims together." *Id.* They must identify "specific deficiencies" that "are common" to the entire class. *In re District of Columbia*, 792 F.3d 96, 100 (D.C. Cir. 2015).

In the context of the IDEA, for example, it is not enough for a group of plaintiffs to assert that "the District[] [has a] pattern and practice of failing to provide FAPEs . . . because [that] constitutes only an allegation that the class members 'have all suffered a violation of the same provision of law.'" *D.L. I*, 713 F.3d at 126 (quoting *Wal-Mart*, 564 U.S. at 350). Instead, the classmembers must identify a "single or uniform policy or practice that bridges all their claims." *Id.* at 127. There must be "some glue" showing that class treatment "will produce a common answer to the crucial question" of liability for every plaintiff. *Wal-Mart*, 564 U.S. at 352.

Here, plaintiffs allege, at the broadest possible level, that there are numerous different types of shortcomings within the District's transportation system that have injured them in varying ways. Although a number of plaintiffs allege that they experienced late buses, *e.g.*, McCray Decl. ¶¶ 13, 21 (ECF No. 4-18); Robertson Decl. ¶¶ 16, 22 (ECF No. 4-22), they also assert a variety of other harms closely tied to the individualized provisions of their IEPs. These range from travel times exceeding the parameters required by the IEP, Guerrero Decl. ¶ 35 (ECF No. 4-9), to missing safety equipment, Daggett Decl. ¶ 25 (ECF No. 4-3), to absent nurses and

aides, Cannon-Clark Decl. ¶ 14 (ECF No. 4-14).  These are all different kinds of harm.  Proof that one student's bus is frequently late does not prove that another student's safety harness is frequently missing or improperly secured.  These alleged shortcomings do not share characteristics, origins, or even common plaintiffs.  And there is certainly not "substantial proof" that a single policy or practice caused each alleged harm.

This incongruity exposes a fatal flaw in plaintiffs' proposed class: there is no feasible way to show, through "common proof," *D.L. II*, 860 F.3d at 724, how *every* individual student is affected by these alleged deficiencies.  Each student's IEP is uniquely tailored to that student, meaning that they all have different requirements that must be satisfied for them to receive a FAPE—and many of those requirements have nothing to do with timeliness.  *Branham v. District of Columbia*, 427 F.3d 7, 12 (D.C. Cir. 2005) ("[D]etermining what constitutes a FAPE will always require a fact-intensive and child-specific inquiry.").  For example, one child may need to be picked up last to minimize their travel time, even if their bus is consistently timely.  And missing equipment that prevents one student from attending school entirely may only create a non-material, five-minute delay for another.  By grouping together plaintiffs who experienced late buses with plaintiffs who experienced far more individualized issues with safety or appropriateness, the class is unlikely "to generate

common *answers* apt to drive the resolution of the litigation." *Wal-Mart*, 564 U.S. at 350.

This Court rightly denied certification when faced with similarly discordant allegations in *D.L. I*. There, numerous plaintiffs sued the District and alleged that it had failed to identify, locate, evaluate, and offer special education services to preschoolers with learning disabilities—four distinct types of IDEA violations. *D.L. I*, 713 F.3d at 122. The district court initially found commonality satisfied because it papered over the plaintiffs' "differing allegations" on the belief that they "only represent[ed] the differing ways in which the District ha[d] caused class members' common injury." *Id.* (citation modified). This Court firmly rejected that logic on appeal, clarifying that the plaintiffs had to do more than assert that they "all suffered a violation of the same provision of law," because the same law "can be violated in many different ways." *Id.* at 126 (quoting *Wal-Mart*, 564 U.S. at 350). Without common answers to the plaintiffs' "different claims of harm," certification was impossible. *Id.* at 128.

On remand, the trial court cured that commonality deficiency by certifying subclasses "defined by reference to a uniform policy or practice governing a specific stage of the special education process." *D.L. II*, 860 F.3d at 724. Those subclasses "allege[d] a common harm," were "subject to common proof," and each subclass's injuries could be "remedied by a single order." *Id.* For example, one subclass was

12

defined as children who did not receive eligibility determinations within the statutory timeframe. *Id.* The number of students who experienced this injury was ascertainable, the students' injuries were the same, and the court could remedy them through a uniform injunction setting numerical targets for improvement in meeting the statutory deadline. *Id.*

The lessons of *D.L. I* and *D.L. II* preclude the class definition here. Plaintiffs have collected a variety of complaints about "different policies and practices [in] different [aspects]" of the District's large transportation system, each of which affects them in "different ways." *D.L. I*, 713 F.3d at 127. Some of those problems could potentially affect discrete groups of students, like issues with late arrivals to school. *E.g.*, Woods Decl. ¶ 5 (ECF No. 4-30). But many others are obviously idiosyncratic, like complaints that a bus once broke down, Maltz Decl. ¶ 10 (ECF No. 4-35), or that a student was bullied on the bus, Mitchell Decl. ¶ 5 (ECF No. 4-33), or that a bus driver fluent in ASL was replaced by a driver not fluent in ASL, Lewis Decl. ¶ 5 (ECF No. 35-3). All of these concerns may be legitimate—and some may even rise to a violation of the IDEA—but none of them is connected to a "single or uniform policy or practice that bridges *all* their claims." *D.L. I*, 713 F.3d at 127 (emphasis added). The class's claims are so "varied" that they simply "could not be resolved together." *In re Johnson*, 760 F.3d 66, 73 (D.C. Cir. 2014).

Indeed, plaintiffs did not even seriously try to identify "a uniform policy or practice that affects all class members." *D.L. I*, 713 F.3d at 128. In their briefing below, they proposed various overlapping questions that they asserted qualified as "common," such as: "Are Defendant's deficient policies and practices related to transportation for students with disabilities denying students with disabilities FAPE in violation of the IDEA?" Pls.' Mem. ISO Mot. for Class Certification at 17 (ECF No. 29-1). But that sweeping question could not possibly be answered for all classmembers at once because their harms are so varied and are often "child-specific." *Branham* 427 F.3d at 12.

Because plaintiffs "are at a loss for a more specific thread to tie [their] claims together," *White*, 64 F.4th at 314, the district court resorted to a mile-high view of commonality. It determined that "the crux of the complaint" focused on "'systemic defects' that will harm all similarly situated students"—namely, the "District's uniform failure to provide an adequate transportation system." *Robertson*, 2026 WL 125237, at *14. It accordingly certified a class that is expressly disjunctive, grouping students who experienced "unreliable" transportation with those who experienced some form of "unsafe" or "inappropriate" transportation. *Id.* at *22. That resort to a vague, system-wide class is exactly what this Court rejected in *D.L. I*, where it found that the trial court had lumped together "multiple, disparate failures" rather than identify "a truly systemic policy or practice which affects them all." 713 F.3d

14

at 128.  Rule 23 does not permit this approach.  Plaintiffs attempting to build such a large class with such disparate claims must present "significant proof" that the defendant "operate[s] under a general policy" that is unlawful, which is totally absent here.  *Wal-Mart*, 564 U.S. at 353.  Plaintiffs merely gesture to an assortment of issues and assume that a uniform policy must account for them all, without providing any explanation for why that is so.[1]

The district court acknowledged that it had no convincing method of resolving this entire case through common proof.  It admitted that "the District's alleged transportation failures may affect different students in different ways."  *Robertson*, 2026 WL 125237, at *14.  Yet it refused to entertain the idea of "divid[ing] the putative class into subclasses of students who suffered the same 'type' of transportation harm"—such as students who experienced missing safety equipment—because it would create *too many* subclasses, what it termed "a 'subclass spiral.'"  *Id.* at *14 n.6.  That only proves the District's point.  As currently defined, the class is so sprawling that capturing all its components—including all

---

[1]    This may actually prevent some classmembers from obtaining individualized remedies through the ordinary IDEA complaint process.  The student who needs an attendant fluent in ASL, for example, may not be able to prove that this problem was caused by a uniform policy that also caused other students' buses to be late.  Yet the student might have been successful in obtaining relief from a hearing officer if there was a material deviation from his IEP.  The class device cannot provide that type of tailored relief to anyone.

children with "inappropriate" transportation conditions—would be near-impossible. If there is no link between different kinds of harm, the kinds of evidence that would be needed to prove them, or the remedies, then there is no commonality.

That said, if the district court had been more restrained—for example, by focusing only on children whose buses were actually late to school and who missed non-negligible instructional time—it may well have been possible to craft a class or subclasses that would satisfy *Wal-Mart* and *D.L. I.* The "subclass spiral" is not an inevitability. Instead, it stems from the district court's overbroad view of what the plaintiffs and other putative class members have in common.

## II.    The District Court Manifestly Erred In Concluding That Plaintiffs Satisfy The Requirements Of Rule 23(b)(2).

Certification under Rule 23(b)(2) is permissible if "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). It "applies only when a single injunction or declaratory judgment would provide relief to each member of the class." *Wal-Mart*, 564 U.S. at 360. "It does not authorize class certification when each individual class member would be entitled to a *different* injunction or declaratory judgment against the defendant." *Id.*

The class definition currently encompasses those whose transportation services have been unsafe, unreliable, or inappropriate—capturing those who are

16

chronically late alongside those whose aide is occasionally absent, or who lack a specific piece of equipment that their IEP requires.  No one injunction could remedy each disparate kind of harm included in the class definition.  Instead, each student would need their own tailored injunction.  An injunction concerning "one-to-one aides" and "nurses," for example, *see* Pls.' Proposed Order on Mot. for Prelim. Inj. at 2 (ECF No. 4-2), does nothing for the students who do not require aides as a part of their IEPs.  Plaintiffs admitted as much in their briefing below, acknowledging that their various harms would require "an individualized inquiry to determine how best to individually accommodate class members across a wide geographic area to get them to and from school."  *Robertson*, 2026 WL 125237, at *21 (quoting Pls.' Mem. ISO Mot. for Class Certification at 31 (ECF No. 29-1)).  That concession is fatal to certification under Rule 23(b)(2).

The district court concluded that class-wide relief was possible because "[t]he aim of plaintiffs' suit . . . is to rectify the District's systemic failure to comply with a specific statutory duty to all class members, which fits the prototype of a (b)(2) class."  *Id.* (citation modified).  It relied on *D.L.* for support, but that portion of *D.L.* was addressing the *subclasses* that the district court established on remand, each of which could receive a targeted injunctive remedy because it was centered on a "common harm" uniting that subclass.  *D.L. II*, 860 F.3d at 724.  Those remedies were tailored and specific: for instance, to correct the failure to evaluate referred

students within the statutory deadline, the court set annual requirements to improve the District's performance on that particular metric. *See id.* That logic does not work here, where plaintiffs allege disparate kinds of harms stemming from different aspects of the transportation system that cannot be remedied with a single injunction. The trial court's amendment of the class definition to encompass students experiencing either "unsafe," "unreliable," *or* "inappropriate" transportation, *Robertson*, 2026 WL 125237, at *22, only betrays that the class's injuries are not the same and could not be remedied through an "indivisible" injunction. *D.L. I*, 713 F.3d at 125.

The only way to conceivably sweep in the full range of plaintiffs' desired relief is to define the injunction expansively to require non-specific improvements to the District's transportation services. Tellingly, that is exactly how plaintiffs frame it: they seek "broad injunctive and declaratory relief" requiring the District "to comply with the requirements of [the IDEA, ADA, Rehabilitation Act, and DCHRA]." Pls.' Mem. ISO Mot. for Class Certification at 30-31 (ECF No. 29-1). But this amounts to nothing more than a "generalized injunction to obey the law," which is not sufficiently specific to guide the District's actions. *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1137 (D.C. Cir. 2009).

Given the nature of plaintiffs' complaints, a single injunction is incapable of "provid[ing] relief to each member of the class." *Wal-Mart*, 564 U.S. at 360.

Concluding otherwise ignores the different kinds of harm the plaintiffs experienced. Again, plaintiffs could have pressed for a narrower class or sub-classes, which might have averted the serious Rule 23(b)(2) issues inherent in the district court's overbroad class definition. But they did not. Short of a vague and broad directive, plaintiffs cannot fashion a remedy that accounts for each putative class member's transportation-related issues or the infinite varieties of individual concerns that might count as causing a child to "experience" (even in just one instance) transportation that is somehow "unsafe, unreliable or inappropriate." Certification under Rule 23(b)(2) was therefore manifestly erroneous.

* * *

The consequence of the trial court's manifest errors is a class that cannot help drive this case toward resolution. Rather than focusing this litigation on issues where multiple plaintiffs might actually have common harms, the case will proceed to discovery and trial on an endless list of issues, many of which may be unique to a single student. Those issues cannot possibly be remedied on a class-wide basis because there are infinite ways (material or not) that a transportation service could deviate from a child's IEP, and the resulting injunction would have to address them all. Multiply that by 4,000 students being transported across the District and nearby states, and the result is unworkable. The district court's decision should be corrected now so that this litigation can proceed surely and swiftly on the right track.

## CONCLUSION

This Court should permit an appeal from the district court's class-certification order.

Respectfully submitted,

BRIAN L. SCHWALB
Attorney General for the District of Columbia

CAROLINE S. VAN ZILE
Solicitor General

ASHWIN P. PHATAK
Principal Deputy Solicitor General

/s/ Jeremy R. Girton
JEREMY R. GIRTON
Assistant Attorney General
Bar Number 888304147

PERRY R. CAO
Assistant Attorney General
Office of the Solicitor General

Office of the Attorney General
400 6th Street, NW, Suite 8100
Washington, D.C. 20001
(202) 724-2029
(202) 741-8786 (fax)
January 2026                        jeremy.girton@dc.gov

2026 WL 125237
Only the Westlaw citation is currently available.
United States District Court, District of Columbia.

Crystal ROBERTSON, on behalf of herself and her minor
child D.R.; Elizabeth Daggett, on behalf of herself and
her minor child H.D.; Joann McCray, on behalf of herself
and her minor child J.C.; Veronica Guerrero, on behalf of
herself and her minor child A.F.; Marcia Cannon-Clark
and David Clark, on behalf of themselves and their minor
child B.R.C.; and the Arc of the United States, Plaintiffs,
v.
DISTRICT OF COLUMBIA, Defendant.

Civil Action No. 24-0656 (PLF)
|
Signed January 16, 2026

**Attorneys and Law Firms**

Evan Monod, Shira Wakschlag, The Arc of the United States,
Inc., Washington, DC, Kaitlin Rose Banner, Wash.Lawyers'
Cmte for Civil Rights & Urb.Affairs, Washington, DC,
Theresa Maria Babendreier, Margaret Hanley Warner,
Eugene I. Goldman, Andrew C. Lang-Reyes, Renee
Suzich, McDermott Will & Schulte LLP, Washington, DC,
Katherine Ilene Zeisel, Shayna Stern, Children's Law Center,
Washington, DC, Chelsea Sullivan, Washington Lawyers'
Committee for Civil Rights and Urba, Washington, DC, for
Plaintiffs.

Mateya Beth Kelley, Gregory Ketcham-Colwill, Office of the
Attorney General for the District of Columbia, Washington,
DC, David R. Wasserstein, Washington, DC, for Defendant.

Rebecca Jarboe, Friendship Public Charter School,
Washington, DC, for Amicus Friendship Public Charter
School.

OPINION

PAUL L. FRIEDMAN, United States District Judge

**\*1** This matter is before the Court on plaintiffs' Motion to
Certify Class ("Pls. Mot.") [Dkt. No. 29], as amended by
plaintiffs' Supplemental Brief on Class Certification ("Pls.
Suppl.") [Dkt. No. 110]. Plaintiffs are parents and guardians
of students with disabilities in the District of Columbia,

as well as The Arc of the United States ("The Arc"),
a non-profit organization dedicated to promoting the rights
of people with disabilities. Plaintiffs filed a Class Action
Complaint for Declaratory and Injunctive Relief ("Compl.")
[Dkt. No. 1], alleging that defendant District of Columbia
("the District") fails to provide adequate transportation to and
from school for children with disabilities, thereby denying
them the free appropriate public education ("FAPE") to
which they are entitled by law and blocking their access
to educational opportunities. See generally Compl. After
carefully considering the parties' papers, the relevant legal
authorities, and the arguments presented by counsel at oral
argument on July 11, 2024 and at a hearing on January 6,
2026, the Court will grant plaintiffs' motion to certify class. [1]

I. BACKGROUND

*A. Factual Background*

The named plaintiffs are the parents or guardians of five
students with disabilities whose individualized education
programs ("IEPs") entitle them to transportation services
to be provided by the District of Columbia Office of the
State Superintendent of Education ("OSSE"). See Declaration
of Crystal Robertson ("Robertson Decl.") [Dkt. No. 4-22]
¶ 6; Declaration of Elizabeth Daggett ("Daggett Decl.")
[Dkt. No. 4-3] ¶ 7; Declaration of Joann McCray ("McCray
Decl.") [Dkt. No. 4-18] ¶ 7; Declaration of Veronica Guerrero
("Guerrero Decl.") [Dkt. No. 4-9] ¶ 7; Declaration of Marcia
Cannon-Clark ("Clark Decl.") [Dkt. No. 4-14] ¶ 6. They bring
claims on behalf of themselves and a putative class of parents
of students with disabilities who are eligible for special
education services under the Individuals with Disabilities
Education Act ("IDEA"), 20 U.S.C. §§ 1400 et seq., and are
entitled to transportation as a related service pursuant to their
IEPs. See Compl. ¶ 222. The Arc, an organization dedicated
to promoting the rights of people with disabilities, is also
a plaintiff. See id. ¶ 31. Plaintiffs allege that the District's failure
to provide safe and adequate transportation to and from school
for their children violates the IDEA, the Americans with
Disabilities Act ("ADA"), 42 U.S.C. §§ 12101 et seq., Section
504 of the Rehabilitation Act, 29 U.S.C. §§ 794 et seq., and
the District of Columbia Human Rights Act ("DCHRA").
D.C. Code §§ 2-1401.01 et seq.; Compl. ¶¶ 219-260.

**\*2** The District, through OSSE, employs a team of over
1,000 drivers and attendants, using a fleet of around 650

OSSE-owned vehicles, to transport children in the District of Columbia to and from school. See Def. Opp. at 2-3 (citing Declaration of Raphael Park [Dkt. No. 31-2] ¶ 12). As of January 31, 2024, there were 4,093 students with disabilities receiving transportation services from OSSE on approximately 550 daily bus routes, which run every morning and every afternoon. See Pls. Mot. at 10 (citing Office of the State Superintendent of Educ., Responses to Fiscal Year 2023 Performance Oversight Questions ("2023 Performance Oversight Responses") [Dkt. No. 4-48] at 215); see also Def. Opp. at 3. OSSE also contracts with private transportation vendors to provide transportation services to approximately 370 additional students. See Pls. Mot. at 10 (citing 2023 Performance Oversight Responses at 223).

Plaintiffs allege that OSSE's buses "regularly arrive hours late to pick up students or never arrive at all, often with no notice to families." Compl. ¶ 5. Plaintiffs further allege that OSSE's current bus routing system often causes delays and sometimes results in a failure to deliver students with disabilities to school. See id. ¶¶ 170-75, 180. As a result of OSSE's alleged failure to provide an effective transportation system, plaintiffs claim that students who rely on OSSE for transportation are denied instructional time at school and participation in therapies or other school-provided services, and are segregated from their peers. See id. ¶¶ 3-6.

In addition, plaintiffs say that even when transportation is provided, the buses lack the necessary equipment and/or staff to safely transport students with disabilities to and from school. See Compl. ¶ 10; see also Daggett Decl. ¶ 25; Guerrero Decl. ¶¶ 13, 18, 20; Clark Decl. ¶ 14. When OSSE fails to provide effective transportation, families are forced to either arrange their students' transportation to school themselves or risk their children losing out on access to their education. See Compl. ¶ 60; see also Daggett Decl. ¶ 26; Guerrero Decl. ¶¶ 13, 18, 20; Clark Decl. ¶ 9. Plaintiffs assert that these issues go beyond their individual children, and argue that OSSE's transportation failures affect all children with disabilities who rely on OSSE for transportation services. See Compl. ¶ 161. Plaintiffs therefore seek systemic relief, asserting that OSSE has failed to implement policies and practices that ensure compliance with the IDEA and the mandates of D.C. and federal anti-discrimination laws. See id. ¶¶ 19-21.

The individual named plaintiffs brought administrative due process complaints before OSSE hearing officers, challenging the denial of FAPE on both an individual and

a systemic level, and alleging that OSSE's transportation failures have violated their rights under the ADA, Section 504 of the Rehabilitation Act, and the DCHRA. See Compl. ¶ 17. In addition to the individualized relief they sought for their children, plaintiffs requested that the hearing officers issue orders requiring OSSE to develop and implement effective policies and procedures to provide their children and other students with disabilities who are eligible for transportation services with safe, consistent, and reliable transportation to and from school. See id. OSSE hearing officers dismissed plaintiffs' systemic and non-IDEA claims, "finding that such relief is unavailable in the administrative forum." Id. With respect to their individual claims, each plaintiff was granted some form of relief, including compensatory education, reimbursement of personal travel expenses, and—in the cases of three of the students—a specific order that "OSSE shall provide consistent, reliable, and appropriate transportation" pursuant to the students' IEPs. See B.R.C. HOD at 11-12 (granting student consistent, reliable, and appropriate transportation, reimbursement for transportation expenses, and compensatory education); H.D. HOD at 12 (granting student consistent, reliable, and appropriate transportation, compensatory education, and reimbursement for transportation expenses); D.R. HOD at 10 (granting student consistent, reliable, and appropriate transportation and compensatory education); A.F. HOD at 11 (granting student compensatory therapy services); J.C. HOD at 17-18 (granting student compensatory education and reimbursement for transportation expenses). The Arc did not file a due process complaint before OSSE. See Compl.

*B. Procedural Background*

**\*3**  On March 7, 2024, plaintiffs filed suit against the District on behalf of themselves and all others similarly situated, alleging violations of the IDEA, the ADA, Section 504 of the Rehabilitation Act, and the DCHRA. See Compl. ¶¶ 219-260. On March 14, 2024, plaintiffs moved for a preliminary injunction against the District [Dkt. No. 4], which the Court denied following a hearing on the motion. See Order of July 23, 2024 [Dkt. No. 50]. On September 4, 2024, the District moved to partially dismiss plaintiffs' complaint pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure. See Defendant's Partial Motion to Dismiss [Dkt. No. 58]. The Court granted the District's motion in part and denied it in part. See Order of January 16, 2025 [Dkt. No. 75]; Robertson v. District of Columbia ("Robertson v. D.C."), 762 F. Supp. 3d 34 (D.D.C. 2025). The Court also dismissed some

of plaintiffs' IDEA and discrimination claims. Robertson v. D.C., 762 F. Supp. 3d at 52, 53, 58.

Plaintiffs moved for class certification on May 3, 2024. See Pls. Mot. Plaintiffs seek certification of the following class of individuals:

> All students with disabilities aged 3-22 who, from March 7, 2022, until judgment is issued in this case, require transportation from the District of Columbia to attend school and have experienced and will continue to experience Defendant's failure to provide safe, reliable, and appropriate transportation.

Pls. Mot. at 11. The District filed its opposition to plaintiffs' motion on June 7, 2024, see Def. Opp., and plaintiffs replied on June 21, 2024. See Pls. Repl. On July 11, 2024, the Court heard oral argument on plaintiffs' motion. See Minute Entry of July 11, 2024.

On September 25, 2024, by email, the District provided the Court and plaintiffs' counsel with a high-level report of bus arrival and departure times based on data collected between August 24, 2024 and September 20, 2024. See Email from Mateya Kelly, Esq. to the Court and Plaintiffs' Counsel [Dkt. No. 64-3]. Unsatisfied with this production, plaintiffs filed a motion asking the Court to direct the District to supplement its September 25, 2024 report to include information on: (i) the number/percentage of students on bus routes who deboard buses arriving at their schools; (ii) "no-shows," and the reason for a student's absence on the bus; (iii) the number/percentage of students who deboard buses arriving at their homes in the afternoon; and (iv) the times the buses arrive at students' homes in the afternoon. See Plaintiffs' Motion for Defendant to Supplement Its September 25, 2024 Submission [Dkt. No. 64].

On February 24, 2025, the Court granted plaintiffs' motion for the District to supplement its data report. See Mem. Op. & Order [Dkt. No. 82]. In granting the motion, the Court reasoned that plaintiffs' requested information was already "available in the form of trip tickets, which capture student-level data such as pick up times, drop off times, the number of students that deboard the buses in the mornings, and

student absences." Id. at 2. The Court entered a protective order, see Order of April 11, 2025 [Dkt. No. 90], and ordered the District to provide notice to students and parents pursuant to the Family Educational Rights and Privacy Act ("FERPA"), 20 U.S.C. § 1232g. See Mem. Op. & Order [Dkt. No. 91]. On April 29, 2025, pursuant to the Court's Order, the District notified families of students whose IEPs include transportation services that those students' personal information may be disclosed if the Court ordered the District to produce bus trip tickets. See Joint Status Report [Dkt. No. 95] at 1. Families were given until May 16, 2025 to object to the disclosure of their students' information. See id. Ultimately, out of the more than 4,100 students whose families received notice, 297 students were the subject of objections ("objectors"). See id. Most of those students were assigned to different bus routes, and approximately 300 bus routes included an objector. See id. After matching objectors to their assigned bus route, the District determined that around 40% of the approximately 4,000 total students who receive transportation services from the District were assigned to bus routes that included an objector. See Joint Status Report [Dkt. No. 97] at 2.

**\*4**  On June 17, 2025, the Court ordered the District to "produce, without redaction, all trip tickets generated between August 26, 2024 and November 30, 2024 for [bus] routes that do not include an objector." Mem. Op. & Order [Dkt. No. 96]. The District completed production of this subset of trip tickets on September 25, 2025. See Joint Status Report [Dkt. No. 106] at 2. If the family of one student assigned to a bus route objected to the disclosure of their students' trip tickets, the District redacted all trip tickets for the entire route, including trip tickets for students whose families did not object. See Joint Status Report [Dkt. No. 97] at 2. The District ultimately produced 5,335 files—233,095 total pages —of documents displaying both unredacted trip tickets for routes that did not include an objector and redacted trip tickets for routes that did include an objector. See Joint Status Report [Dkt. No. 106] at 3.

Shortly thereafter, on October 24, 2025, plaintiffs filed a supplemental brief on class certification, see Pls. Suppl., and the District responded on November 24, 2025. See Def. Resp. The Court heard oral argument on the issues discussed in the parties' supplemental filings on January 6, 2026. See Minute Entry of January 6, 2026. The parties have fully briefed the issue of class certification, and plaintiffs' motion to certify the class is now ripe for decision.

## II. LEGAL FRAMEWORK

### A. The IDEA

As the Court described in more detail in its opinion granting in part and denying in part the District's partial motion to dismiss, see Robertson v. D.C., 762 F. Supp. 3d at 45-47, the IDEA requires that students with disabilities be provided with a FAPE, which includes providing both "special education and related services designed to meet their unique needs." 20 U.S.C. § 1400(d)(1)(A). The "[r]elated services" required to provide a FAPE include "transportation" to and from schools and between schools, travel in and around school buildings, and any "[s]pecialized equipment (such as special or adapted buses, lifts, and ramps)" that "may be required to assist a child with a disability to benefit from special education." Id. § 1401(26)(A); 34 C.F.R. § 300.34(c)(16). But the IDEA does not define the precise scope of "transportation" services that states must provide in order to receive IDEA funding. See Pierre-Noel on behalf of K.N. v. Bridges Pub. Charter Sch., 113 F.4th 970, 974 (D.C. Cir. 2024).

Under the IDEA, the "'primary vehicle' for providing each child with the promised FAPE" is the child's "individualized education program," or IEP. Fry v. Napoleon Cmty. Schs. ("Fry"), 580 U.S. 154, 158, 137 S.Ct. 743, 197 L.Ed.2d 46 (2017) (quoting Honig v. Doe, 484 U.S. 305, 311, 108 S.Ct. 592, 98 L.Ed.2d 686 (1988)); see also 20 U.S.C. §§ 1412(a)(4), 1414(d). "[T]he IEP spells out a personalized plan to meet all of [a] child's 'educational needs.'" Id. (quoting 20 U.S.C. § 1414(d)(1)(A)(i)(II)(bb)). Among other things, the IEP specifies "the special education and related services," such as transportation services, that the child will receive. 20 U.S.C. § 1414(d)(1)(A)(i)(I)-(IV). The IDEA also requires that the IEP allow the disabled student to receive an education in the "[l]east restrictive environment," or "LRE." See 20 U.S.C. § 1412(a)(5). This means that schools are required to ensure that, "[t]o the maximum extent appropriate," a student with disabilities is educated with their non-disabled peers, unless "the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily." Id. § 1412(a)(5)(A); see also 34 C.F.R. § 300.114(a)(2)(i)-(ii).

The IDEA also establishes formal procedures for resolving disputes between parents and school districts concerning a child's special education. See Fry, 580 U.S. at 159, 137 S.Ct. 743. Under the IDEA, students and parents may file complaints with administrative hearing officers to challenge a denial of FAPE, see 20 U.S.C. § 1415(b)(6); 34 C.F.R. § 300.507, and they may seek judicial review of a hearing officer's determination by filing a civil action in state or federal court. See 20 U.S.C. § 1415(i)(2)(A). A court "may provide a substantive remedy only when it determines that a school has denied a FAPE." Fry, 580 U.S. at 168 n.7, 137 S.Ct. 743; see also id. at 165, 137 S.Ct. 743 (explaining that in order to obtain relief under the IDEA, a plaintiff's "suit must seek relief for the denial of a FAPE, because that is the only 'relief' the IDEA makes 'available.'").

**\*5** When determining whether a child has received a FAPE, courts ask whether the "educational program" offered to the child is "reasonably calculated to enable [the] child to make progress appropriate in light of the child's circumstances." Endrew F. ex rel. Joseph F. v. Douglas Cnty. Sch. Dist. RE-1, 580 U.S. 386, 403, 137 S.Ct. 988, 197 L.Ed.2d 335 (2017).

### B. Discrimination Claims

In addition to their IDEA claims, plaintiffs raise claims under several other statutes, all grounded in the theory that the District has previously and continues to discriminate against plaintiffs because of their disabilities. The ADA and Section 504 of the Rehabilitation Act provide protections for individuals with disabilities, including a prohibition on excluding or segregating them or denying them the benefits of public services. See 29 U.S.C. § 794(a); 42 U.S.C. § 12132. Both statutes require covered entities—including public school systems—to provide reasonable modifications to ensure students with disabilities an equal opportunity to benefit from public education. 28 C.F.R. § 35.130(b)(7); 34 C.F.R. §§ 104.34(a), 104.37(a)(1). The DCHRA prohibits an educational institution from denying or abridging access to or use of its facilities or programs based on an individual's disability. D.C. Code § 2-1402.41(1).

To succeed under the ADA, Section 504 of the Rehabilitation Act, or the DCHRA, plaintiffs must prove that: (1) plaintiffs are qualified individuals with disabilities, (2) defendant is subject to the mandates of the statutes; and (3) plaintiffs were excluded from, denied the benefit of, or subject to discrimination under a program or activity on the basis of their disability. See Robertson v. D.C., 762 F. Supp. 3d at 48; see also Hunter on behalf of A.H. v. District of Columbia, 64 F. Supp. 3d 158, 166 (D.D.C. 2014); American Council of the Blind v. Paulson, 525 F.3d 1256, 1266 (D.C. Cir.

2008). There is no dispute that plaintiffs satisfy the first two prongs. Each of the named plaintiffs is the parent of a child with a disability that "substantially limit[s]" a major life activity and who relies on transportation from OSSE to attend school. Compl. ¶ 233 (citing 42 U.S.C. § 12102). These children and other members of the putative class participate in educational programs provided by the District. Id. ¶ 234 (citing 42 U.S.C. § 12131(2)). The District generally, and OSSE specifically, are public entities subject to the mandates of the ADA, Section 504 of the Rehabilitation Act, and the DCHRA. Id. ¶ 236. The question, then, is whether plaintiffs' children and similarly situated individuals were excluded from, denied the benefit of, or subject to discrimination based on their disability.

### C. Class Certification

Rule 23 of the Federal Rules of Civil Procedure requires a party seeking class certification to "affirmatively demonstrate [their] compliance" with the rule's requirements. Wal-Mart Stores, Inc. v. Dukes ("Wal-Mart"), 564 U.S. 338, 350, 131 S.Ct. 2541, 180 L.Ed.2d 374 (2011). Those requirements fall into two categories: first, under Rule 23(a), the moving party must show that "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." FED. R. CIV. P. 23(a). These four requirements are referred to as numerosity, commonality, typicality, and adequacy. See In re Rail Freight Fuel Surcharge Antitrust Litig, ("In re Rail Freight"), 292 F. Supp. 3d 14, 88 (D.D.C. 2017), aff'd sub nom. In re Rail Freight Fuel Surcharge Antitrust Litig.-MDL No. 1869, 934 F.3d 619 (D.C. Cir. 2019). Failure to demonstrate any of these requirements is fatal to class certification. See id.

**\*6** The moving party must also show that its suit falls within at least one of three categories of cases described in Rule 23(b). See FED. R. CIV. P. 23(b). Here, plaintiffs move for class certification under Rule 23(b)(2) and Rule 23(b)(3). Under Rule 23(b)(2), the Court may certify a class action when "the party opposing the class has acted or refused to act on grounds that apply generally to the class" such that injunctive or declaratory relief is "appropriate respecting the class as a whole." FED. R. CIV. P. 23(b)(2); see also Angelica S. v. DHS, 786 F. Supp. 3d 158, 178 (D.D.C. 2025). Under Rule 23(b)(3), the Court may certify

a class action where "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." FED. R. CIV. P. 23(b)(3).

Though "[a] district court exercises broad discretion in deciding whether to permit a case to proceed as a class action," Hartman v. Duffey, 19 F.3d 1459, 1471 (D.C. Cir. 1994), the court must perform a "rigorous analysis" to ensure compliance with the requirements of Rule 23. Comcast Corp. v. Behrend, 569 U.S. 27, 33, 133 S.Ct. 1426, 185 L.Ed.2d 515 (2013) (quoting Wal-Mart, 564 U.S. at 351, 131 S.Ct. 2541). Strict compliance with Rule 23's requirements is "indispensable," Gen. Tel. Co. of Sw. v. Falcon, 457 U.S. 147, 160, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982), and the burden of proving compliance with Rule 23 lies with the plaintiff. See Hoyte v. District of Columbia, 325 F.R.D. 485, 491 (D.D.C. 2017) (explaining that plaintiffs generally must prove compliance with Rule 23 by a preponderance of the evidence).

### III. RULE 23(a) FINDINGS AND CONCLUSIONS

### A. Numerosity

Plaintiffs contend that they have proven compliance with Rule 23(a)(1)'s "numerosity" requirement by a preponderance of the evidence. See Pls. Mot. at 12-14; see also Pls. Suppl. at 5-13. The District offers two main arguments to the contrary: first, it raises a threshold challenge to plaintiffs' proposed class definition, arguing that plaintiffs' "proposed class definition is inextricably tied to the Court's resolution of the merits" and therefore is impermissibly "fail-safe," Def. Resp. at 6, such that the "class definition cannot meet the numerosity requirement." Def. Opp. at 9. Second, it contends that even if plaintiffs' proposed class definition is not impermissibly fail-safe, plaintiffs have still failed to show that the putative class is "so numerous that joinder of all members is impracticable." Id. at 10.

The Court finds neither of the District's arguments persuasive, and concludes that plaintiffs have proven compliance with Rule 23(a)(1) by a preponderance of the evidence.

1. Plaintiffs' Proposed Class Definition Is Not Fail-Safe

The District argues that plaintiffs' proposed class definition is impermissibly "fail-safe." See Def. Opp. at 8-10. Recall that plaintiffs seek certification of the following class:

> All students with disabilities aged 3-22 who, from March 7, 2022, until judgment is issued in this case, require transportation from the District of Columbia to attend school and have experienced and will continue to experience Defendant's failure to provide safe, reliable, and appropriate transportation.

Pls. Mot. at 11. The District maintains that this proposed class definition is "fail-safe" because "membership in the class would depend on a final resolution of the merits." Def. Opp. at 9; see also Def. Resp. at 6. The District notes that "[p]laintiffs' proposed class definition is limited to qualifying students who 'have experienced and will continue to experience Defendant's [alleged] failure to provide safe, reliable, and appropriate transportation.' " Def. Opp. at 8-9 (quoting Pls. Mot. at 11). But—the District argues—the phrase "Defendant's failure" necessarily refers to a merits determination that the District violated the IDEA, ADA, Rehabilitation Act, or DCHRA. See Def. Resp. at 6. According to the District, the very thing that plaintiffs must prove in order to prevail on the merits is that the District in fact failed to provide them and similarly situated students with "safe, reliable, and appropriate transportation" to school. Def. Opp. at 9. And if plaintiffs succeed in showing that the District failed to provide such transportation, then they must further prove that the District's transportation failures constitute a denial of a FAPE under the IDEA, and that the District has discriminated against plaintiffs and similarly situated individuals in violation of the ADA, the Rehabilitation Act, and the DCHRA. See id. The District contends that if plaintiffs fail to prove these elements, then "a class previously certified under [p]laintiffs' proposed definition would lose its entire membership," id., and such a fail-safe class definition "cannot meet the numerosity requirement." Def. Opp. at 9.

**\*7** To support its argument, the District relies heavily on In re White, 64 F.4th 302 (D.C. Cir. 2023). There, the

D.C. Circuit described a "fail-safe" class definition as one "for which membership can only be ascertained through 'a determination of the merits of the case.' " Id. at 303 (quoting In re Rodriguez, 695 F.3d 360, 369-370 (5th Cir. 2012)); see also Young v. Nationwide Mut. Ins. Co., 693 F.3d 532, 538 (6th Cir. 2012) (defining a "fail-safe" class as "a class that cannot be defined until the case is resolved on its merits."); Messner v. Northshore Univ. HealthSystem, 669 F.3d 802, 825 (7th Cir. 2012) (explaining that a "fail-safe" class is "one that is defined so that whether a person qualifies as a member [of the class] depends on whether the person has a valid claim."). "For example," the court of appeals explained, "a class defined as 'those shareholders whom Company X defrauded' would be fail safe" because "[i]f the named plaintiffs prevail on the merits by showing fraud, then the class is populated by all those with meritorious claims; if the named plaintiffs fail to prove fraud, there will be no class members to be bound by the adverse judgment." In re White, 64 F.4th at 303.

The court identified two main problems with certifying a "fail-safe" class. "First, if membership in a class depends on a final resolution of the merits, it is administratively difficult to determine class membership early on." In re White, 64 F.4th at 313. "Second, if the only members of fail-safe classes are those who have viable claims on the merits, then class members either win or, by virtue of losing, are defined out of the class, escaping the bars of res judicata and collateral estoppel." Id. In other words, "[h]eads they win; tails the defendant lose[s]—at least, that is the concern." Id. Though the court declined to impose a "freestanding bar" against "fail-safe" class definitions, id. at 315, it cautioned that "a class that could be defined to have zero members if the plaintiffs lose is not numerous at all," and therefore could not satisfy Rule 23(a)'s numerosity requirement. Id. at 314; see also Young v. Nationwide Mut. Ins. Co., 693 F.3d at 538 (explaining that "fail-safe" classes "allow putative class members to seek a remedy but not be bound by an adverse judgment—either those 'class members win or, by virtue of losing, they are not in the class' and are not bound" by the court's judgment) (quoting Randleman v. Fid. Nat. Title Ins. Co., 646 F.3d 347, 352 (6th Cir. 2011)).

The Court concludes that plaintiffs' proposed class definition is not fail-safe. The District concedes that the Court need not reach the merits of this case in order to identify individuals that meet the following criteria in the first portion of plaintiffs' proposed class definition: (1) a student, (2) with disabilities, (3) aged 3-22, and (4) who from March 7, 2022, until

judgment is issued in this case, requires transportation from the District to attend school. See Pls. Mot. at 11. The District's problem is with the remainder of the proposed class definition: "have experienced and will continue to experience Defendant's <u>failure</u> to provide safe, reliable, and appropriate transportation." <u>Id.</u> (emphasis added). According to the District, to certify such a class would require the Court to make a merits determination that the District violated the IDEA, the ADA, the Rehabilitation Act, and the DCHRA. See Def. Resp. at 6. Not so. An individual who satisfies the proposed class criteria would be a member of the proposed class even if this Court ultimately finds that the District— despite its alleged transportation failures—is not <u>liable</u> to members of the class for those failures under governing law. And as the District acknowledges, the provision of "safe, reliable, and appropriate transportation" is not a standard imposed by the IDEA or any other law. See Def. Opp. at 9. The proposed class definition therefore does not require the Court to reach the merits of this case.

**\*8** Furthermore, neither of the concerns identified by the D.C. Circuit in In re White is present here. First, the proposed class definition does not make it "administratively difficult to determine class membership early on" because, as discussed, the Court can identify individuals who fit the class criteria without having to determine whether the District's alleged transportation failures are legally actionable. In re White, 64 F.4th at 313. Second, having a "viable claim[ ] on the merits," id. at 313, is not a condition of membership in the class because the proposed class definition does not require that an individual be entitled to relief. See Pls. Mot. at 11; see also Young v. Nationwide Mut. Ins. Co., 693 F.3d at 538 ("a 'fail-safe' class is one that includes <u>only</u> those who are <u>entitled</u> to relief") (emphasis in original). So the class would not be left with "zero members" if plaintiffs "lose"—that is, if the Court later finds that the District is not liable and plaintiffs are not entitled to relief. In re White, 64 F.4th at 314.

In sum, the Court concludes that "[t]he facts that define an individual" as a member of plaintiffs' proposed class "are knowable without any determination of liability." Gamboa v. KISS Nutraceuticals, 777 F. Supp. 3d 1210, 1225 (D. Colo. 2025) (quoting Perry v. Krieger Beard Services, LLC, 2018 WL 3218413, at \*3 (S.D. Ohio July 2, 2018)). Plaintiffs' proposed class definition therefore is not "fail-safe" and requires no modification.[2] And the District's concerns regarding the use of the phrase "Defendant's failure" in the proposed class definition can be easily addressed by modifying the definition as follows:

> All students with disabilities aged 3-22 who, from March 7, 2022, until judgment is issued in this case, require transportation from the District of Columbia to attend school and have experienced and will continue to experience unsafe, unreliable, or inappropriate transportation services from the District of Columbia.

The Court believes this modification addresses the District's concerns. See In re White, 64 F.4th at 314 ("For those rare cases (if any) in which a truly 'fail-safe' class hurdles all of Rule 23's requirements, then the problem will in all likelihood be one of wording, not substance.").[3]

2. Plaintiffs Have Established Numerosity

Having addressed the District's threshold challenge to plaintiffs' proposed class definition, the Court now considers whether plaintiffs have proven compliance with Rule 23(a)(1). To satisfy Rule 23(a)(1), plaintiffs must show that the putative class is "so numerous that joinder of all members is impracticable." FED. R. CIV. P. 23(a)(1). Though Rule 23(a)(1) includes no "hard rules for when joinder will be found to be impracticable," Coleman ex rel. Bunn v. District of Columbia, 306 F.R.D. 68, 76 (D.D.C. 2015), courts generally find the requirement satisfied when a plaintiff presents credible evidence that "a proposed class has at least forty members." Angelica S. v. DHS, 786 F. Supp. 3d at 176 (quoting Richardson v. L'Oreal USA, Inc., 991 F. Supp. 2d 181, 196 (D.D.C. 2013)). "Mere conjecture, without more, is insufficient to establish numerosity, but plaintiffs do not have to provide an exact number of putative class members in order to satisfy the numerosity requirement." In re Rail Freight, 292 F. Supp. 3d at 93 (quoting Pigford v. Glickman, 182 F.R.D. 341, 347 (D.D.C. 1998)).

**\*9** As discussed, there were approximately 4,000 students with disabilities receiving transportation services from the District, through OSSE, on approximately 550 daily bus routes as of January 31, 2024. See Pls. Mot. at 10 (citing 2023 Performance Oversight Responses at 215); see also Def. Opp. at 3. Bus drivers assigned to these daily bus routes complete

daily "trip tickets" for their morning and afternoon routes. See Pls. Suppl. at 4 n.3. "Trip tickets" are documents that indicate which children rode the bus that day, which children were absent from the bus, and whether the bus was timely. See id. Pursuant to this Court's Memorandum Opinion and Order of June 17, 2025 [Dkt. No. 96], the District produced a subset of unredacted trip tickets generated between August 26, 2024 and November 30, 2024. See Joint Status Report [Dkt. No. 106]. Plaintiffs' expert, Bates White Economic Consulting ("Bates White") conducted an analysis of trip tickets generated in the month of October 2024. See Pls. Suppl. at 6.

Bates White found that in October 2024, 303 students were assigned to bus routes that arrived after the start of instruction at least once per week on average, and 161 students were assigned to bus routes that arrived after the start of instruction at least twice per week on average. See Amendment to the Declaration of Benjamin M. Wolfert ("Bates White Decl. Am.") [Dkt. No. 115-1] ¶ 7. As discussed previously, when the District produced the bus trip tickets generated between August 26, 2024 and November 30, 2024, it redacted all trip tickets for an entire route if that route included an objector, even if some non-objectors were also assigned to that route. See Joint Status Report [Dkt. No. 97] at 2-3. Mr. Wolfert's analysis therefore is based on unredacted trip tickets generated in October 2024 for approximately 2,500 of the approximately 4,000 students that receive transportation services from the District. See Bates White Decl. Am. ¶ 4 n.3. Mr. Wolfert explained that "[i]f the unredacted routes are representative, or statistically similar to, the redacted routes, then the total number of students arriving late at least once a week would be somewhere between 606 and 909, and the number of students arriving late at least twice a week would be somewhere between 322 and 483." Id. ¶ 17.

Plaintiffs also offer 16 declarations from the parents of 18 students detailing their experiences with the District's transportation system, and these declarations represent not only the experiences of the individual students, but of the other students riding on the same bus route. See e.g., Declaration of Malerie Goodman [Dkt. No. 110-2] ¶¶ 6, 9 (stating that her son's bus "was late approximately twelve times" between February 2025 and April 2025, "causing him to miss instructional time when [she] was not able to drive him," and that there were ten other students on the bus route); Declaration of Stephanie Maltz [Dkt. No. 110-3] ¶¶ 5, 7-9 (stating that her child's bus arrived "outside the scheduled pickup window" six times between July 1, 2025 and July 10,

2025, and that there were five other students on the bus route); Declaration of Elizabeth Mitchell [Dkt. No. 110-4] ¶¶ 6-7, 10 (stating that in September 2024, her child arrived half an hour late to school twice, arrived an hour late back home twice, and that there were 12-13 other students on the bus route); Declaration of Cathy Miler [Dkt. No. 110-5] ¶¶ 6, 8 (stating that "[f]rom August 2024 to May 2025, the bus came 20-30 minutes late nearly every morning," did not come at all "approximately five times," and that there were six to eight other students on the bus route); Declaration of Pamela Leake [Dkt. No. 110-7] ¶¶ 6, 8 (stating that during the 2024-2025 school year, her child "was late to school due to transportation issues one to two times a week," and that there were three to four other students on the bus route).

The Court finds that plaintiffs have shown that their proposed class—which includes "[a]ll students with disabilities aged 3-22" who "require transportation from [the District] to attend school and have experienced and will continue to experience Defendant's failure to provide safe, reliable, and appropriate transportation," Pls. Mot. at 11—contains at least forty individuals, which is presumptively too numerous to make joinder practicable. See Hinton v. District of Columbia, 567 F. Supp. 3d 30, 52 (D.D.C. 2021) (explaining that courts may "draw reasonable inferences from the facts presented to find the requisite numerosity.") (quoting Coleman ex rel. Bunn v. District of Columbia, 306 F.R.D. at 76).

**\*10** The District raises two main arguments to the contrary. First, the District notes that Bates White's analysis is limited to untimely morning bus service, while plaintiffs' proposed class definition includes students who have experienced any failure to provide "safe, reliable, and appropriate transportation," including missing safety harnesses and absent aides and nurses. Def. Resp. at 4 (quoting Pls. Suppl. at 2). But this distinction is immaterial. At this stage, plaintiffs are not required to prove that there are at least forty putative members for every distinct manifestation of the District's alleged transportation failures. See Angelica S. v. DHS, 786 F. Supp. 3d at 176. Rather, plaintiffs bear the burden of demonstrating that their proposed class, as defined, has at least forty members. See id. Plaintiffs have satisfied that burden.

Second, the District challenges Bates White's finding that approximately 300 students arrived at school after the start of instruction at least once a week on average in the month of October 2024. See Def. Resp. at 4-5; see also Bates White Decl. Am. ¶ 7; Declaration of Benjamin M. Wolfert

("Bates White Decl.") [Dkt. No. 110-1] ¶ 21. The District asserts that Bates White's findings "do[ ] not represent actual students, but rather students assigned to select routes, whether or not they were actually on the bus." Def. Resp. at 5 (citing Bates White Decl. ¶ 20).[4] The Court does not find this argument persuasive because the District produced the trip tickets underlying Bates White's analysis, and the trip tickets indicate when a particular student is absent from the bus. See Pls. Suppl. at 4 n.3. The District could have determined how many of the 300 students were assigned to select routes but were not "actually on the bus," and therefore did not experience untimely morning bus service. The District did not perform this analysis. Its argument therefore does little to undermine Bates White's findings.[5]

Having addressed each of the District's arguments to the contrary, the Court finds that plaintiffs have proven by a preponderance of the evidence that their proposed class satisfies Rule 23(a)(1)'s requirement of numerosity.

*B. Commonality*

Next is commonality. Plaintiffs contend that they have sufficiently proven that their proposed class satisfies Rule 23(a)(2)'s requirement of commonality. The Court agrees.

1. Legal Standard

To satisfy Rule 23(a)'s commonality requirement, plaintiffs must show that "there are questions of law or fact common to the class." FED. R. CIV. P. 23(a)(2). Specifically, their claims "must depend upon a common contention," and "[t]hat common contention ... must be of such a nature that it is capable of class-wide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." Wal-Mart, 564 U.S. at 350, 131 S.Ct. 2541. "Where plaintiffs allege widespread wrongdoing by a defendant[,] a uniform policy or practice that affects all class members" satisfies the commonality requirement. Thorpe v. District of Columbia, 303 F.R.D. 120, 145 (D.D.C. 2014).

**\*11** The Supreme Court's holding in Wal-Mart changed the landscape that district courts must navigate when deciding whether a putative class action satisfies Rule 23(a)'s commonality requirement. 564 U.S. 338, 131 S.Ct. 2541, 180

L.Ed.2d 374. In Wal-Mart, a putative class of female Wal-Mart employees sought to sue the company under Title VII for sex discrimination in pay and promotion practices. See id. at 343, 131 S.Ct. 2541. Plaintiffs claimed that their local managers exercised their discretion over pay and promotions to favor male employees, leading to an unlawful disparate impact on—and disparate treatment of—female employees. See id. at 344-45, 131 S.Ct. 2541. Plaintiffs argued that the putative class satisfied Rule 23(a)'s commonality requirement because this discrimination was "common to all [of] Wal-Mart's female employees" and that a "uniform 'corporate culture' permit[ted] bias against women to infect, perhaps subconsciously, the discretionary decisionmaking of each one of Wal-Mart's thousands of managers." Id. at 345, 131 S.Ct. 2541. The district court certified a class of "[a]ll women employed at any Wal-Mart domestic retail store at any time since December 26, 1998 who have been or may be subjected to Wal-Mart's challenged pay and management track promotions policies and practices." Id. at 346, 131 S.Ct. 2541.

The Supreme Court reversed, holding that the class did not satisfy commonality. See Wal-Mart, 564 U.S. at 359-60, 131 S.Ct. 2541. The court explained that although resolution of each plaintiff's claim turned on a common question—that is, whether her gender was the reason she was paid less and/or passed over for a promotion, see id. at 343-45, 131 S.Ct. 2541—"[w]hat matters to class certification ... is not the raising of common 'questions,' " but rather "the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation." Id. at 350, 131 S.Ct. 2541. "That common contention, moreover, must be of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." Id. In other words, the court found, the class must show that its "theory can be proved on a classwide basis." Id. at 356, 131 S.Ct. 2541.

In Brown v. District of Columbia ("Brown v. D.C."), 928 F.3d 1070 (D.C. Cir. 2019), the D.C. Circuit summarized Wal-Mart's teachings as follows:

> The problem with the Wal-Mart class action ... was that there was no common proof leading to a common answer to the common question at the heart of each plaintiff's claim. Indeed,

local supervisors made all pay and promotion decisions; to prove that the reason for each pay and promotion decision was the same despite the diffuse decision-making structure, the plaintiffs had to show either (1) that each local supervisor used a particular company-wide decision-making procedure that incorporated sex as a consideration or (2) that Wal-Mart had a general company-wide policy of treating female employees worse than male employees. Wal-Mart, 564 U.S. at 352-53 [131 S.Ct. 2541]. The plaintiffs could not show either.... Wal-Mart establishes that Rule 23(a)(2) is satisfied if resolution of each plaintiff's claim turns on a common question (or questions) and if common proof leads to a common answer (or answers) to that question for each plaintiff.

Id. at 1080 (emphasis in original).

The D.C. Circuit also interpreted Wal-Mart at several points during the DL litigation, a case brought under the IDEA. See DL v. District of Columbia ("DL I"), 713 F.3d 120 (D.C. Cir. 2013); DL v. District of Columbia ("DL II"), 860 F.3d 713 (D.C. Cir. 2017). The facts and teachings of DL I and DL II are summarized by the court of appeals as follows:

[P]arents of children between the ages of three and five sued the District [of Columbia], alleging that it violated the [IDEA], 20 U.S.C. §§ 1400 et seq., which imposes on the District a number of different obligations with respect to students who require special education services. DL II, 860 F.3d at 717. The District's IDEA obligations include providing "an effective intake and referral process," offering "adequate and timely education placements to implement individual education plans" and ensuring "a smooth and effective transition from early intervention programs to preschool programs." DL I, 713 F.3d at 128. The district court originally certified a class of all three-to-five-year-olds with respect to whom the District failed to discharge any of these obligations. Id. at 124-25. [The D.C. Circuit] rejected the class certification in DL I because there was no "common 'tru[e] or fals[e]'

question [that could] be answered for each of these three different claims of harm that would assist the district court in determining the District's liability as to each group." Id. [The D.C. Circuit] remanded the case "so the district court [could] determine whether subclasses would meet the requirements of Rule 23(a) commonality after Wal-Mart." Id. at 129.

 **\*12**  On remand, the district court certified four subclasses of three-to-five-year-olds denied a special education: (1) those whom the District failed to identify as disabled; (2) those whom the District failed to evaluate within 120 days of referral; (3) those to whom the District failed to provide an eligibility determination within 120 days of referral; and (4) those denied a smooth transition from an early intervention program to a preschool program. DL II, 860 F.3d at 724. In DL II, [the D.C. Circuit] held that three of the four subclasses satisfied the commonality requirement. Id. at 724-25.... [S]ubclass four was organized around a common question—did the District fail to provide certain individuals a smooth and effective transition from early intervention to preschool?—which was subject to a common answer—yes—based on common proof— evidence showing that 30 per cent of toddlers were denied a smooth transition from early intervention to preschool. Id. Thus, the DL litigation followed the holding of Wal-Mart: Rule 23(a)(2) is satisfied if resolution of each plaintiff's claim turns on a common question (or questions) and if common proof leads to a common answer (or answers) to that question for each plaintiff.

Brown v. D.C., 928 F.3d at 1080-81 (emphasis in original).

Outside of the D.C. Circuit's decisions in DL I and DL II, three other courts of appeals have addressed certification of an IDEA class post-Wal-Mart. See G.T. v. Bd. of Educ. of Cnty. of Kanawha ("G.T."), 117 F.4th 193 (4th Cir. 2024); Parent/Pro. Advoc. League v. City of Springfield, ("PPAL") 934 F.3d 13 (1st Cir. 2019); Jamie S. v. Milwaukee Pub. Schs. ("Jamie S."), 668 F.3d 481 (7th Cir. 2012). Those courts have unanimously held that in order to satisfy Rule 23(a)'s commonality requirement after Wal-Mart, plaintiffs must "identify[ ] a uniformly applied, official policy of the school district, or an unofficial yet well-defined practice, that drives the alleged violation." PPAL, 934 F.3d at 29; see also Jamie S., 668 F.3d at 498; G.T., 117 F.4th at 205. Making such a showing can be difficult since "[t]he typical IDEA lawsuit involves a highly individualized assessment of whether a child was denied a FAPE." G.T., 117 F.4th at 205. So when "challenging hundreds of individualized special

education decisions, satisfying the commonality prerequisite requires proof of some common driver—the 'glue' holding all those decisions together in a way that suggests they can productively be litigated all at once. Id. (quoting Jamie S., 668 F.3d at 498). Simply asserting that the proposed class members "have all suffered a violation of the same provision of law" is insufficient to satisfy the commonality requirement. Id. at 202 (quoting Wal-Mart, 564 U.S. at 350, 131 S.Ct. 2541).

### 2. Plaintiffs Have Satisfied the Commonality Requirement

In view of Wal-Mart, DL I, and DL II, the Court finds that plaintiffs have proven commonality. The gravamen of plaintiffs' suit is that the entire transportation services system offered by the District is infirm, so much so that the District is effectively subverting the rights of all students with disabilities who require its transportation services. See Pls. Mot. at 8 (arguing that "[t]he District is failing to provide transportation services in conformity with ... students' IEPs by failing to maintain a transportation system that enables students with disabilities to attend school such that they can make meaningful progress towards their IEP goals."); Pls. Repl. at 7 (arguing that "[t]he District's uniform failure to provide an adequate transportation system to students with disabilities violates students' statutorily defined rights under the IDEA.").

The declarations offered by plaintiffs support these assertions. The declarations from parents of children with disabilities recount how the District's transportation system has caused their children to miss out on instructional time, access to their peers, and numerous therapies, such as physical therapy, occupational therapy, speech-language pathology, and behavioral therapies. See, e.g., Declaration of Jamie Davis Smith ("Davis Smith Decl.") [Dkt. No. 4-38] ¶ 13 (describing how inconsistent bus arrival and departure times caused their child to miss two hours of school per week, on average, in 2024, and the bus was once so late they had to file a missing person's report for their child when OSSE could not track the bus); Guerrero Decl. [Dkt. No. 4-9] ¶ 12 (stating that during the 2022-2023 school year, OSSE buses dropped their child off late to school 90 times); Clark Decl. [Dkt. No. 4-14] 116, 27-28 (describing how late bus arrivals in the mornings and afternoons caused their child to miss instructional time, time with their peers, and therapy sessions, and even when the bus came on time, there was often no nurse on board and no space for their child's wheelchair); McCray Decl. [Dkt. No. 4-18] ¶ 37 (describing how OSSE's repeated failure to pick up their child in the morning caused the child to repeatedly miss his morning classes, leading to lower grades in those classes); Declaration of Miryam Koumba ("Koumba Decl.") [Dkt. No. 4-41] ¶ 8 (describing how inconsistent bus service in the afternoons caused their child to miss therapy appointments recommended by his medical care team); Daggett Decl. [Dkt. No. 4-3] ¶¶ 30-35, 38 (describing how their child was regularly picked up and dropped off late by OSSE during the 2023-2024 school year, and their child often could not be transported to school because the bus would arrive without a safety harness).

**\*13** Plaintiffs also offer two expert declarations, one from Dr. Paul Livelli and one from Dr. Linda Fran Bluth. See Declaration of Dr. Paul Livelli ("Livelli Expert Decl.") [Dkt. No. 4-26]; Declaration of Dr. Linda Fran Bluth, Ed.D. ("Bluth Expert Decl.") [Dkt. No. 4-28]. Dr. Livelli—who has 34 years of experience as a special educator and administrator and serves as a consultant to students with disabilities living in D.C.—observes that OSSE fails to provide reliable transportation to students with disabilities. See Livelli Expert Decl. ¶¶ 22-26. Dr. Livelli explains that students with disabilities are uniquely impacted by the District's transportation failures because their conditions make it difficult to follow a lesson when they arrive to school mid-class. See id. ¶¶ 29-30. He states that though the lack of consistent, appropriate, and safe transportation may impact students with disabilities in different ways, the overall lack of structure and routine inhibits students with disabilities' meaningful progress towards their IEP and their other educational and social-emotional goals. See id. ¶¶ 36-39; see also id. ¶ 21 ("Transportation is the key for these children to receive FAPE."). Dr. Livelli also explains that when students are late or miss school because of OSSE's transportation failures, those late days and absences cause cascading deviations from IEPs, see id. ¶¶ 28-30, and deny students the opportunity to socialize with their peers. See id. ¶¶ 28, 32, 44. According to Dr. Livelli, these deviations from students' IEPs deny them a FAPE. See id. ¶¶ 21, 27.

Dr. Bluth, for her part, has over 59 years of experience in the field of special education and related services, and 43 years of experience serving as an expert witness in the field of transportation, with a specialty in school transportation services for students with disabilities. See Bluth Expert Decl. ¶ 2. She states that OSSE's routing system "suffers significant deficiencies that impact OSSE's ability to provide safe and appropriate transportation for children with disabilities," id.

¶ 30, and that it lacks sufficient trained staff and specialized equipment. Id. ¶¶ 34-35; see also id. ¶ 21 ("Unreliable transportation related services deny children a FAPE and deprive[ ] them of an equal opportunity to access their public education.").

Plaintiffs also present data gathered from OSSE's public website, Daily DOT Updates, https://osse.dc.gov/page/dailydot-updates, which tracks daily bus delays and cancellations. Based on that data, plaintiffs allege that in the first five months of the 2023-2024 school year, "there were over 1,000 delays and cancellations ... [a]nd, over a period of approximately 110 days, there were approximately 3,200 instances of recorded bus route disruptions in the morning or in the afternoon." Plaintiffs' Motion for a Preliminary Injunction [Dkt. No. 4] at 7. Plaintiffs further allege that OSSE's data measurement practices are deficient because OSSE reports "on-time performance" by the time the bus leaves the bus terminal, regardless of whether the bus actually arrives at a child's home on time or whether the bus delivers the child to school on time. See id. at 8; see also 2023 Performance Oversight Responses at 217 ("in January 2023, [OSSE] established a process to collect daily reportable data on whether a bus is 'late' based on a bus departing its terminal later than its scheduled time."); Bates White Decl. Am. ¶ 7 (explaining that there is "only a weak positive correlation between a bus leaving the terminal on time and arriving at or before the start of instruction.").

Lastly, plaintiffs offer statistical analyses from Mr. Benjamin M. Wolfert, a partner at Bates White Economic Consulting, LLC. See Bates White Decl. [Dkt. No. 110-1]; Bates White Decl. Am. [Dkt. No. 115-1]. Recall that Bates White analyzed trip tickets generated in October 2024. See Pls. Suppl. at 6. Based on those trip tickets, Mr. Wolfert found that 14 of OSSE's bus routes had scheduled daily school drop-off times that were after the start of instruction. See Bates White Decl. Am. ¶ 7. That means that as of October 2024, 14 of OSSE's bus routes "were designed such that, if the route was running as planned, students would still be dropped off after class began every day of the week." Id. ¶ 15. "Among these drop-offs, the typical expected drop-off was at least 10 minutes after the start of class." Id. Mr. Wolfert further found that about 300 students were assigned to bus routes that arrived after the start of instruction at least once a week on average, and about 160 students were assigned to bus routes that arrived after the start of instruction at least twice a week on average. See id. ¶ 7.

**\*14** The Court finds that plaintiffs have provided strong evidence of persistent problems with the transportation services that the District provides—or fails to provide—to students with disabilities. The question nevertheless remains: have plaintiffs shown that there are "questions of law or fact common to the class," FED. R. CIV. P. 23(a)(2), and that those questions are "capable of classwide resolution" such that "determination of [the questions'] truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke[?]" Wal-Mart, 564 U.S. at 350, 131 S.Ct. 2541. Plaintiffs assert that their claims present the following common questions: "(1) are Defendant's existing policies and practices related to transportation for students with disabilities deficient?; (2) how are they deficient?; (3) do those deficiencies deny class members a FAPE under the IDEA?; (4) do these deficiencies deny class members the opportunity to benefit from and participate in educational services equal to their non-disabled peers? (5) do these deficiencies deny class members the opportunity to receive educational services in the most integrated setting appropriate to their needs?; and (6) has Defendant failed to reasonably modify its educational programs and activities as needed to avoid discrimination?" Pls. Repl. at 5 (citing Pls. Mot. at 17-18). Plaintiffs say that a "true or false" answer to these questions will "generate common answers for the entire class and resolve issues that are central (and potentially dispositive) to the validity of each plaintiff's claim." Pls. Repl. at 5 (quoting Thorpe v. District of Columbia, 303 F.R.D. at 146-47). Plaintiffs further assert that "a single injunction can remedy the harm alleged in one stroke," further demonstrating commonality. Id.

The Court finds that plaintiffs have satisfied Rule 23(a)'s commonality requirement. Though "[m]any IDEA cases are suited to individualized assessments and relief," Robertson v. D.C., 762 F. Supp. 3d at 51, in cases where the crux of the complaint lies instead in "systemic defects" that will harm all similarly situated students, it is consistent with the purpose of the IDEA for courts to provide structural relief that serves all children with disabilities. DL II, 860 F.3d at 731 (collecting cases approving structural relief in the IDEA context); see also Robertson v. D.C., 762 F. Supp. 3d at 51. Here, plaintiffs are not, for example, challenging eligibility for transportation services or the appropriateness of the transportation services authorized through their IEPs, or "the merits of individual, fact-specific IDEA claims." Pls. Repl. at 7. Rather, they claim that "[t]he District's uniform failure to provide an adequate transportation system to students with disabilities violates students' statutorily defined rights

under the IDEA, regardless of why they were violated or the degree of harm they inflicted." Id. at 11. While the District's alleged transportation failures may affect different students in different ways, the Court finds that plaintiffs have demonstrated that those failures may stem from deficient procedures and practices that pervade the District's entire transportation system—including faulty bus route planning, untimely bus arrivals and departures, and insufficient driver, attendant, and aide staffing and training. See Pls. Repl. at 8. [6]

**\*15** The Court also finds that plaintiffs' claims are organized around at least two common questions of fact, which are subject to common answers and common proof. See DL I, 713 F.3d at 128 (explaining that to satisfy Rule 23(a)(2), identification of "even a single common question will do."). First, concerning plaintiffs' IDEA claims: does the District systematically fail to provide transportation services to class members? This question is subject to a common answer—yes—based on common proof—for instance, statistics showing that the District in fact or constructively fails to provide transportation services to a certain percentage of students with disabilities who are entitled to those services. See Wal-Mart, 564 U.S. at 350, 131 S.Ct. 2541; Brown v. D.C., 928 F.3d at 1080. Second, concerning plaintiffs' discrimination claims: do the alleged deficiencies in the District's transportation system deny class members the opportunity to benefit from and participate in educational services equal to their non-disabled peers? This question is subject to a common answer—yes—based on common proof—for instance, statistics showing that a certain percentage of students with disabilities who receive transportation services from the District are missing instructional time and socialization time with their peers due to the District's alleged transportation failures. See DL II, 860 F.3d at 724-25 (discussing plaintiffs' statistical evidence showing a systemic failure to comply with specific IDEA requirements).

Plaintiffs have also identified a common question of law: if the District is systematically failing to provide transportation services to class members, does that systematic failure deny those students a FAPE under the IDEA? See Pls. Mot. at 17. Recall that the IDEA requires that students with disabilities be provided with a FAPE, which includes providing both "special education and related services designed to meet their unique needs." 20 U.S.C. § 1400(d)(1)(A). And "related services" includes "transportation" to and from schools and between schools, travel in and around school buildings, and any "specialized equipment (such as special or adapted buses, lifts, and ramps)" that "may be required to assist a child with

a disability to benefit from special education." Id. § 1401(26)(A); 34 C.F.R. § 300.34(c)(16); see Robertson v. D.C., 762 F. Supp. 3d at 46; Petties v. D.C., 888 F. Supp. 165, 171 (D.D.C. 1995).

But the IDEA does not outline the precise scope of "transportation services" that a state must provide in order to ensure that students with disabilities receive a FAPE. See Pierre-Noel on behalf of K.N. v. Bridges Pub. Charter Sch., 113 F.4th at 974. So in essence, plaintiffs ask: what is the scope of "transportation services" that the District must provide to students with disabilities in order to ensure that they receive a FAPE under the IDEA? See Pls. Mot. at 17; see also Transcript of Record, Robertson v. D.C., Civil Action No. 24-0656 (January 6, 2026) [Dkt. No. 119] at 41:17-20 (plaintiffs' counsel argued that the IDEA's mandate to provide "the related service of transportation ... includes bus timeliness; it includes transportation supports; and it includes other accommodations, like aides."); id. at 43:3-5, 45:8-9 (the District's counsel disputed plaintiffs' framing of timeliness issues and a lack of transportation supports as general "transportation injuries" under the IDEA, especially given the lack of "statutory, regulatory law" outlining what "safe, reliable, and appropriate transportation" necessitates under the IDEA).

The Court's resolution of this question of law therefore "is central to the validity of each one of [plaintiffs' IDEA] claims in one stroke." Wal-Mart, 564 U.S. at 350, 131 S.Ct. 2541. If the Court concludes that the mere provision of transportation to and from school is enough to satisfy the IDEA—regardless of bus timeliness in the mornings and afternoons or the presence of safety harnesses and dedicated staff—then plaintiffs' claims alleging untimely buses, missing safety supports, absent aides and nurses, and inadequate bus staff training are all undermined "in one stroke." Id. But if the Court concludes that the IDEA requires the District to provide something more than the bare minimum of "transportation services"—that is, if the quality of the District's transportation services matters—then that legal conclusion would lend some support to the "validity" of every plaintiffs' IDEA claims "in one stroke." Wal-Mart, 564 U.S. at 350, 131 S.Ct. 2541. [7]

**\*16** Comparing plaintiffs' claims to those at issue in Wal-Mart, DL I, and DL II is instructive. Recall that in Wal-Mart, plaintiffs sought to certify a nationwide class of approximately 1.5 million female Wal-Mart employees, but failed to point to any companywide policies, customs, or

practices that might furnish the "glue" holding together the millions of decentralized employment decisions at issue. See 564 U.S. at 352, 131 S.Ct. 2541. Here, by contrast, all of the policies and practices that plaintiffs seek to challenge—both written and unwritten—as well as all of plaintiffs' alleged harms flow from decisions made by a single, centralized body: the District, through OSSE. In addition, Wal-Mart is a Title VII case, and "the crux of the inquiry" when adjudicating Title VII claims is "the reason for a particular employment decision." DL II, 860 F.3d at 725 (quoting Wal-Mart, 564 U.S. at 352, 131 S.Ct. 2541). "The fact that Wal-Mart supervisors might have had different reasons for 'literally millions of employment decisions' therefore was fatal to the commonality of the plaintiffs' Title VII claims." Id. (quoting Wal-Mart, 564 U.S. at 352, 131 S.Ct. 2541). "By contrast, IDEA requires the District to find and serve all children with disabilities as a condition of its funding," and "[u]nlike Title VII liability, IDEA liability does not depend on the reason for a defendant's failure and plaintiffs need not show why their rights were denied to establish that they were." Id. The D.C. Circuit found that Wal-Mart's commonality analysis therefore had "limited relevance" to the IDEA case before it. Id.

This Court similarly finds that Wal-Mart's commonality inquiry has limited relevance here. The key question is whether the District is systemically failing to provide transportation services as required by the IDEA, "not why it has failed to do so in any particular case or on a systemic level." Garnett v. Zeilinger, 301 F. Supp. 3d 199, 208 (D.D.C. 2018). "This question can be answered on a class-wide basis." Id.; see also DL II, 860 F.3d at 725 (affirming certification of multiple subclasses of disabled children even though the school system may have denied each class member special education for different reasons, such as "insufficient outreach," "insufficient staff," or "documentation errors.").

Plaintiffs' proposed class is also distinguishable from the class the D.C. Circuit decertified for lack of commonality in DL I. There, parents of children between the ages of three and five brought IDEA claims against the District, alleging that it violated a number of its IDEA obligations. See DL I, 713 F.3d at 122-23. Specifically, to comply with the IDEA, the District must: (1) provide "an effective intake and referral process"; (2) offer "adequate and timely education placements to implement individual education plans"; and (3) ensure "a smooth and effective transition from early intervention programs to preschool programs." DL I, 713 F.3d at 128. These three obligations are collectively known as the "Child Find" obligations. See 20 U.S.C. § 1412(a)(3)

(A). The district court originally certified a class of all three-to-five-year-olds with respect to whom the District failed to discharge any of these Child Find obligations, but the D.C. Circuit decertified the class in DL I. See DL I, 713 F.3d at 129. The court explained that the class failed to satisfy Rule 23(a)'s commonality requirement because "the harms alleged to have been suffered by the plaintiffs ... involve[d] different policies and practices at different stages of the District's Child Find and FAPE process." Id. at 127. For example, for some children in the class, the alleged harm was due to an ineffective "intake and referral process" while for others, the alleged harm was caused by failure to adequately implement their IEPs, while for still others, the alleged harm was caused by "the absence of a smooth and effective transition" from one program to another. Id. at 128. The court of appeals reasoned that, "in the absence of a uniform policy or practice that affects all class members," plaintiffs had failed to show commonality because there was no common question that would assist the district court in determining liability under the IDEA for all class members. Id.

Unlike the putative class in DL I, which challenged the District's implementation of several discrete statutory obligations under the IDEA, see DL II, 860 F.3d at 723 (citing DL I, 713 F.3d at 127), here plaintiffs present significant evidence that the District's allegedly deficient transportation practices result in a failure to satisfy a single required element of providing students with disabilities with a FAPE under the IDEA: ensuring the provision of "special education and related services designed to meet their unique needs." 20 U.S.C. § 1400(d)(1)(A). And "related services" include transportation services. Id. § 1401(26)(A); 34 C.F.R. § 300.34(c)(16). Plaintiffs' expert declarations, parent declarations, and statistical analyses all point to recurring, district-wide failures in transportation services—such as inadequate bus route design, insufficient staffing and training, and inadequate oversight—that allegedly harm putative class members irrespective of each individual members' disability, diagnosis, placement, or school. Plaintiffs challenge the District's practices as it relates to its transportation system, which functions as a gateway to the receipt of a FAPE and, plaintiffs allege, places each and every putative class member at risk of being denied a FAPE. DL I, 713 F.3d at 131 (Edwards, J., concurring) (explaining that the district court is "free to certify a class or subclass if it determines that a single policy or practice effectively forecloses disabled children in that class or subclass from pursuing IDEA benefits.").

**\*17** On remand after the decision in DL I, Judge Lamberth certified four subclasses of three-to-five-year-olds denied a special education: (1) those whom the District failed to identify as disabled; (2) those whom the District failed to evaluate within 120 days of referral; (3) those to whom the District failed to provide an eligibility determination within 120 days of referral; and (4) those denied a smooth transition from an early intervention program to a preschool program. DL v. D.C., 302 F.R.D. 1, 18 (D.D.C. 2013), aff'd, DL II, 860 F.3d 713. [8] The D.C. Circuit found that the fourth subclass satisfied commonality because it "was organized around a common question—did the District fail to provide certain individuals a smooth and effective transition from early intervention to preschool?—which was subject to a common answer—yes—based on common proof—evidence showing that 30 per cent of toddlers were denied a smooth transition from early intervention to preschool." Brown v. D.C., 928 F.3d at 1081 (citing DL II, 860 F.3d at 724). The same is true here. Plaintiffs' claims raise common questions that are subject to common answers based on common proof. See supra at ——.

Having considered the effect of Wal-Mart, DL I, and DL II on the instant case and the District's arguments to the contrary, the Court finds that plaintiffs have sufficiently proven that their proposed class satisfies Rule 23(a)(2)'s requirement of commonality.

*C. Typicality*

Next up is the issue of typicality, which "shifts the focus from the characteristics of the class to the preferred characteristics of the class representatives." DL v. D.C., 302 F.R.D. at 14. To show typicality, the named plaintiffs must prove that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." FED. R. CIV. P. 23(a)(3). The typicality requirement "is satisfied if each class member's claim arises from the same course of events that led to the claims of the representative parties and each class member makes similar legal arguments to prove the defendant's liability." Stephens v. Farmers Rest. Grp., 329 F.R.D. 476, 483 (D.D.C. 2019). Varying fact patterns "do[ ] not mandate a finding of a lack of typicality, as long as the claims arise out of the same legal or remedial theory." In re Lorazepam & Clorazepate Antitrust Litig., 202 F.R.D. 12, 27 (D.D.C. 2001). Commonality and typicality "tend to merge." Gen. Tel. Co. of Sw. v. Falcon, 457 U.S. 147, 157 n.13, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982).

This standard is easily met here. As this Court explained in greater detail in its opinion granting in part and denying in part the District's partial motion to dismiss, "[t]he putative class members have alleged the same claims and suffered the same injury as have the named plaintiffs: the District of Columbia's [alleged] failure to provide safe, reliable, and appropriate transportation to students with disabilities, resulting in the deprivation of FAPE," denial of equal access to their education, and unnecessary segregation of plaintiffs. Robertson v. D.C., 762 F. Supp. 3d at 54. Because "each class member's claim arises from the same course of events that led to the claims of the representative parties and each class member makes similar legal arguments to prove the defendant's liability," Stephens v. Farmers Rest. Grp., 329 F.R.D. at 483, the Court finds that plaintiffs have satisfied Rule 23(a)'s typicality requirement.

**\*18** The District advances two arguments for why plaintiffs cannot establish typicality. See Def. Opp. at 21-24. First, the District notes that plaintiffs' proposed class definition includes students with disabilities who "have experienced and will continue to experience" unsatisfactory transportation services. Id. at 22 (quoting Pls. Mot. at 11). But the District says that named plaintiffs cannot show that they "will continue to experience" unsatisfactory transportation services because each plaintiff "has already received a hearing officer determination that awarded them relief for their transportation-related harms." Id. Such relief included prospective relief in the form of an order that "OSSE shall provide consistent, reliable and appropriate transportation to and from Public School pursuant to [each] Student's IEP." Id. (citing Robertson HOD at 11; Daggett HOD at 13; and Cannon-Clark HOD at 12-13).

The Court does not find this argument persuasive. All five of the individual named plaintiffs allege that the harms they are experiencing as a result of the District's alleged transportation failures are ongoing, even after they received individualized relief at their administrative hearings. See Robertson Decl. [Dkt. No. 4-22] ¶ 43; Daggett Decl. [Dkt. No. 4-3] ¶¶ 55-56; Declaration of Joann McCray [Dkt. No. 110-16] ¶¶ 6-21; Declaration of Veronica Guerrero [Dkt. No. 45-2] ¶¶ 6, 11-18, 20; Declaration Marcia Cannon-Clark [Dkt. No. 110-17] ¶¶ 9-14. In addition, the hearing officer determinations that each individual named plaintiff received did not afford them the systemic relief they seek here, as each hearing officer dismissed plaintiffs' systemic IDEA, Section 504, ADA, and DCHRA claims with prejudice. See Robertson HOD

[Dkt. No. 4-24] at 1-2; Daggett HOD [Dkt. No. 4-6] at 1-2; McCray HOD [Dkt. No. 4-20] at 2; Guerrero HOD [Dkt. No. 24-1] at 3; Clark HOD [Dkt. No. 24-2] at 1-2. Plaintiffs' proffered statistical analyses also indicate that the systemic issues alleged by the individual named plaintiffs and putative class members may still plague the District's transportation system. See generally Bates White Decl.; Bates White Decl. Am. (analyzing bus trip tickets from the 2024-2025 school year and reporting ongoing timeliness issues). The individual named plaintiffs' claims therefore remain typical of the putative class, notwithstanding the individualized relief previously awarded at their administrative hearings.

Second, the District argues that plaintiffs' claims are not typical to the class because plaintiffs "have exhausted their administrative remedies and putative class members (presumably) have not." Def. Opp. at 23. It is true that parties seeking relief under the IDEA must first exhaust their administrative remedies, unless an exception applies. See Robertson v. D.C., 762 F. Supp. 3d at 46-48 (explaining the IDEA's exhaustion requirement). But as this Court has previously held, the putative class members need not exhaust their administrative remedies because "[t]he named plaintiffs' exhaustion is sufficient under the doctrine of vicarious exhaustion." Id. at 53. Because "[b]oth the named plaintiffs and the putative plaintiffs have allegedly suffered the same injury ... [i]t would be inefficient and irrational to require each similarly situated parent to individually raise their claims administratively." Id. at 54. "This common claim serves to eliminate the utility of the exhaustion requirement," and the Court therefore finds that each of the putative class members need not exhaust. Id.

Having considered the District's arguments to the contrary, the Court concludes that plaintiffs have sufficiently demonstrated by a preponderance of the evidence that their proposed class satisfies Rule 23(a)(3)'s requirement of typicality.

### D. Adequacy

The final Rule 23(a) requirement is adequacy. To demonstrate adequacy, the representative parties must show they "will fairly and adequately protect the interests of the class." FED. R. CIV. P. 23(a)(4). The adequacy requirement "embraces two components: the class representative (i) 'must not have antagonistic or conflicting interests with the unnamed members of the class' and (ii) 'must appear able to vigorously prosecute the interests of the class through qualified counsel.'

" J.D. v. Azar, 925 F.3d 1291, 1312 (D.C. Cir. 2019) (quoting Twelve John Does v. District of Columbia, 117 F.3d 571, 575 (D.C. Cir. 1997)). The first criterion focuses on conflicts of interest, which "prevent named plaintiffs from satisfying the adequacy requirement only if they are 'fundamental to the suit and ... go to the heart of the litigation.' " Nat'l Veterans Legal Servs. Program v. U.S., 235 F. Supp. 3d 32, 41 (D.D.C. 2017) (quoting Keepseagle v. Vilsack, 102 F. Supp. 3d 205, 216 (D.D.C. 2015)) (alteration in original). The second criterion ensures that class counsel is qualified to represent the class. See id. at 43.

**\*19** Counsel for the named plaintiffs also request to be appointed counsel for the plaintiff class pursuant to Rule 23(g) of the Federal Rules of Civil Procedure. In appointing class counsel, the Court must consider: "(i) the work counsel has done in identifying or investigating potential claims in the action; (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; (iii) counsel's knowledge of the applicable law; and (iv) the resources that counsel will commit to representing the class." FED. R. CIV. P. 23(g)(1)(A). The ultimate question is whether counsel for the named plaintiffs can "fairly and adequately represent the interests of the class." FED. R. CIV. P. 23(g)(4).

The Court finds that plaintiffs have satisfied the adequacy requirement. The named plaintiffs challenge the same conduct by the District that putative class members have been subjected to, and allege the same harms as putative class members. See Pls. Mot. at 23-24. There is also no evidence in the record that the named plaintiffs "have antagonistic or conflicting interests with the unnamed members of the class." J.D. v. Azar, 925 F.3d at 1312 (quoting Twelve John Does v. District of Columbia, 117 F.3d at 575); see also Pls. Mot. at 23.

The group of attorneys seeking to represent the class are also well-qualified to "fairly and adequately represent the interests of the class." FED. R. CIV. P. 23(g)(4). Plaintiffs' counsel include attorneys experienced in civil rights litigation in this district, attorneys with experience in disability rights litigation, and attorneys with experience in class litigation. See Pls. Mot. at 24-28; see also Declaration of Margaret Warner [Dkt. No. 29-2] (partner at McDermott Will & Emery LLP with significant trial and class action experience in this district); Declaration of Kaitlin Banner [Dkt. No. 29-3] (counsel for The Washington Lawyers' Committee for Civil Rights and Urban Affairs with significant experience

litigating disability rights class actions in this district); Declaration of Katherine Zeisel [Dkt. No. 29-4] (counsel for The Children's Law Center with significant experience representing clients in special education cases in this district); Declaration of Shira Wakschlag [Dkt. No. 29-5] (counsel for The Arc of the United States with significant experience in litigating civil rights class actions). Given their experience and knowledge of the applicable law, the Court concludes that counsel for the named plaintiffs will fairly and adequately represent the class. See FED. R. CIV. P. 23(a)(4), (g).

The District argues that the named plaintiffs cannot prove adequacy because they "have all received relief in accordance with their identified transportation-related needs," so they "have no incentive" to seek "additional transportation-related services ... when they themselves do not need them." Def. Opp. at 24-25. This is a repackaged version of the District's argument against typicality—that is, that the named plaintiffs cannot represent the putative class because they have already received some individualized relief through their administrative hearings. Because this argument rests on the same premise the Court rejected in addressing typicality, the Court rejects the District's argument against adequacy for the same reasons. See supra at ——–——.

Having considered the District's arguments to the contrary, the Court finds that plaintiffs have sufficiently demonstrated by a preponderance of the evidence that their proposed class satisfies Rule 23(a)(4)'s requirement of adequacy. The Court also finds that counsel for the named plaintiffs will fairly and adequately represent the interests of the class, and therefore appoints them as class counsel pursuant to Rule 23(g).

## IV. RULE 23(b) FINDINGS AND CONCLUSIONS

**\*20** Having satisfied all of Rule 23(a)'s requirements, plaintiffs now must satisfy one of the three provisions of Rule 23(b). Plaintiffs are seeking both injunctive and declaratory relief and compensatory education, so they seek "hybrid certification" under Rules 23(b)(2) and (b)(3).

Where, as here, plaintiffs seek both compensatory education awards and injunctive and declaratory relief, courts have approved a hybrid certification under Rules 23(b)(2) and (b)(3). See Barnes v. District of Columbia, Civil Action No. 24-750 (RCL), 2025 WL 947684, at \*26 (D.D.C. Mar. 28, 2025) (citing A.R. v. Conn. State Bd. of Educ., 5 F.4th 155, 159 (2d Cir. 2021)). But because the Court dismissed

plaintiffs' claims for compensatory education, see Robertson v. D.C., 762 F. Supp. 3d at 52-53, there is no need to address plaintiffs' claims related to Rule 23(b)(3). See id. at 53 (holding that "[t]here is no basis upon which it would be appropriate for the Court to award compensatory education for IDEA violations accruing after the issuing of the plaintiffs' original hearing officer determinations."). The Court therefore will only consider plaintiffs' Rule 23(b)(2) class certification arguments.

Under Rule 23(b)(2), "[a] class action may be maintained if Rule 23(a) is satisfied and if ... the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." FED. R. CIV. P. 23(b)(2). "The key to the (b)(2) class is the indivisible nature of the injunctive or declaratory remedy warranted—the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them." Wal-Mart, 564 U.S. at 360, 131 S.Ct. 2541 (quoting Richard A. Nagareda, Class Certification in the Age of Aggregate Proof, 84 N.Y.U. L. REV. 97, 132 (2009)) (internal quotation marks omitted). Courts have interpreted Rule 23(b)(2) as imposing two requirements: "(1) that defendant's actions or refusal to act are generally applicable to the class and (2) that plaintiffs seek final injunctive relief or corresponding declaratory relief on behalf of the class." O.A. v. Trump, 404 F. Supp. 3d 109, 157 (D.D.C. 2019) (quoting Bynum v. District of Columbia, 214 F.R.D. 27, 37 (D.D.C. 2003)) (internal quotation marks omitted).

As to the first requirement, plaintiffs challenge systemic deficiencies in the District's transportation system for students with disabilities, and argue that those deficiencies violate the students' rights under the IDEA, the ADA, Section 504 of the Rehabilitation Act, and the DCHRA. See Pls. Mot. at 30-32. And as discussed, the putative class includes students with disabilities who "require transportation from the District of Columbia to attend school and have experienced and will continue to experience" deficient transportation services from the District. See Pls. Mot. at 11. So if plaintiffs are correct that there are systemic deficiencies alleged in the District's transportation system, then the District's alleged conduct—including its alleged refusal to remedy those systemic deficiencies—is "generally applicable to the class." O.A. v. Trump, 404 F. Supp. 3d at 157; see also Pls. Mot. at 30; FED. R. CIV. P. 23(b)(2). The Court therefore finds that plaintiffs have satisfied Rule 23(b)(2)'s first requirement.

**\*21** As to Rule 23(b)(2)'s second requirement—that "final injunctive relief or corresponding declaratory relief [must be] appropriate respecting the class as a whole," FED. R. CIV. P. 23(b)(2)—plaintiffs contend that their requested relief would "affect the entire class at once." Pls. Repl. at 17 (quoting Wal-Mart, 564 U.S. at 362, 131 S.Ct. 2541). This is so, they say, because an injunction addressing the deficiencies in the District's transportation system would "increase class members' opportunity to receive the transportation services to which they are entitled." Id. at 17-18. Plaintiffs argue that, while the District "may have to perform an individualized inquiry to determine how best to individually accommodate class members across a wide geographic area to get them to and from school," if plaintiffs are granted injunctive relief, the Court "need not do the same in issuing broad injunctive and declaratory relief to ensure [the District] complies with federal law." Pls. Mot. at 31.

The District counters that plaintiffs have "fail[ed] to show that a class-wide injunction would remedy their alleged disparate injuries without 'relief specifically tailored to each class member.' " Def. Opp. at 27 (quoting Shook v. Bd. of Cnty. Commissioners of Cnty. of El Paso, 543 F.3d 597, 604 (10th Cir. 2008)). The District argues that given plaintiffs' "theory of injury"—that is, that they have not been receiving transportation services in conformity with their IEPs—"[n]o injunction ... could remedy their injuries without accounting for each student's individual needs." Id. The District points to plaintiffs' proposed order as proof that "each individual class member would be entitled to a different injunction," making certification under Rule 23(b)(2) improper. Id. at 28 (quoting Wal-Mart, 564 U.S. at 360, 131 S.Ct. 2541).[9]

The Court finds that plaintiffs have satisfied the second requirement of Rule 23(b)(2). As the D.C. Circuit explained in DL II, "Rule 23(b)(2) exists so that parties and courts, especially in civil rights cases like this, can avoid piecemeal litigation when common claims arise from systemic harms that demand injunctive relief." 860 F.3d at 726; see also Brown v. D.C., 928 F.3d at 1083 (noting that "civil rights cases against parties charged with unlawful, class-based discrimination ... [are] prime examples of what [Rule 23](b)(2) is meant to capture.") (quoting Wal-Mart, 564 U.S. at 361, 131 S.Ct. 2541) (internal quotation marks omitted). Contrary to the District's framing of plaintiffs' theory of injury, plaintiffs are not challenging individualized determinations regarding their personal IEPs. Rather, they allege that the District's transportation system is plagued by systemic deficiencies that deprive plaintiffs and similarly situated individuals of adequate transportation to and from school, in violation of D.C. and federal law. See Pls. Repl. at 19; see also DL v. D.C., 302 F.R.D. at 16 (explaining that because members of each of plaintiffs' subclasses "allege[d] a uniform harm ... injunctive relief requiring the district to perform its statutory duty [would] 'settl[e] the legality of the behavior with respect to the class as a whole.") (quoting FED. R. CIV. P. 23(b)(2)). The aim of plaintiffs' suit therefore is to "rectify the District's systemic failure to comply" with a "specific statutory dut[y]" to all class members," which "fits the prototype of [a] (b)(2) class." DL v. D.C., 302 F.R.D. at 16 (quoting Baby Neal ex rel. Kanter v. Casey, 43 F.3d 48, 58-59 (3d Cir. 1994)).

**\*22** Having addressed the District's arguments to the contrary, the Court finds that plaintiffs have satisfied Rule 23(b)(2)'s requirements and are entitled to class certification.

## V. CLASS DEFINITION

With the requirements of Rule 23 satisfied, the Court must define the class being certified. See FED. R. CIV. P. 23(c)(1)(B). Recall plaintiffs' proposed class definition:

> All students with disabilities aged 3-22 who, from March 7, 2022, until judgment is issued in this case, require transportation from the District of Columbia to attend school and have experienced and will continue to experience Defendant's failure to provide safe, reliable, and appropriate transportation.

Pls. Mot. at 11. As previewed above, the Court largely adopts this class definition but modifies it as follows to avoid any fail-safe issues, to the extent they may exist:

> All students with disabilities aged 3-22 who, from March 7, 2022, until judgment is issued in this case, require transportation from the District of Columbia to attend school and have experienced and will continue

to experience unsafe, unreliable, or inappropriate transportation services from the District of Columbia.

The Court certifies this class pursuant to Rule 23(b)(2) and with respect to plaintiffs' existing claims under the IDEA, ADA, Section 504 of the Rehabilitation Act, and DCHRA.

For the reasons explained in this opinion, the Court will GRANT plaintiffs' Motion to Certify Class [Dkt. No. 29], as amended by plaintiffs' Supplemental Brief on Class Certification [Dkt. No. 110]. A separate order consistent with this opinion will issue this same day.

**All Citations**

--- F.Supp.3d ----, 2026 WL 125237

---

## Footnotes

1    The Court has reviewed the following documents in connection with the pending motion: Complaint ("Compl.") [Dkt. No. 1]; B.R.C. Hearing Officer Determination ("B.R.C. HOD") [Dkt. No. 28]; H.D. Hearing Officer Determination ("H.D. HOD") [Dkt. No. 28-1]; A.F. Hearing Officer Determination ("A.F. HOD") [Dkt. No. 28-2]; J.C. Hearing Officer Determination ("J.C. HOD") [Dkt. No. 28-3]; D.R. Hearing Officer Determination ("D.R. HOD") [Dkt. No. 28-4]; Plaintiffs' Motion to Certify Class ("Pls. Mot.") [Dkt. No. 29]; Defendant's Opposition to Plaintiffs' Motion to Certify Class ("Def. Opp.") [Dkt. No. 38]; Plaintiffs' Reply in Support of Their Motion to Certify Class ("Pls. Repl.") [Dkt. No. 41]; Plaintiffs' Supplemental Brief on Class Certification ("Pls. Suppl.") [Dkt. No. 110]; and Defendant's Response to Plaintiffs' Supplemental Brief ("Def. Resp.") [Dkt. No. 114].

2    Other federal courts have reached similar conclusions. See e.g., Gamboa v. KISS Nutraceuticals, 777 F. Supp. 3d at 1225 (finding that a proposed class definition including workers "who were not paid overtime wages" was not fail-safe because "legal entitlement to overtime wages" was not "a condition of their membership in the class.") (emphasis in original); Staley v. FSR Int'l Hotel Inc., Civil Action No. 22-6781 (JSR), 2024 WL 3534450, at *5 (S.D.N.Y. July 25, 2024) (finding that a proposed class definition including "former non-union employees" who have been "laid off" or who have experienced a "plant closing" was not "fail-safe," even though these factual determinations were elements that plaintiffs were required to prove to succeed on the merits of their claims).

3    At the hearing on January 6, 2026, counsel for plaintiffs agreed that the Court's suggested modification "would be an appropriate change to plaintiffs' proposed class definition." Transcript of Record, Robertson v. D.C., Civil Action No. 24-0656 (January 6, 2026) [Dkt. No. 119] at 14:15-16.

4    Though the District raised this argument in response to plaintiffs' supplemental brief, see Def. Resp. at 4-5, at the hearing on January 6, 2026, counsel for the District stated that the District does not contest Mr. Wolfert's analysis as it relates to numerosity. See Transcript of Record, Robertson v. D.C., Civil Action No. 24-0656 (January 6, 2026) [Dkt. No. 119] at 27:18-22 ("[Plaintiffs' counsel] noted that we haven't contested any of the numerosity evidence put forth in [Mr. Wolfert's] declaration. That's true. Frankly, we haven't had the chance, but for purposes of today we aren't contesting the substantive analysis of their expert.").

5    Lastly, the District argues that even "assuming the validity" of Bates White's underlying analysis, the approximately 300 students who experienced untimely morning bus service in October 2024 "represents about 7.4% of the more than 4,000 students transported by OSSE every day." Def. Resp. at 5. But that observation misses the point. Rule 23(a)(1) does not require that plaintiffs show that a large percentage of

the affected population suffered harm. It requires that plaintiffs show that the putative class is "so numerous that joinder of all members is impracticable," FED. R. CIV. P. 23(a)(1), and plaintiffs clear that threshold here.

6    The District repeatedly argues that, "[r]ather than a common harm, [p]laintiffs allege a smorgasbord of deviations" from their individual IEPs, including late buses, excessive travel times, missing safety equipment, absent aides and nurses, and inadequate training of busing staff. Def. Opp. at 14. But as plaintiffs persuasively argued at the hearing on January 6, 2026, the District's commonality objections would not be cured even if the Court divided the putative class into subclasses of students who suffered the same "type" of transportation harm, as the District seems to demand. See Transcript of Record, Robertson v. D.C., Civil Action No. 24-0656 (January 6, 2026) [Dkt. No. 119] at 22:10-14. Rather, plaintiffs assert that distinguishing between types of transportation harms—e.g., untimely buses, missing transportation supports, or absent aides—instead of treating the alleged harms as consequences of a deficient transportation system would result in a "subclass spiral." Id. at 23:10.

To illustrate, suppose that the Court formed a subclass of students who have experienced missing transportation supports. Under the District's theory that commonality under Rule 23(a)(2) requires identicality of harm, the District could return to this Court to argue that such a subclass still does not satisfy commonality because its members did not suffer from the absence of the same type of transportation support. Some may have suffered from missing wheelchair harnesses, while others may have suffered from a missing ramp, while still others may have suffered from a missing car seat. Taken to its logical conclusion, the District's approach effectively forecloses a finding of commonality in the IDEA context, where students' disabilities and the supports needed to address those disabilities are unique by design.

7    The Court is not without guidance in defining the upper and lower limits of the District's obligation to provide "transportation services." For example, in 2024, the D.C. Circuit held that the District's obligation under the IDEA to provide "transportation services" at minimum includes door-to-door transportation assistance—that is, moving a child to and from the door of their apartment to the vehicle that will transport them to and from school. See Pierre-Noel on behalf of K.N. v. Bridges Pub. Charter Sch., 113 F.4th at 978. And earlier this year, this Court found that some "auxiliary benefits," such as reimbursement for the costs of self-transportation when the bus is late, are beyond the scope of the District's obligation under the IDEA to provide "transportation services." Robertson v. D.C., 762 F. Supp. 3d at 51-52.

8    The fourth subclass certified in DL II maps onto one of the "Child Find" obligations—the "smooth and effective transition" obligation—which requires states to provide a seamless transition when three-year-olds move from "early intervention" programs (governed by Part C of the IDEA) to preschool (governed by Part B of the IDEA). See 20 U.S.C. §§ 1412(a)(9), 1435(a)(8)(A), 1437(a)(9); 34 C.F.R. § 303.209. A child's transition between these two programs is "smooth and effective" if, among other things, it begins at least ninety days before the child's third birthday, delivers "seamless" services, and involves both Part B and Part C personnel. See 20 U.S.C. § 1412(a)(9); 34 C.F.R. § 303.209.

9    The District also argues that Rule 23(b)(2) certification is improper because plaintiffs' requested injunction is "fatally vague," and thus fails to satisfy Rule 65(d)(1) of the Federal Rules of Civil Procedure. See Def. Opp. at 25-27. Rule 65(d)(1) requires that any injunction issued by the Court must "state its terms specifically" and "describe in reasonable detail" the acts restrained or required. FED. R. CIV. P. 65(d)(1). But whether plaintiffs' requested injunction satisfies Rule 65(d)(1) is not a question the Court must resolve at the class certification stage. Instead, the Court must ask whether the putative class is "sufficiently cohesive [such] that any classwide injunctive relief can satisfy the limitations of [Rule 65(d)]." Shook v. Board of County Commissioners of County of El Paso, 543 F.3d at 604. In the Court's view, plaintiffs have set forth facts suggesting that the District's conduct regarding its transportation system is generally applicable to the class as a whole, making injunctive relief appropriate.

**End of Document**                                    © 2026 Thomson Reuters. No claim to original U.S. Government Works.

## CERTIFICATE OF SERVICE

I certify that on January 30, 2026, this petition was served by email, with prior

written consent, to:

Kaitlin R. Banner (kaitlin_banner@washlaw.org)
Chelsea Sullivan (chelsea_sullivan@washlaw.org)
WASHINGTON LAWYERS' COMMITTEE FOR CIVIL RIGHTS AND URBAN AFFAIRS
700 14th Street, NW, Suite 400
Washington, D.C. 20005

Katherine Zeisel (kzeisel@childrenslawcenter.org)
Shayna Stern (sstern@childrenslawcenter.org)
CHILDREN'S LAW CENTER
250 Massachusetts Ave., NW, Suite 350
Washington, D.C. 20001

Margaret H. Warner (mwarner@mwe.com)
Eugene I. Goldman (egoldman@mwe.com)
Theresa Maria Babendreier (tbabendreier@mwe.com)
Andrew C. Lang-Reyes (alangreyes@mwe.com)
MCDERMOTT WILL & EMERY LLP
500 North Capitol Street, NW
Washington, D.C. 20001

Shira Wakschlag (wakschlag@thearc.org)
Evan Monod (monod@thearc.org)
Riley Dankovich (dankovich@thearc.org)
THE ARC OF THE UNITED STATES
2000 Pennsylvania Ave., NW
Washington, D.C. 20006

/s/ Jeremy R. Girton
JEREMY R. GIRTON

## CERTIFICATE OF COMPLIANCE

I certify that this petition complies with the type-volume limitation in Federal Rule of Appellate Procedure 5(c)(1) because the petition contains 4,464 words, excluding exempted parts.  This motion complies with the typeface and type style requirements of Federal Rule of Appellate Procedure 32(a)(5) and (6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 365 in Times New Roman 14-point font.

/s/ Jeremy R. Girton
JEREMY R. GIRTON