No. 26-8001

*In the*

# United States Court of Appeals
### *for the*
## District of Columbia Circuit

CRYSTAL ROBERTSON, et al.,
*Plaintiffs-Appellees*,
– v. –
DISTRICT OF COLUMBIA,
*Defendant-Appellant.*

On Appeal from the United States District Court
for the District of Columbia
Case No. 24-cv-0656, Hon. Paul L. Friedman

## ANSWER IN OPPOSITION TO DEFENDANT-APPELLANT'S PETITION FOR PERMISSION TO APPEAL

KAITLIN R. BANNER
CHELSEA SULLIVAN
  *Washington Lawyers' Committee*
  *for Civil Rights and Urban Affairs*
  *700 14th Street NW*
  *Washington, DC 20005*
  *(202) 319-1000*

KATHERINE ZEISEL
SHAYNA STERN
  *Children's Law Center*
  *250 Massachusetts Ave NW*
  *Washington, DC 20001*
  *(202) 267-4900*

PAUL W. HUGHES
EUGENE I. GOLDMAN
GRACE WALLACK
  *McDermott Will & Schulte LLP*
  *500 North Capitol Street NW*
  *Washington, DC 20001*
  *(202) 756-8000*

SHIRA WAKSCHLAG
EVAN MONOD
RILEY DANKOVICH
  *The Arc of the United States*
  *2000 Pennsylvania Ave NW*
  *Washington, DC 20006*
  *(202) 534-3708*

*Counsel for Plaintiffs-Appellees*

# CERTIFICATE OF PARTIES AND AMICI CURIAE

(**A**) **Parties and amici**. The parties before the Court are plaintiffs-appellees Crystal Robertson, Elizabeth Daggett, Joann McCray, Veronica Guerrero, Marcia Cannon-Clark, and David Clark, each on behalf of themselves and their minor children, the Arc of the United States, and defendant-appellant the District of Columbia. The United States of America filed a statement of interest in the proceedings before the district court. Friendship Public Charter School appeared as amicus curiae before the district court in support of plaintiffs' motion for class certification.

(**B**) **Rulings under review**. The ruling under review is the district court's Opinion (Dkt. 120) and Order (Dkt. 121) of January 16, 2026, granting plaintiffs' motion for class certification.

(**C**) **Related cases**. This case has not previously been before this Court. Counsel is aware of no related cases.

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Circuit Rule 5(a) and 28(a)(1)(A), undersigned counsel states that plaintiffs-appellees are individuals and as such do not have a parent corporation or issue stock. The Arc of the United States is a non-profit organization and does not have a parent corporation or issue stock.

*/s/ Paul W. Hughes*

# TABLE OF CONTENTS

Introduction ..................................................................................................1

Background ..................................................................................................3

    A.   Statutory and factual background....................................................3

    B.   Procedural background ..................................................................4

Standard of Review ....................................................................................8

Argument ....................................................................................................9

I.   The district court's class certification decision was not
manifestly erroneous. ..........................................................................9

    A.   The district court correctly determined that there are
"questions of law or fact common to the class." ...........................9

    B.   The district court correctly found that plaintiffs satisfy Rule
23(b)(2).......................................................................................17

Conclusion.................................................................................................23

# TABLE OF AUTHORITIES

**Cases**

*In re Brewer*,
  863 F.3d 861 (D.C. Cir. 2017) ....................................................................8

*Brown v. District of Columbia*,
  928 F.3d 1070 (D.C. Cir. 2019) ............................................... 2, 12, 17, 19

*In re District of Columbia*,
  792 F.3d 96 (D.C. Cir. 2015) ...............................................................2, 9

*District of Columbia v. Air Fla., Inc.*,
  750 F.2d 1077 (D.C. Cir. 1984) .................................................................21

*DL v. District of Columbia*,
  194 F. Supp. 3d 30 (D.D.C. 2016) .......................................................20

*DL v. District of Columbia*,
  302 F.R.D. 1 (D.D.C. 2013) .................................................. 9, 18, 20, 23

*DL v. District of Columbia*,
  713 F.3d 120 (D.C. Cir. 2013) .................. 10, 11, 12, 13, 14, 15, 16, 17, 20

*DL v. District of Columbia*,
  860 F.3d 713 (D.C. Cir. 2017) ............... 2, 8, 12, 13, 14, 15, 16, 18, 19, 20

*In re Johnson*,
  760 F.3d 66 (D.C. Cir. 2014) ...........................................................11, 15

*In re Lorazepam & Clorazepate Antitrust Litig.*,
  289 F.3d 98 (D.C. Cir. 2002) ...........................................................21, 22

*Seth v. District of Columbia*,
  813 F. App'x. 611 (D.C. Cir. 2020)..........................................................3

*Thorpe v. District of Columbia*,
  303 F.R.D. 120 (D.D.C. 2014).........................................................10, 19

*Wal-Mart Stores Inc. v. Dukes*,
  564 U.S. 338 (2011) ........................................... 10, 11, 15, 16, 17, 19, 23

## Statutes and Regulations

20 U.S.C.
  § 1400(d)(1)(A) ...............................................................................3, 20
  § 1401(9)(D)...................................................................................3
  § 1401(26)(A) .................................................................................3, 20

34 C.F.R. § 300.34(c)(16) ...............................................................20

## Rules

Fed. R. Civ. P.
  23(a)...............................................................................................9
  23(a)(2) .........................................................................9, 10, 16
  23(b)(2) ......................................................... 2, 8, 9, 17, 18, 19
  23(f)................................................................. 2, 8, 17, 21, 22

# INTRODUCTION

The Individuals with Disabilities Education Act (IDEA) guarantees students with disabilities the right to a free appropriate public education. This promise includes appropriate "transportation" services—so that students with disabilities are timely and safely transported to and from school. The Americans with Disabilities Act (ADA) and Section 504 of the Rehabilitation Act (Section 504) also prohibit discrimination based on disability in public services, including education.

In this case, a class of students with disabilities alleges the District of Columbia is systematically failing to satisfy students' transportation needs, thereby denying them a free appropriate public education and equal access to their education. In the morning, many District buses arrive *hours* late (or not at all) to pick up students. If they make it to school, students arrive so late that they miss entire classes as well as physical, occupational, behavioral, and speech-language therapy sessions. This pattern repeats in the afternoon, when bus trips take hours longer than expected, risking the health of students with certain medical conditions. Moreover, even when buses do arrive, they often lack the necessary equipment and staff to safely transport students with disabilities. The district court thus found that there is "strong evidence of persistent problems with the transportation services that the District provides—or fails to provide—to students with disabilities" and

1

"those failures may stem from deficient procedures and practices that pervade the District's entire transportation system." Slip Op. 29-30 (Exhibit A).

Against this backdrop, the district court determined that there are questions of fact and law concerning the District's failure to provide adequate transportation that are common to plaintiffs' claims and susceptible to common answers. The district court also concluded that plaintiffs' suit "fits the prototype" of a Rule 23(b)(2) class, as plaintiffs seek to "rectify the District's systemic failure to comply with a specific statutory duty to all class members." Slip Op. 46. The district court thus certified a class to pursue these claims against the District.

The Court should deny the District's petition for review. The District claims review is appropriate because the certification decision is manifestly erroneous. But manifest error is a "high bar," and this Court has "never before granted Rule 23(f) review on the basis of a manifest error." *In re District of Columbia*, 792 F.3d 96, 99 (D.C. Cir. 2015). Because the district court faithfully applied *DL v. District of Columbia*, 860 F.3d 713 (D.C. Cir. 2017) (*DL II*) and *Brown v. District of Columbia*, 928 F.3d 1070 (D.C. Cir. 2019), the District cannot clear that high bar here.

# BACKGROUND

## A. Statutory and factual background

The IDEA requires the District to provide students with disabilities with a free appropriate public education (FAPE). The ADA, Section 504, and the District of Columbia Human Rights Act (DCHRA)[1] ensure students' equal access to education. To fulfill these statutory mandates, the District must provide or ensure the provision of "special education and related services" in conformity with each student's Individualized Education Program (IEP). 20 U.S.C. §§ 1400(d)(1)(A), 1401(9)(D). The term "related services" includes "transportation." *Id.* § 1401(26)(A).

The District provides transportation services to students who require them through the Office of the State Superintendent of Education, Division of Transportation (OSSE). As of January 31, 2024, 4,093 students with disabilities received transportation services from OSSE on approximately 552 daily bus routes. Pl.'s Mot. Class Cert. 10. OSSE owns 647 of its own buses and 20 vans. Compl. ¶ 46. When a student is determined to require transportation as part of their IEP, OSSE is responsible for providing that transportation. *Id.* ¶ 53.

---

[1] Because the ADA, Section 504, and the DCHRA are interpreted "in parallel" (*Seth v. District of Columbia*, 813 F. App'x. 611, 613 n.1 (D.C. Cir. 2020)), unless otherwise specified, references to the ADA encompass plaintiffs' Section 504 and DCHRA claims as well.

## B. Procedural background

Plaintiffs sued the District alleging violations of the IDEA, ADA, Section 504, and the DCHRA on March 7, 2024. Plaintiffs moved for class certification on May 3, 2024, and on July 11, 2024, the district court heard initial oral argument on plaintiffs' motion.

In the months following argument, plaintiffs pressed the District repeatedly for information relating to student transportation, which the district court ultimately ordered the District to produce. After another months-long period of delays and disputes over the scope of the District's production, the district court ordered the District to produce all "trip tickets generated between August 26, 2024 and November 30, 2024." Slip Op. 7.[2] The District finally completed its production on September 25, 2025. *Id.*

The District's data revealed extensive bus delays and critical design flaws in the District's bus routing system. Plaintiffs' expert, Bates White Economic Consulting, conducted an analysis of trip tickets for October 2024. Slip Op. 18. That analysis demonstrated that "303 students were assigned to bus routes that arrived after the start of instruction at least once per

---

[2] Trip tickets are paper forms filled out by bus drivers that record student-level data including pick-up and drop-off times, absences, and information about aides and equipment. The District's production excluded tickets for routes that included a student whose family objected to the disclosure of their child's information under the Family Educational Rights and Privacy Act (FERPA).

week on average, and 161 students were assigned to bus routes that arrived after the start of instruction at least twice per week on average." *Id.*[3] The expert analysis also found that fourteen of the District's bus routes "were designed such that, if the route was running as planned, students would still be dropped off … at least 10 minutes after the start of class" each day. *Id.* at 28-29.

Plaintiffs put forth extensive evidence of the severe impact these failures have on students' progress toward their educational and social-emotional goals. Plaintiffs provided 16 declarations from parents and guardians of 18 students—all of whom experienced bus delays. Pl.'s Supp. Br. Class Cert. 9. For many students, the morning buses arrive "almost two hours late" causing students to miss hours of instructional time. *E.g.*, Rhone-Miller Decl. ¶ 7; Goodman Decl. ¶ 9; McKinley Decl. ¶¶ 9-12; *see also, e.g.*, Dagget HOD (Dkt. 4-6) at 5-6 (one student was dropped off late to school *every day* the student was on the bus between August 29, 2022 and September 26, 2023, save for one day, and the student was over an hour late for 70% of those days). Multiple students missed entire school days due to transportation issues. *E.g.*, McBeth Decl. ¶ 11 (stating that A.B.'s bus never arrived

___

[3]   Further, because the Bates White analysis only considered trip tickets for approximately 2,500 of the roughly 4,000 students who receive transportation services from the District, if those tickets are representative, the total number of students arriving late is likely much higher. Slip. Op. 18-19.

for picture day); Koumba Decl. ¶ 19 (describing two occasions when transportation issues caused K.M. to miss school entirely).

Other students were routinely dropped off at home far too late, which negatively affected students' health, focus, and ability to attend therapy sessions. For example, one student (G.L.) frequently arrived home after 5:00 PM, which caused him to miss therapy appointments. Leake Decl. ¶ 12; *see also* Skolnik Decl. ¶¶ 5-6 (C.S.'s six-hour roundtrip bus ride caused her to become emotionally dysregulated and have difficulty focusing at home); Walker Decl. ¶¶ 19-20 (two-hour-long bus rides home caused J.W. to come home exhausted and resistant to his homework or therapy). These issues often put students' health at risk. *E.g.*, McBeth Decl. ¶¶ 9, 11-12, 14-15 (explaining that long bus delays of over two hours caused A.B., who requires toileting assistance, to arrive home soiled); Smith Decl. ¶ 6 (C.S. frequently arrived home in a soiled diaper due to long bus rides, leaving her at heightened risk of cancer due to her medical condition). S.S. missed school on four or five occasions during the 2024–2025 school year because the bus arrived without functioning air conditioning, creating unsafe conditions due to his risk of heat-induced seizures. Miler Decl. ¶ 7; *see also* Cannon-Clark Decl. ¶ 14 (explaining that B.R.C. requires multiple medications that must be taken on a strict schedule, and that late arrivals in the afternoon disrupt that schedule, putting her at higher risk of seizures).

Plaintiffs also submitted declarations from two experts, who explained that "students with disabilities are uniquely impacted by the District's transportation failures because their conditions make it difficult to follow a lesson when they arrive to school mid-class" and "when students are late or miss school … those late days and absences cause cascading deviations from IEPs, and deny students the opportunity to socialize with their peers," which in turn denies them a FAPE. Slip Op. 27 (quoting Livelli Expert Decl. ¶¶ 28-32, 44); *see also* Bluth Expert Decl. ¶¶ 30-34 (explaining that OSSE's route planning "suffers significant deficiencies" and OSSE lacks "sufficient personnel, including drivers and attendants, to provide children with disabilities safe, reliable, and appropriate transportation services").

The district court heard further argument on class certification on January 6, 2026, and, on January 16, certified plaintiffs' class. The court held that plaintiffs satisfied numerosity, commonality, typicality, and adequacy. As to commonality, the district court concluded that plaintiffs showed that the District has "deficient procedures and practices that pervade the District's entire transportation system—including faulty bus route planning, untimely bus arrivals and departures, and insufficient driver, attendant, and aide staffing and training" and that, although these transpor-

7

tation failures "may affect different students in different ways," the "District's uniform failure to provide an adequate transportation system" injured all class members. Slip Op. 30.

The district court also found that plaintiffs satisfied the requirements of Rule 23(b)(2) because "plaintiffs challenge systemic deficiencies in the District's transportation system for students with disabilities," and an injunction addressing those systemic deficiencies would benefit all class members. Slip Op. 43-44. In so concluding, the district court cited this Court's decision in *DL II*, where it explained that "Rule 23(b)(2) exists so that parties and courts, especially in civil rights cases like this, can avoid piecemeal litigation when common claims arise from systemic harms that demand injunctive relief." *Id.* at 45 (quoting 860 F.3d at 726).

## STANDARD OF REVIEW

Rule 23(f) provides the Court discretion to entertain interlocutory review of an order granting or denying class certification. "[B]ecause interlocutory appeals are generally disfavored as disruptive, time-consuming, and expensive for both the parties and the courts," however, the "Court strictly adhere[s]" to the "limited" criteria for granting a Rule 23(f) petition. *In re Brewer*, 863 F.3d 861, 874 (D.C. Cir. 2017). The only review ground the District asserts—"manifest error"—is "extremely difficult to meet." *Id.* at 875.

The "manifest error" standard requires a showing that the district court "failed to apply the correct legal standard, reached a decision squarely foreclosed by precedent, or otherwise committed an error that is plain and indisputable, and that amounts to a complete disregard of the controlling law." *In re District of Columbia*, 792 F.3d at 97-98. Put differently, the District "must show not merely that the District Court's decision was wrong, but that the error was plain and indisputable." *Id.* at 101.

## ARGUMENT

### I. THE DISTRICT COURT'S CLASS CERTIFICATION DECISION WAS NOT MANIFESTLY ERRONEOUS.

The District cannot satisfy the "exacting standard" for showing manifest error. *In re District of Columbia*, 792 F.3d at 101. The district court's findings under Rule 23(a)(2) and Rule 23(b)(2) were not erroneous, much less manifestly so.

#### A. The district court correctly determined that there are "questions of law or fact common to the class."

Rule 23(a) requires "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). In the IDEA context, commonality exists where plaintiffs "do not seek to litigate the merits of individual, fact-specific IDEA claims … but whether the District generally met its statutory obligations to disabled children under the IDEA." *DL v. District of Columbia*, 302 F.R.D. 1, 13 (D.D.C. 2013), *aff'd*, 860 F.3d 713 (D.C. Cir. 2017). Where "plaintiffs allege

9

widespread wrongdoing by a defendant[,] a uniform policy or practice that affects all class members" satisfies the commonality requirement. *Thorpe v. District of Columbia*, 303 F.R.D. 120, 145 (D.D.C. 2014), *pet. denied, In re District of Columbia*, 792 F.3d 96. Here, the district court correctly determined that plaintiffs satisfied commonality because plaintiffs demonstrated that the "District's uniform failure to provide an adequate transportation system" stemmed from a "systemic defect[] that will harm all similarly situated students," and denied them their rights under the IDEA and ADA. Slip Op. 30. This conclusion was not manifestly erroneous.

**1.** The District argues that the class definition contravenes *Wal-Mart Stores Inc. v. Dukes*, 564 U.S. 338 (2011) because it does not present questions that are susceptible to "common proof" leading to "common answers apt to drive the resolution of the litigation." Pet. 9, 11-12. The crux of the District's argument is that because each student's IEP is "uniquely tailored to that student," any subsequent IDEA claims are not susceptible to common proof. Pet. 11. But as this Court explained in *DL I*, "Rule 23(a)(2) does not require that *all* questions be common to the class." *DL v. District of Columbia*, 713 F.3d 120, 128 (D.C. Cir. 2013) (*DL I*) (emphasis added). Rather, as the Supreme Court acknowledged in *Wal-Mart*, "'even a single common question will do' ... as long as its determination 'will resolve an issue that is

central to the validity of each one of the claims in one stroke.'" *Id.* (quoting *Wal-Mart*, 564 U.S. at 350).

The district court identified "at least two" common questions of fact.[4] One was "does the District systematically fail to provide transportation services to class members?" Slip Op. 31. The district court reasoned that "this question is subject to a common answer" based on common proof such as "statistics showing that the District … fails to provide transportation services to a certain percentage of students with disabilities." *Id.* The second question, concerning plaintiffs' discrimination claims, was whether the "deficiencies in the District's transportation system deny class members the opportunity to benefit from and participate in educational services equal to their non-disabled peers?" *Id.* This, too, the district court reasoned, could be susceptible to common proof—"for instance, statistics showing that a certain percentage of students with disabilities who receive transportation services from the District are missing instructional time and socialization time

---

[4] The district court also identified a common question of law regarding the minimum standard of transportation service that the District must provide. Slip Op. 30-34. The District did not challenge in its Petition the district court's conclusion that "the quality of the District's transportation services matters" under the relevant statutes. *Id.* at 33. Because that issue "was not raised or briefed" here, this Court should "not review … the district court's determination of how best to manage the issues before it." *In re Johnson*, 760 F.3d 66, 75 (D.C. Cir. 2014).

with their peers due to the District's alleged transportation failures." *Id.* at 31-32.

These common questions are akin to those addressed in, and approved by, this Court in *DL II*. There, the fourth subclass consisted of "children whom the District failed to … provide with a smooth and effective transition" from an early intervention program to preschool. 713 F.3d at 128. The Court explained that this subclass satisfied commonality because it was "organized around a common question—did the District fail to provide certain individuals a smooth and effective transition from early intervention to preschool?" *Brown*, 928 F.3d at 1080-1081 (quoting *DL II*, 860 F.3d at 724-725). This question was in turn "subject to a common answer … based on common proof—evidence showing that 30 per cent of toddlers were denied a smooth transition." *Id.*

That is, this Court has already approved the use of statistical-based proof in the IDEA context as one way to provide a common answer to a common question that goes to the heart of plaintiffs' claims. The district court did the same here by relying on plaintiffs' undisputed statistical analysis of the trip ticket data, which illustrated the "deficient procedures and practices that pervade the District's entire transportation system." Slip Op. 28-30. And as plaintiffs' counsel explained at argument, the District's "trip tick-

ets that address transportation are one source of common proof that encompass … bus timeliness, whether aid[e]s were present, [and] whether equipment was present" and would be "a source of common proof for all of these issues." Hr'g Tr. (1/6/2026) at 21:13-17 (Exhibit B). Further, plaintiffs' anti-discrimination claims are subject to both a common answer and the common proof of "statistics showing that a certain percentage of students with disabilities are missing instruction time and socialization with their peers due to the District's alleged transportation failures." Slip Op. 30-31 (citing *DL II*, 860 F.3d at 724-725). Because the district court's commonality conclusion follows this Court's reasoning in *DL II*, the District cannot show that it is manifestly erroneous.

**2.** Next, the District rehashes arguments that this Court rejected in *DL I* and *DL II*. The District claims that the class definition here is infirm because plaintiffs "lumped together 'multiple, disparate failures'" and did not identify "a truly systematic policy or practice which affects them all." Pet. 14. Not so.

To start with, this argument misreads the district court's decision, which found that plaintiffs were challenging the District's "uniform failure" to provide adequate transportation to students with disabilities. Slip Op. 30. As the district court found (*id.*), this failure stems from one or more deficient "polic[ies] or practice[s] affect[ing] all class members" that satisfy

commonality. *DL I*, 713 F.3d at 128. While the District's inadequate transportation system may harm students in various ways, the harm stems from common transportation failures that plaintiffs have identified across the entire transportation system, including route planning and insufficient staff training. Slip Op. 30. This is akin to the fourth subclass that this Court approved in *DL II*, where the question of whether the District failed to provide a "smooth and effective transition from an early intervention program to a preschool" satisfied commonality because it was susceptible to common statistical proof. The district court did not manifestly err in concluding that "the same is true here." Slip Op. 31, 36-37 (citing *DL II*, 860 F.3d at 724). Further, as this Court explained in *DL II*, unlike the Title VII claims considered in *Wal-Mart*, IDEA "liability does not depend on the reason for a defendant's failure and plaintiffs need not show why their rights were denied to establish" commonality. 860 F.3d at 725.

The district court's thorough evaluation of the evidence supports this conclusion. As noted above, the district court reviewed the declarations from parents of students with disabilities recounting how the District's inadequate transportation system harmed their children's ability to access their education. Slip Op. 19; *see id.* (one parent stating that "during the 2022-2023 school year, OSSE buses dropped their child off late to school 90 times"); *id.* (another parent describing "how their child was regularly picked

up and dropped off late by OSSE during the 2023-2024 school year, and their child often could not be transported to school because the bus would arrive without a safety harness"). Plaintiffs' expert Dr. Livelli also explained that "though the lack of consistent, appropriate, and safe transportation may impact students with disabilities in different ways, the overall lack of structure and routine inhibits students with disabilities' meaningful progress towards their IEP and their other educational and social-emotional goals." *Id.* at 27. And the district court correctly found that, unlike *Wal-Mart*, where independent decisions of hundreds of different supervisors were driving the alleged Title VII claims, here "all of the policies and practices that plaintiffs seek to challenge—both written and unwritten—as well as all of plaintiffs' alleged harms flow from decisions made by a single, centralized body: the District, through OSSE." Slip Op. 34.

At its core, the District is arguing that because plaintiffs' claims necessarily "vary from child-to-child" (*DL II*, 860 F.3d at 725), their IDEA claims can never be truly susceptible to class-wide resolution. *See* Pet. 14, 19.[5] The Court rejected this argument in *DL I*, where it rejected the claim "that widespread policies and practices in violation of the IDEA could *never*

---

[5]   The District does not specifically address the district court's conclusion that plaintiffs identified a common question of law specific to their discrimination claims under the ADA and similar statutes (*see* Pet. 7-16), further indicating review is not necessary (*In re Johnson*, 760 F.3d at 75).

satisfy Rule 23(a)(2)'s commonality requirement after *Wal-Mart*." 713 F.3d at 127 (emphasis added). Judge Edwards wrote separately to emphasize that, despite the "inherently child specific nature" of IDEA injuries, "a class action based on a truly systemic … failure may be viable" and "an illegal policy would support a claim for a systemic violation" of the IDEA, as would "widespread practices." *DL I*, 713 F.3d at 131 (Edwards, J., concurring). *DL II* then affirmed the district court's certification of multiple subclasses of children with disabilities because each subclass—like the class here—was "defined by reference" to a single uniform policy or practice of the District "governing a specific stage of the special education process." 860 F.3d at 724.

The district court followed the precedent set in *DL I* and *DL II* to a tee. It noted that "[p]laintiffs' expert declarations, parent declarations, and statistical analyses all point to recurring, district-wide failures in transportation services … that allegedly harm putative class members irrespective of each individual members' disability, diagnosis, placement, or school." Slip Op. 36.[6] Because the district court hewed closely to this Court's instructions

---

[6] Although the district court did not follow *DL II* by certifying subclasses, its opinion adequately explains why subclasses would be inappropriate. Slip Op. 30-31 n.6. The district court noted that the District's theory of commonality is incompatible with the subclasses approved in *DL II*, because a subclass member there may have been denied a FAPE for "different reasons" but nevertheless suffered a common harm uniting the subclass—just as plaintiffs' class here is united by common transportation harms. Slip Op. 34 (quoting *DL II*, 860 F.3d at 725).

in *DL I* and the Supreme Court's instructions in *Wal-Mart*, the District has not shown manifest error warranting this Court's review under Rule 23(f).

**B.  The district court correctly found that plaintiffs satisfy Rule 23(b)(2).**

Under Rule 23(b)(2), "[a] class action may be maintained if … the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). "Courts have interpreted Rule 23(b)(2) as imposing two requirements: (1) that defendant's actions or refusal to act are generally applicable to the class and (2) that plaintiffs seek final injunctive relief or corresponding declaratory relief on behalf of the class." Slip Op. 43.

The district court concluded that both requirements were satisfied. As to the first, the district court reasoned that because plaintiffs are challenging "systemic deficiencies in the District's transportation system," if they are correct about those deficiencies and the District's refusal to remedy them, "then the District's alleged conduct … is 'generally applicable to the class.'" Slip Op. 43-44. As to the second, the district court explained that "civil rights cases against parties charged with unlawful, class-based discrimination are 'prime examples' of what Rule 23(b)(2) is meant to capture." *Id.* at 45 (quoting *Brown*, 928 F.3d at 1083). Because plaintiffs allege "that the District's transportation system is plagued by systemic deficiencies that

deprive plaintiffs and similarly situated individuals of adequate transportation to and from school," an injunction that would rectify this systemic failure and compel the District to perform its statutory duty would benefit all class members. *Id.* at 45-46.

**1.** The District argues that the district court erred because "[n]o one injunction could remedy each disparate kind of harm included in the class definition" and "each student would need their own tailored injunction." Pet. 16-17. Again, this Court has already rejected this contention in indistinguishable circumstances.

In *DL*, on remand the district court certified four subclasses, each asserting that the District failed to meet one of four specific statutory obligations under the IDEA. *DL*, 302 F.R.D. at 16. The District argued, as it does here, that Rule 23(b)(2) was not met because the injunction would "merely establish[] a system for eventually providing individualized relief." *Id.* The district court rejected this argument, because the "aim of the subclasses here—to rectify the District's systemic failure to comply [with] four specific statutory duties to all class members—fits the prototype of the (b)(2) class, which is the most frequent[] ... vehicle for civil rights actions and other institutional reform cases that receive class action treatment." *Id.*

This Court affirmed, noting that the "district court's comprehensive order" "provide[d] relief to each member of the class." *DL II*, 860 F.3d at 726;

*see also Thorpe*, 303 F.R.D. at 151 ("For purposes of satisfying Rule 23(b)(2), it is sufficient that plaintiffs have proffered evidence of systemic deficiencies in the District's system … and that those deficiencies appear to be affecting the class.").

In *Brown*, this Court elaborated on its reasoning in *DL II*, writing:

> Although the injunction [under Rule 23(b)(2)] must provide relief to each member of the class, the perfect need not be the enemy of the good. If a certain outcome is legally mandated and an injunction provides each member of the class an increased opportunity to achieve that outcome, Rule 23(b)(2) is satisfied.

*Brown*, 928 F.3d at 1082. This Court noted that, in *DL*, the Court "implied that the injunction aided every class member because it improved his likelihood of achieving the legally mandated outcome" because the injunction required the District to "improve its performance by 10 percent in the first year and 5 percent each year thereafter." *Id.* at 1083. And, again, civil rights cases such as this one, where the District is charged with "unlawful, class-based discrimination," are "'prime examples' of what (b)(2) is meant to capture." *Id.* (quoting *Wal-Mart*, 564 U.S. at 360).

**2.** The District next observes that, in *DL*, this Court approved *subclasses* of students "each of which could receive a targeted injunctive remedy because it was centered on a 'common harm' uniting that subclass." Pet. 17 (quoting *DL II*, 860 F.3d at 724). But that was simply because the initial

class definition grouped together allegations targeting four "different policies and practices at different stages of the District's Child Find and FAPE process." *DL I*, 713 F.3d at 127. On remand, the district court certified four subclasses, each of which "pose[d] the question whether the District's policies were adequate to fulfill a specific statutory obligation under the IDEA." *DL*, 302 F.R.D. at 12-13. "Stated differently, each subclass alleges a uniform practice or failure that harmed every subclass member in the same way." *Id.* at 13.

Here, by contrast, the district court found plaintiffs adequately showed "that the District's allegedly deficient transportation practices result in a failure to satisfy *a single required element* of providing students with disabilities with a FAPE under the IDEA." Slip Op. 35 (emphasis added). That single, discrete statutory obligation is ensuring the provision of "transportation services." 20 U.S.C. §§ 1400(d)(1)(A), 1401(26)(A); *see* 34 C.F.R. § 300.34(c)(16). Like the subclasses approved in *DL*, this class concerns a "common harm[] … remediable by a single injunction requiring annual improvement" on specific transportation metrics regarding timeliness, safety, and compliance with students' IEPs. *DL II*, 860 F.3d at 724-725 (approving subclass of "toddlers denied smooth and effective transitions to preschool" curable by a "single injunction requiring annual improvement"); *DL v. District of Columbia*, 194 F. Supp. 3d 30, 100-101 (D.D.C. 2016), *aff'd*, 860

F.3d 713 (D.C. Cir. 2017) (injunction requiring the District to "increase the percentage of smooth and effective transitions by 10% in the first full year, … and an additional 5% in each subsequent year" until 95% is reached, and defining a "smooth and effective transition" based on four specific criteria).

**3.** Finally, the District contends that the district court erred by modifying the class definition to include children who "have experienced issues with safety *or* bus reliability *or* other 'inappropriate' services." Pet. 8 (emphasis in original). The District claims that this change from "and" to "or" creates a "sprawling" class definition (Pet. 8) and demonstrates "that the class's injuries are not the same and could not be remedied through an 'indivisible' injunction." Pet. 17-18.

This argument does not merit review, for two reasons.

*First*, the District did not object to this revised definition when the district court proposed it during the hearing on class certification. Hr'g Tr. at 13:18-14:13. "It is well settled that issues and legal theories not asserted at the District Court level ordinarily will not be heard on appeal." *District of Columbia v. Air Fla., Inc.*, 750 F.2d 1077, 1084 (D.C. Cir. 1984).

Insisting on a timely objection is even more important "in a complex class action where the district court may reconsider and modify the class as the case progresses." *In re Lorazepam & Clorazepate Antitrust Litig.*, 289 F.3d 98, 105 (D.C. Cir. 2002). As the Court stated, Rule 23(f) "should be

exercised in a manner that avoids … inhibition of the district court's willingness to revise the class certification for fear of triggering another round of appellate review." *Id*. This Court should not permit an interlocutory appeal under Rule 23(f) to clarify the meaning of "and" versus "or" in a class definition when the District failed to bring that issue before the district court in the first instance.

*Second*, the District overstates the effect of this wording change. The District argues that "[t]he trial court's amendment of the class definition" makes the class definition fatally overbroad, uniting "infinite varieties of individual concerns." Pet. 18, 19. But the District made the same arguments about plaintiffs' original definition, which encompassed children who will "experience Defendant's failure to provide safe, reliable, *and* appropriate transportation." Pet. 5-6 (emphasis added). Below, the District argued that, even with "and," this proposed class definition "encompass[ed] an indefinite number of harms, from absent nurses and dedicated aides, to missing or improperly used safety equipment, to excessive travel times." Def.'s Supp. Resp. Br. 1; *see also* Hr'g Tr. at 31:22-32:6, 36:11-13.

Whether the class definition uses "and" or "or" is not dispositive because, as the district court correctly concluded, "plaintiffs are not challenging individualized determinations regarding their personal IEPs." Slip Op. 45. Rather, plaintiffs "allege that the District's transportation system is

plagued by systemic deficiencies that deprive plaintiffs and similarly situated individuals of adequate transportation to and from school, in violation of D.C. and federal law." *Id.* That is a single injury stemming from the District's uniform failure to provide an adequate transportation system to students with disabilities, and would be remedied by a single injunctive or declaratory remedy applicable to the whole class. *See Wal-Mart*, 564 U.S. at 360; *DL*, 302 F.R.D. at 16.

## CONCLUSION

The Court should deny the District's petition for interlocutory review.

Dated: February 23, 2026

Respectfully submitted,

/s/ *Paul W. Hughes*

KAITLIN R. BANNER
CHELSEA SULLIVAN
  *Washington Lawyers' Committee
  for Civil Rights and Urban Affairs*
  *700 14th Street NW*
  *Washington, DC 20005*
  *(202) 319-1000*

PAUL W. HUGHES
EUGENE I. GOLDMAN
GRACE WALLACK
  *McDermott Will & Schulte LLP*
  *500 North Capitol Street NW*
  *Washington, DC 20001*
  *(202) 756-8000*

KATHERINE ZEISEL
SHAYNA STERN
  *Children's Law Center*
  *250 Massachusetts Ave NW*
  *Washington, DC 20001*
  *(202) 267-4900*

SHIRA WAKSCHLAG
EVAN MONOD
RILEY DANKOVICH
  *The Arc of the United States*
  *2000 Pennsylvania Ave NW*
  *Washington, DC 20006*
  *(202) 534-3708*

*Counsel for Plaintiffs-Appellees*

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g), I hereby certify that this answer:

(i) complies with the type-volume limitation of Rule 5(c)(1) because it contains 5,171 words, excluding the parts of the brief exempted by Rule 32(f); and

(ii)    complies with the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared using Microsoft Word for Microsoft 365 MSO and is set in New Century Schoolbook LT Std font in a size equivalent to 14 points or larger.

Dated: February 23, 2026 _/s/ Paul W. Hughes_

## CERTIFICATE OF SERVICE

I hereby certify that on February 23, 2026, I electronically filed the foregoing answer with the Clerk of this Court using the CM/ECF system, and counsel for all parties will be served by the CM/ECF system.

Dated: February 23, 2026 _/s/ Paul W. Hughes_

# EXHIBIT A

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CRYSTAL ROBERTSON, on behalf of herself and her minor child D.R.; ) ) ) ) | |
| ELIZABETH DAGGETT, on behalf of herself and her minor child H.D.; ) ) ) ) | |
| JOANN MCCRAY, on behalf of herself and her minor child J.C.; ) ) ) ) | |
| VERONICA GUERRERO, on behalf of herself and her minor child A.F.; ) ) ) ) | Civil Action No. 24-0656 (PLF) |
| MARCIA CANNON-CLARK AND DAVID CLARK, on behalf of themselves and their minor child B.R.C.; and ) ) ) ) | |
| THE ARC OF THE UNITED STATES, ) ) | |
| Plaintiffs, ) ) | |
| v. ) ) | |
| DISTRICT OF COLUMBIA, ) ) | |
| Defendant. ) ) | |

## OPINION

This matter is before the Court on plaintiffs' Motion to Certify Class ("Pls. Mot.")

[Dkt. No. 29], as amended by plaintiffs' Supplemental Brief on Class Certification

("Pls. Suppl.") [Dkt. No. 110].  Plaintiffs are parents and guardians of students with disabilities

in the District of Columbia, as well as The Arc of the United States ("The Arc"), a non-profit

organization dedicated to promoting the rights of people with disabilities.  Plaintiffs filed a Class

Action Complaint for Declaratory and Injunctive Relief ("Compl.") [Dkt. No. 1], alleging that

defendant District of Columbia ("the District") fails to provide adequate transportation to and from school for children with disabilities, thereby denying them the free appropriate public education ("FAPE") to which they are entitled by law and blocking their access to educational opportunities. See generally Compl. After carefully considering the parties' papers, the relevant legal authorities, and the arguments presented by counsel at oral argument on July 11, 2024 and at a hearing on January 6, 2026, the Court will grant plaintiffs' motion to certify class.[1]

## I.    BACKGROUND

### A.    Factual Background

The named plaintiffs are the parents or guardians of five students with disabilities whose individualized education programs ("IEPs") entitle them to transportation services to be provided by the District of Columbia Office of the State Superintendent of Education ("OSSE"). See Declaration of Crystal Robertson ("Robertson Decl.") [Dkt. No. 4-22] ¶ 6; Declaration of Elizabeth Daggett ("Daggett Decl.") [Dkt. No. 4-3] ¶ 7; Declaration of Joann McCray ("McCray Decl.") [Dkt. No. 4-18] ¶ 7; Declaration of Veronica Guerrero ("Guerrero Decl.") [Dkt. No. 4-9] ¶ 7; Declaration of Marcia Cannon-Clark ("Clark Decl.") [Dkt. No. 4-14] ¶ 6. They bring claims on behalf of themselves and a putative class of parents of students with disabilities who are eligible for special education services under the Individuals with Disabilities

---

[1]    The Court has reviewed the following documents in connection with the pending motion:  Complaint ("Compl.") [Dkt. No. 1]; B.R.C. Hearing Officer Determination ("B.R.C. HOD") [Dkt. No. 28]; H.D. Hearing Officer Determination ("H.D. HOD") [Dkt. No. 28-1]; A.F. Hearing Officer Determination ("A.F. HOD") [Dkt. No. 28-2]; J.C. Hearing Officer Determination ("J.C. HOD") [Dkt. No. 28-3]; D.R. Hearing Officer Determination ("D.R. HOD") [Dkt. No. 28-4]; Plaintiffs' Motion to Certify Class ("Pls. Mot.") [Dkt. No. 29]; Defendant's Opposition to Plaintiffs' Motion to Certify Class ("Def. Opp.") [Dkt. No. 38]; Plaintiffs' Reply in Support of Their Motion to Certify Class ("Pls. Repl.") [Dkt. No. 41]; Plaintiffs' Supplemental Brief on Class Certification ("Pls. Suppl.") [Dkt. No. 110]; and Defendant's Response to Plaintiffs' Supplemental Brief ("Def. Resp.") [Dkt. No. 114].

Education Act ("IDEA"), 20 U.S.C. §§ 1400 et seq., and are entitled to transportation as a related service pursuant to their IEPs.  See Compl. ¶ 222.  The Arc, an organization dedicated to promoting the rights of people with disabilities, is also a plaintiff.  See id. ¶ 31.  Plaintiffs allege that the District's failure to provide safe and adequate transportation to and from school for their children violates the IDEA, the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101 et seq., Section 504 of the Rehabilitation Act, 29 U.S.C. §§ 794 et seq., and the District of Columbia Human Rights Act ("DCHRA").  D.C. Code §§ 2-1401.01 et seq.; Compl. ¶¶ 219-260.

The District, through OSSE, employs a team of over 1,000 drivers and attendants, using a fleet of around 650 OSSE-owned vehicles, to transport children in the District of Columbia to and from school.  See Def. Opp. at 2-3 (citing Declaration of Raphael Park [Dkt. No. 31-2] ¶ 12).  As of January 31, 2024, there were 4,093 students with disabilities receiving transportation services from OSSE on approximately 550 daily bus routes, which run every morning and every afternoon.  See Pls. Mot. at 10 (citing Office of the State Superintendent of Educ., Responses to Fiscal Year 2023 Performance Oversight Questions ("2023 Performance Oversight Responses") [Dkt. No. 4-48] at 215); see also Def. Opp. at 3.  OSSE also contracts with private transportation vendors to provide transportation services to approximately 370 additional students.  See Pls. Mot. at 10 (citing 2023 Performance Oversight Responses at 223).

Plaintiffs allege that OSSE's buses "regularly arrive hours late to pick up students or never arrive at all, often with no notice to families."  Compl. ¶ 5.  Plaintiffs further allege that OSSE's current bus routing system often causes delays and sometimes results in a failure to deliver students with disabilities to school.  See id. ¶¶ 170-75, 180.  As a result of OSSE's alleged failure to provide an effective transportation system, plaintiffs claim that students who

rely on OSSE for transportation are denied instructional time at school and participation in therapies or other school-provided services, and are segregated from their peers. See id. ¶¶ 3-6.

In addition, plaintiffs say that even when transportation is provided, the buses lack the necessary equipment and/or staff to safely transport students with disabilities to and from school. See Compl. ¶ 10; see also Daggett Decl. ¶ 25; Guerrero Decl. ¶¶ 13, 18, 20; Clark Decl. ¶ 14. When OSSE fails to provide effective transportation, families are forced to either arrange their students' transportation to school themselves or risk their children losing out on access to their education. See Compl. ¶ 60; see also Daggett Decl. ¶ 26; Guerrero Decl. ¶¶ 13, 18, 20; Clark Decl. ¶ 9. Plaintiffs assert that these issues go beyond their individual children, and argue that OSSE's transportation failures affect all children with disabilities who rely on OSSE for transportation services. See Compl. ¶ 161. Plaintiffs therefore seek systemic relief, asserting that OSSE has failed to implement policies and practices that ensure compliance with the IDEA and the mandates of D.C. and federal anti-discrimination laws. See id. ¶¶ 19-21.

The individual named plaintiffs brought administrative due process complaints before OSSE hearing officers, challenging the denial of FAPE on both an individual and a systemic level, and alleging that OSSE's transportation failures have violated their rights under the ADA, Section 504 of the Rehabilitation Act, and the DCHRA. See Compl. ¶ 17. In addition to the individualized relief they sought for their children, plaintiffs requested that the hearing officers issue orders requiring OSSE to develop and implement effective policies and procedures to provide their children and other students with disabilities who are eligible for transportation services with safe, consistent, and reliable transportation to and from school. See id. OSSE hearing officers dismissed plaintiffs' systemic and non-IDEA claims, "finding that such relief is unavailable in the administrative forum." Id. With respect to their individual claims, each

4

plaintiff was granted some form of relief, including compensatory education, reimbursement of personal travel expenses, and—in the cases of three of the students—a specific order that "OSSE shall provide consistent, reliable, and appropriate transportation" pursuant to the students' IEPs. See B.R.C. HOD at 11-12 (granting student consistent, reliable, and appropriate transportation, reimbursement for transportation expenses, and compensatory education); H.D. HOD at 12 (granting student consistent, reliable, and appropriate transportation, compensatory education, and reimbursement for transportation expenses); D.R. HOD at 10 (granting student consistent, reliable, and appropriate transportation and compensatory education); A.F. HOD at 11 (granting student compensatory therapy services); J.C. HOD at 17-18 (granting student compensatory education and reimbursement for transportation expenses). The Arc did not file a due process complaint before OSSE. See Compl.

## B.   Procedural Background

On March 7, 2024, plaintiffs filed suit against the District on behalf of themselves and all others similarly situated, alleging violations of the IDEA, the ADA, Section 504 of the Rehabilitation Act, and the DCHRA. See Compl. ¶¶ 219-260. On March 14, 2024, plaintiffs moved for a preliminary injunction against the District [Dkt. No. 4], which the Court denied following a hearing on the motion. See Order of July 23, 2024 [Dkt. No. 50]. On September 4, 2024, the District moved to partially dismiss plaintiffs' complaint pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure. See Defendant's Partial Motion to Dismiss [Dkt. No. 58]. The Court granted the District's motion in part and denied it in part. See Order of January 16, 2025 [Dkt. No. 75]; Robertson v. District of Columbia ("Robertson v. D.C."), 762 F. Supp. 3d 34 (D.D.C. 2025). The Court also dismissed some of plaintiffs' IDEA and discrimination claims. Robertson v. D.C., 762 F. Supp. 3d at 52, 53, 58.

Plaintiffs moved for class certification on May 3, 2024.  See Pls. Mot.  Plaintiffs seek certification of the following class of individuals:

> All students with disabilities aged 3-22 who, from March 7, 2022,
> until judgment is issued in this case, require transportation from
> the District of Columbia to attend school and have experienced and
> will continue to experience Defendant's failure to provide safe,
> reliable, and appropriate transportation.

Pls. Mot. at 11.  The District filed its opposition to plaintiffs' motion on June 7, 2024, see Def. Opp., and plaintiffs replied on June 21, 2024.  See Pls. Repl.  On July 11, 2024, the Court heard oral argument on plaintiffs' motion.  See Minute Entry of July 11, 2024.

On September 25, 2024, by email, the District provided the Court and plaintiffs' counsel with a high-level report of bus arrival and departure times based on data collected between August 24, 2024 and September 20, 2024.  See Email from Mateya Kelly, Esq. to the Court and Plaintiffs' Counsel [Dkt. No. 64-3].  Unsatisfied with this production, plaintiffs filed a motion asking the Court to direct the District to supplement its September 25, 2024 report to include information on:  (i) the number/percentage of students on bus routes who deboard buses arriving at their schools; (ii) "no-shows," and the reason for a student's absence on the bus; (iii) the number/percentage of students who deboard buses arriving at their homes in the afternoon; and (iv) the times the buses arrive at students' homes in the afternoon.  See Plaintiffs' Motion for Defendant to Supplement Its September 25, 2024 Submission [Dkt. No. 64].

On February 24, 2025, the Court granted plaintiffs' motion for the District to supplement its data report.  See Mem. Op. & Order [Dkt. No. 82].  In granting the motion, the Court reasoned that plaintiffs' requested information was already "available in the form of trip tickets, which capture student-level data such as pick up times, drop off times, the number of students that deboard the buses in the mornings, and student absences."  Id. at 2.  The Court entered a protective order, see Order of April 11, 2025 [Dkt. No. 90], and ordered the District to

6

provide notice to students and parents pursuant to the Family Educational Rights and Privacy Act ("FERPA"), 20 U.S.C. § 1232g.  See Mem. Op. & Order [Dkt. No. 91].  On April 29, 2025, pursuant to the Court's Order, the District notified families of students whose IEPs include transportation services that those students' personal information may be disclosed if the Court ordered the District to produce bus trip tickets.  See Joint Status Report [Dkt. No. 95] at 1.  Families were given until May 16, 2025 to object to the disclosure of their students' information.  See id.  Ultimately, out of the more than 4,100 students whose families received notice, 297 students were the subject of objections ("objectors").  See id.  Most of those students were assigned to different bus routes, and approximately 300 bus routes included an objector.  See id.  After matching objectors to their assigned bus route, the District determined that around 40% of the approximately 4,000 total students who receive transportation services from the District were assigned to bus routes that included an objector.  See Joint Status Report [Dkt. No. 97] at 2.

On June 17, 2025, the Court ordered the District to "produce, without redaction, all trip tickets generated between August 26, 2024 and November 30, 2024 for [bus] routes that do not include an objector."  Mem. Op. & Order [Dkt. No. 96].  The District completed production of this subset of trip tickets on September 25, 2025.  See Joint Status Report [Dkt. No. 106] at 2.  If the family of one student assigned to a bus route objected to the disclosure of their students' trip tickets, the District redacted all trip tickets for the entire route, including trip tickets for students whose families did not object.  See Joint Status Report [Dkt. No. 97] at 2.  The District ultimately produced 5,335 files—233,095 total pages—of documents displaying both unredacted trip tickets for routes that did not include an objector and redacted trip tickets for routes that did include an objector.  See Joint Status Report [Dkt. No. 106] at 3.

Shortly thereafter, on October 24, 2025, plaintiffs filed a supplemental brief on class certification, see Pls. Suppl., and the District responded on November 24, 2025. See Def. Resp. The Court heard oral argument on the issues discussed in the parties' supplemental filings on January 6, 2026. See Minute Entry of January 6, 2026. The parties have fully briefed the issue of class certification, and plaintiffs' motion to certify the class is now ripe for decision.

## II.  LEGAL FRAMEWORK

### A.  The IDEA

As the Court described in more detail in its opinion granting in part and denying in part the District's partial motion to dismiss, see Robertson v. D.C., 762 F. Supp. 3d at 45-47, the IDEA requires that students with disabilities be provided with a FAPE, which includes providing both "special education and related services designed to meet their unique needs." 20 U.S.C. § 1400(d)(1)(A). The "[r]elated services" required to provide a FAPE include "transportation" to and from schools and between schools, travel in and around school buildings, and any "[s]pecialized equipment (such as special or adapted buses, lifts, and ramps)" that "may be required to assist a child with a disability to benefit from special education." Id. § 1401(26)(A); 34 C.F.R. § 300.34(c)(16). But the IDEA does not define the precise scope of "transportation" services that states must provide in order to receive IDEA funding. See Pierre-Noel on behalf of K.N. v. Bridges Pub. Charter Sch., 113 F.4th 970, 974 (D.C. Cir. 2024).

Under the IDEA, the "'primary vehicle' for providing each child with the promised FAPE" is the child's "individualized education program," or IEP. Fry v. Napoleon Cmty. Schs. ("Fry"), 580 U.S. 154, 158 (2017) (quoting Honig v. Doe, 484 U.S. 305, 311 (1988)); see also 20 U.S.C. §§ 1412(a)(4), 1414(d). "[T]he IEP spells out a personalized plan to meet all of [a] child's 'educational needs.'" Id. (quoting 20 U.S.C. § 1414(d)(1)(A)(i)(II)(bb)).

8

Among other things, the IEP specifies "the special education and related services," such as transportation services, that the child will receive.  20 U.S.C. § 1414(d)(1)(A)(i)(I)-(IV).  The IDEA also requires that the IEP allow the disabled student to receive an education in the "[l]east restrictive environment," or "LRE."  See 20 U.S.C. § 1412(a)(5).  This means that schools are required to ensure that, "[t]o the maximum extent appropriate," a student with disabilities is educated with their non-disabled peers, unless "the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily."  Id. § 1412(a)(5)(A); see also 34 C.F.R. § 300.114(a)(2)(i)-(ii).

The IDEA also establishes formal procedures for resolving disputes between parents and school districts concerning a child's special education.  See Fry, 580 U.S. at 159. Under the IDEA, students and parents may file complaints with administrative hearing officers to challenge a denial of FAPE, see 20 U.S.C. § 1415(b)(6); 34 C.F.R. § 300.507, and they may seek judicial review of a hearing officer's determination by filing a civil action in state or federal court.  See 20 U.S.C. § 1415(i)(2)(A).  A court "may provide a substantive remedy only when it determines that a school has denied a FAPE."  Fry, 580 U.S. at 168 n.7; see also id. at 165 (explaining that in order to obtain relief under the IDEA, a plaintiff's "suit must seek relief for the denial of a FAPE, because that is the only 'relief' the IDEA makes 'available.'").

When determining whether a child has received a FAPE, courts ask whether the "educational program" offered to the child is "reasonably calculated to enable [the] child to make progress appropriate in light of the child's circumstances."  Endrew F. ex rel. Joseph F. v. Douglas Cnty. Sch. Dist. RE-1, 580 U.S. 386, 403 (2017).

### B.  Discrimination Claims

In addition to their IDEA claims, plaintiffs raise claims under several other statutes, all grounded in the theory that the District has previously and continues to discriminate against plaintiffs because of their disabilities.  The ADA and Section 504 of the Rehabilitation Act provide protections for individuals with disabilities, including a prohibition on excluding or segregating them or denying them the benefits of public services.  See 29 U.S.C. § 794(a); 42 U.S.C. § 12132.  Both statutes require covered entities—including public school systems—to provide reasonable modifications to ensure students with disabilities an equal opportunity to benefit from public education.  28 C.F.R. § 35.130(b)(7); 34 C.F.R. §§ 104.34(a), 104.37(a)(1).  The DCHRA prohibits an educational institution from denying or abridging access to or use of its facilities or programs based on an individual's disability.  D.C. Code § 2-1402.41(1).

To succeed under the ADA, Section 504 of the Rehabilitation Act, or the DCHRA, plaintiffs must prove that:  (1) plaintiffs are qualified individuals with disabilities, (2) defendant is subject to the mandates of the statutes; and (3) plaintiffs were excluded from, denied the benefit of, or subject to discrimination under a program or activity on the basis of their disability.  See Robertson v. D.C., 762 F. Supp. 3d at 48; see also Hunter on behalf of A.H. v. District of Columbia, 64 F. Supp. 3d 158, 166 (D.D.C. 2014); American Council of the Blind v. Paulson, 525 F.3d 1256, 1266 (D.C. Cir. 2008).  There is no dispute that plaintiffs satisfy the first two prongs.  Each of the named plaintiffs is the parent of a child with a disability that "substantially limit[s]" a major life activity and who relies on transportation from OSSE to attend school.  Compl. ¶ 233 (citing 42 U.S.C. § 12102).  These children and other members of the putative class participate in educational programs provided by the District.  Id. ¶ 234 (citing 42 U.S.C. § 12131(2)).  The District generally, and OSSE specifically, are public entities

10

subject to the mandates of the ADA, Section 504 of the Rehabilitation Act, and the DCHRA.  Id.

¶ 236.  The question, then, is whether plaintiffs' children and similarly situated individuals were

excluded from, denied the benefit of, or subject to discrimination based on their disability.

### C.  Class Certification

Rule 23 of the Federal Rules of Civil Procedure requires a party seeking class

certification to "affirmatively demonstrate [their] compliance" with the rule's requirements.

Wal-Mart Stores, Inc. v. Dukes ("Wal-Mart"), 564 U.S. 338, 350 (2011).  Those requirements

fall into two categories:  first, under Rule 23(a), the moving party must show that "(1) the class is

so numerous that joinder of all members is impracticable; (2) there are questions of law or fact

common to the class; (3) the claims or defenses of the representative parties are typical of the

claims or defenses of the class; and (4) the representative parties will fairly and adequately

protect the interests of the class."  FED. R. CIV. P. 23(a).  These four requirements are referred to

as numerosity, commonality, typicality, and adequacy.  See In re Rail Freight Fuel Surcharge

Antitrust Litig. ("In re Rail Freight"), 292 F. Supp. 3d 14, 88 (D.D.C. 2017), aff'd sub nom. In re

Rail Freight Fuel Surcharge Antitrust Litig.-MDL No. 1869, 934 F.3d 619 (D.C. Cir. 2019).

Failure to demonstrate any of these requirements is fatal to class certification.  See id.

The moving party must also show that its suit falls within at least one of three

categories of cases described in Rule 23(b).  See FED. R. CIV. P. 23(b).  Here, plaintiffs move for

class certification under Rule 23(b)(2) and Rule 23(b)(3).  Under Rule 23(b)(2), the Court may

certify a class action when "the party opposing the class has acted or refused to act on grounds

that apply generally to the class" such that injunctive or declaratory relief is "appropriate

respecting the class as a whole."  FED. R. CIV. P. 23(b)(2); see also Angelica S. v. DHS, 786 F.

Supp. 3d 158, 178 (D.D.C. 2025).  Under Rule 23(b)(3), the Court may certify a class action

where "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." FED. R. CIV. P. 23(b)(3).

Though "[a] district court exercises broad discretion in deciding whether to permit a case to proceed as a class action," Hartman v. Duffey, 19 F.3d 1459, 1471 (D.C. Cir. 1994), the court must perform a "rigorous analysis" to ensure compliance with the requirements of Rule 23. Comcast Corp. v. Behrend, 569 U.S. 27, 33 (2013) (quoting Wal-Mart, 564 U.S. at 351). Strict compliance with Rule 23's requirements is "indispensable," Gen. Tel. Co. of Sw. v. Falcon, 457 U.S. 147, 160 (1982), and the burden of proving compliance with Rule 23 lies with the plaintiff. See Hoyte v. District of Columbia, 325 F.R.D. 485, 491 (D.D.C. 2017) (explaining that plaintiffs generally must prove compliance with Rule 23 by a preponderance of the evidence).

### III.   RULE 23(a) FINDINGS AND CONCLUSIONS

#### A.   Numerosity

Plaintiffs contend that they have proven compliance with Rule 23(a)(1)'s "numerosity" requirement by a preponderance of the evidence. See Pls. Mot. at 12-14; see also Pls. Suppl. at 5-13. The District offers two main arguments to the contrary:  first, it raises a threshold challenge to plaintiffs' proposed class definition, arguing that plaintiffs' "proposed class definition is inextricably tied to the Court's resolution of the merits" and therefore is impermissibly "fail-safe," Def. Resp. at 6, such that the "class definition cannot meet the numerosity requirement." Def. Opp. at 9.  Second, it contends that even if plaintiffs' proposed class definition is not impermissibly fail-safe, plaintiffs have still failed to show that the putative class is "so numerous that joinder of all members is impracticable." Id. at 10.

The Court finds neither of the District's arguments persuasive, and concludes that plaintiffs have proven compliance with Rule 23(a)(1) by a preponderance of the evidence.

### 1. Plaintiffs' Proposed Class Definition Is Not Fail-Safe

The District argues that plaintiffs' proposed class definition is impermissibly "fail-safe." See Def. Opp. at 8-10. Recall that plaintiffs seek certification of the following class:

> All students with disabilities aged 3-22 who, from March 7, 2022, until judgment is issued in this case, require transportation from the District of Columbia to attend school and have experienced and will continue to experience Defendant's failure to provide safe, reliable, and appropriate transportation.

Pls. Mot. at 11. The District maintains that this proposed class definition is "fail-safe" because "membership in the class would depend on a final resolution of the merits." Def. Opp. at 9; see also Def. Resp. at 6. The District notes that "[p]laintiffs' proposed class definition is limited to qualifying students who 'have experienced and will continue to experience Defendant's [alleged] failure to provide safe, reliable, and appropriate transportation.'" Def. Opp. at 8-9 (quoting Pls. Mot. at 11). But—the District argues—the phrase "Defendant's failure" necessarily refers to a merits determination that the District violated the IDEA, ADA, Rehabilitation Act, or DCHRA. See Def. Resp. at 6. According to the District, the very thing that plaintiffs must prove in order to prevail on the merits is that the District in fact failed to provide them and similarly situated students with "safe, reliable, and appropriate transportation" to school. Def. Opp. at 9. And if plaintiffs succeed in showing that the District failed to provide such transportation, then they must further prove that the District's transportation failures constitute a denial of a FAPE under the IDEA, and that the District has discriminated against plaintiffs and similarly situated individuals in violation of the ADA, the Rehabilitation Act, and the DCHRA. See id. The District contends that if plaintiffs fail to prove these elements, then "a class previously certified

13

under [p]laintiffs' proposed definition would lose its entire membership," id., and such a fail-safe class definition "cannot meet the numerosity requirement."  Def. Opp. at 9.

To support its argument, the District relies heavily on In re White, 64 F.4th 302 (D.C. Cir. 2023).  There, the D.C. Circuit described a "fail-safe" class definition as one "for which membership can only be ascertained through 'a determination of the merits of the case.'"  Id. at 303 (quoting In re Rodriguez, 695 F.3d 360, 369-370 (5th Cir. 2012)); see also Young v. Nationwide Mut. Ins. Co., 693 F.3d 532, 538 (6th Cir. 2012) (defining a "fail-safe" class as "a class that cannot be defined until the case is resolved on its merits."); Messner v. Northshore Univ. HealthSystem, 669 F.3d 802, 825 (7th Cir. 2012) (explaining that a "fail-safe" class is "one that is defined so that whether a person qualifies as a member [of the class] depends on whether the person has a valid claim.").  "For example," the court of appeals explained, "a class defined as 'those shareholders whom Company X defrauded' would be fail safe" because "[i]f the named plaintiffs prevail on the merits by showing fraud, then the class is populated by all those with meritorious claims; if the named plaintiffs fail to prove fraud, there will be no class members to be bound by the adverse judgment."  In re White, 64 F.4th at 303.

The court identified two main problems with certifying a "fail-safe" class.  "First, if membership in a class depends on a final resolution of the merits, it is administratively difficult to determine class membership early on."  In re White, 64 F.4th at 313.  "Second, if the only members of fail-safe classes are those who have viable claims on the merits, then class members either win or, by virtue of losing, are defined out of the class, escaping the bars of res judicata and collateral estoppel."  Id.  In other words, "[h]eads they win; tails the defendant lose[s]—at least, that is the concern."  Id.  Though the court declined to impose a "freestanding bar" against "fail-safe" class definitions, id. at 315, it cautioned that "a class that could be

14

defined to have zero members if the plaintiffs lose is not numerous at all," and therefore could not satisfy Rule 23(a)'s numerosity requirement. Id. at 314; see also Young v. Nationwide Mut. Ins. Co., 693 F.3d at 538 (explaining that "fail-safe" classes "allow putative class members to seek a remedy but not be bound by an adverse judgment—either those 'class members win or, by virtue of losing, they are not in the class' and are not bound" by the court's judgment) (quoting Randleman v. Fid. Nat. Title Ins. Co., 646 F.3d 347, 352 (6th Cir. 2011)).

The Court concludes that plaintiffs' proposed class definition is not fail-safe. The District concedes that the Court need not reach the merits of this case in order to identify individuals that meet the following criteria in the first portion of plaintiffs' proposed class definition: (1) a student, (2) with disabilities, (3) aged 3-22, and (4) who from March 7, 2022, until judgment is issued in this case, requires transportation from the District to attend school. See Pls. Mot. at 11. The District's problem is with the remainder of the proposed class definition: "have experienced and will continue to experience Defendant's failure to provide safe, reliable, and appropriate transportation." Id. (emphasis added). According to the District, to certify such a class would require the Court to make a merits determination that the District violated the IDEA, the ADA, the Rehabilitation Act, and the DCHRA. See Def. Resp. at 6. Not so. An individual who satisfies the proposed class criteria would be a member of the proposed class even if this Court ultimately finds that the District—despite its alleged transportation failures—is not liable to members of the class for those failures under governing law. And as the District acknowledges, the provision of "safe, reliable, and appropriate transportation" is not a standard imposed by the IDEA or any other law. See Def. Opp. at 9. The proposed class definition therefore does not require the Court to reach the merits of this case.

15

Furthermore, neither of the concerns identified by the D.C. Circuit in In re White is present here.  First, the proposed class definition does not make it "administratively difficult to determine class membership early on" because, as discussed, the Court can identify individuals who fit the class criteria without having to determine whether the District's alleged transportation failures are legally actionable.  In re White, 64 F.4th at 313.  Second, having a "viable claim[] on the merits," id. at 313, is not a condition of membership in the class because the proposed class definition does not require that an individual be entitled to relief.  See Pls. Mot. at 11; see also Young v. Nationwide Mut. Ins. Co., 693 F.3d at 538 ("a 'fail-safe' class is one that includes only those who are entitled to relief") (emphasis in original).  So the class would not be left with "zero members" if plaintiffs "lose"—that is, if the Court later finds that the District is not liable and plaintiffs are not entitled to relief.  In re White, 64 F.4th at 314.

In sum, the Court concludes that "[t]he facts that define an individual" as a member of plaintiffs' proposed class "are knowable without any determination of liability." Gamboa v. KISS Nutraceuticals, 777 F. Supp. 3d 1210, 1225 (D. Colo. 2025) (quoting Perry v. Krieger Beard Services, LLC, 2018 WL 3218413, at *3 (S.D. Ohio July 2, 2018)).  Plaintiffs' proposed class definition therefore is not "fail-safe" and requires no modification.[2]  And the

---

[2]       Other federal courts have reached similar conclusions.  See e.g., Gamboa v. KISS Nutraceuticals, 777 F. Supp. 3d at 1225 (finding that a proposed class definition including workers "who were not paid overtime wages" was not fail-safe because "legal entitlement to overtime wages" was not "a condition of their membership in the class.") (emphasis in original); Staley v. FSR Int'l Hotel Inc., Civil Action No. 22-6781 (JSR), 2024 WL 3534450, at *5 (S.D.N.Y. July 25, 2024) (finding that a proposed class definition including "former non-union employees" who have been "laid off" or who have experienced a "plant closing" was not "fail-safe," even though these factual determinations were elements that plaintiffs were required to prove to succeed on the merits of their claims).

District's concerns regarding the use of the phrase "Defendant's failure" in the proposed class

definition can be easily addressed by modifying the definition as follows:

> All students with disabilities aged 3-22 who, from March 7, 2022,
> until judgment is issued in this case, require transportation from
> the District of Columbia to attend school and have experienced and
> will continue to experience unsafe, unreliable, or inappropriate
> transportation services from the District of Columbia.

The Court believes this modification addresses the District's concerns.  See In re White, 64 F.4th

at 314 ("For those rare cases (if any) in which a truly 'fail-safe' class hurdles all of Rule 23's

requirements, then the problem will in all likelihood be one of wording, not substance.").[3]


### 2.   Plaintiffs Have Established Numerosity

Having addressed the District's threshold challenge to plaintiffs' proposed

class definition, the Court now considers whether plaintiffs have proven compliance with

Rule 23(a)(1).  To satisfy Rule 23(a)(1), plaintiffs must show that the putative class is "so

numerous that joinder of all members is impracticable."  FED. R. CIV. P. 23(a)(1).  Though

Rule 23(a)(1) includes no "hard rules for when joinder will be found to be impracticable,"

Coleman ex rel. Bunn v. District of Columbia, 306 F.R.D. 68, 76 (D.D.C. 2015), courts generally

find the requirement satisfied when a plaintiff presents credible evidence that "a proposed class

has at least forty members."  Angelica S. v. DHS, 786 F. Supp. 3d at 176 (quoting Richardson v.

L'Oreal USA, Inc., 991 F. Supp. 2d 181, 196 (D.D.C. 2013)).  "Mere conjecture, without more,

is insufficient to establish numerosity, but plaintiffs do not have to provide an exact number of

---

[3]      At the hearing on January 6, 2026, counsel for plaintiffs agreed that the Court's
suggested modification "would be an appropriate change to plaintiffs' proposed class definition."
Transcript of Record, Robertson v. D.C., Civil Action No. 24-0656 (January 6, 2026)
[Dkt. No. 119] at 14:15-16.

putative class members in order to satisfy the numerosity requirement." In re Rail Freight, 292 F. Supp. at 93 (quoting Pigford v. Glickman, 182 F.R.D. 341, 347 (D.D.C. 1998)).

As discussed, there were approximately 4,000 students with disabilities receiving transportation services from the District, through OSSE, on approximately 550 daily bus routes as of January 31, 2024. See Pls. Mot. at 10 (citing 2023 Performance Oversight Responses at 215); see also Def. Opp. at 3. Bus drivers assigned to these daily bus routes complete daily "trip tickets" for their morning and afternoon routes. See Pls. Suppl. at 4 n.3. "Trip tickets" are documents that indicate which children rode the bus that day, which children were absent from the bus, and whether the bus was timely. See id. Pursuant to this Court's Memorandum Opinion and Order of June 17, 2025 [Dkt. No. 96], the District produced a subset of unredacted trip tickets generated between August 26, 2024 and November 30, 2024. See Joint Status Report [Dkt. No. 106]. Plaintiffs' expert, Bates White Economic Consulting ("Bates White") conducted an analysis of trip tickets generated in the month of October 2024. See Pls. Suppl. at 6.

Bates White found that in October 2024, 303 students were assigned to bus routes that arrived after the start of instruction at least once per week on average, and 161 students were assigned to bus routes that arrived after the start of instruction at least twice per week on average. See Amendment to the Declaration of Benjamin M. Wolfert ("Bates White Decl. Am.") [Dkt. No. 115-1] ¶ 7. As discussed previously, when the District produced the bus trip tickets generated between August 26, 2024 and November 30, 2024, it redacted all trip tickets for an entire route if that route included an objector, even if some non-objectors were also assigned to that route. See Joint Status Report [Dkt. No. 97] at 2-3. Mr. Wolfert's analysis therefore is based on unredacted trip tickets generated in October 2024 for approximately 2,500 of the approximately 4,000 students that receive transportation services from the District. See Bates

18

White Decl. Am. ¶ 4 n.3.  Mr. Wolfert explained that "[i]f the unredacted routes are representative, or statistically similar to, the redacted routes, then the total number of students arriving late at least once a week would be somewhere between 606 and 909, and the number of students arriving late at least twice a week would be somewhere between 322 and 483."  Id. ¶ 17.

Plaintiffs also offer 16 declarations from the parents of 18 students detailing their experiences with the District's transportation system, and these declarations represent not only the experiences of the individual students, but of the other students riding on the same bus route. See e.g., Declaration of Malerie Goodman [Dkt. No. 110-2] ¶¶ 6, 9 (stating that her son's bus "was late approximately twelve times" between February 2025 and April 2025, "causing him to miss instructional time when [she] was not able to drive him," and that there were ten other students on the bus route); Declaration of Stephanie Maltz [Dkt. No. 110-3] ¶¶ 5, 7-9 (stating that her child's bus arrived "outside the scheduled pickup window" six times between July 1, 2025 and July 10, 2025, and that there were five other students on the bus route); Declaration of Elizabeth Mitchell [Dkt. No. 110-4] ¶¶ 6-7, 10 (stating that in September 2024, her child arrived half an hour late to school twice, arrived an hour late back home twice, and that there were 12-13 other students on the bus route); Declaration of Cathy Miler [Dkt. No. 110-5] ¶¶ 6, 8 (stating that "[f]rom August 2024 to May 2025, the bus came 20-30 minutes late nearly every morning," did not come at all "approximately five times," and that there were six to eight other students on the bus route); Declaration of Pamela Leake [Dkt. No. 110-7] ¶¶ 6, 8 (stating that during the 2024-2025 school year, her child "was late to school due to transportation issues one to two times a week," and that there were three to four other students on the bus route).

The Court finds that plaintiffs have shown that their proposed class—which includes "[a]ll students with disabilities aged 3-22" who "require transportation from

[the District] to attend school and have experienced and will continue to experience Defendant's failure to provide safe, reliable, and appropriate transportation," Pls. Mot. at 11—contains at least forty individuals, which is presumptively too numerous to make joinder practicable. See Hinton v. District of Columbia, 567 F. Supp. 3d 30, 52 (D.D.C. 2021) (explaining that courts may "draw reasonable inferences from the facts presented to find the requisite numerosity.") (quoting Coleman ex rel. Bunn v. District of Columbia, 306 F.R.D. at 76).

The District raises two main arguments to the contrary. First, the District notes that Bates White's analysis is limited to untimely morning bus service, while plaintiffs' proposed class definition includes students who have experienced any failure to provide "safe, reliable, and appropriate transportation," including missing safety harnesses and absent aides and nurses. Def. Resp. at 4 (quoting Pls. Suppl. at 2). But this distinction is immaterial. At this stage, plaintiffs are not required to prove that there are at least forty putative members for every distinct manifestation of the District's alleged transportation failures. See Angelica S. v. DHS, 786 F. Supp. 3d at 176. Rather, plaintiffs bear the burden of demonstrating that their proposed class, as defined, has at least forty members. See id. Plaintiffs have satisfied that burden.

Second, the District challenges Bates White's finding that approximately 300 students arrived at school after the start of instruction at least once a week on average in the month of October 2024. See Def. Resp. at 4-5; see also Bates White Decl. Am. ¶ 7; Declaration of Benjamin M. Wolfert ("Bates White Decl.") [Dkt. No. 110-1] ¶ 21. The District asserts that Bates White's findings "do[ ] not represent actual students, but rather students assigned to select routes, whether or not they were actually on the bus." Def. Resp. at 5 (citing Bates White Decl.

¶ 20).[4]  The Court does not find this argument persuasive because the District produced the trip tickets underlying Bates White's analysis, and the trip tickets indicate when a particular student is absent from the bus.  See Pls. Suppl. at 4 n.3.  The District could have determined how many of the 300 students were assigned to select routes but were not "actually on the bus," and therefore did not experience untimely morning bus service.  The District did not perform this analysis.  Its argument therefore does little to undermine Bates White's findings.[5]

Having addressed each of the District's arguments to the contrary, the Court finds that plaintiffs have proven by a preponderance of the evidence that their proposed class satisfies Rule 23(a)(1)'s requirement of numerosity.

### B.   Commonality

Next is commonality.  Plaintiffs contend that they have sufficiently proven that their proposed class satisfies Rule 23(a)(2)'s requirement of commonality.  The Court agrees.

---

[4]   Though the District raised this argument in response to plaintiffs' supplemental brief, see Def. Resp. at 4-5, at the hearing on January 6, 2026, counsel for the District stated that the District does not contest Mr. Wolfert's analysis as it relates to numerosity.  See Transcript of Record, Robertson v. D.C., Civil Action No. 24-0656 (January 6, 2026) [Dkt. No. 119] at 27:18-22 ("[Plaintiffs' counsel] noted that we haven't contested any of the numerosity evidence put forth in [Mr. Wolfert's] declaration.  That's true.  Frankly, we haven't had the chance, but for purposes of today we aren't contesting the substantive analysis of their expert.").

[5]   Lastly, the District argues that even "assuming the validity" of Bates White's underlying analysis, the approximately 300 students who experienced untimely morning bus service in October 2024 "represents about 7.4% of the more than 4,000 students transported by OSSE every day."  Def. Resp. at 5.  But that observation misses the point.  Rule 23(a)(1) does not require that plaintiffs show that a large percentage of the affected population suffered harm. It requires that plaintiffs show that the putative class is "so numerous that joinder of all members is impracticable," FED. R. CIV. P. 23(a)(1), and plaintiffs clear that threshold here.

1.  Legal Standard

To satisfy Rule 23(a)'s commonality requirement, plaintiffs must show that "there are questions of law or fact common to the class." FED. R. CIV. P. 23(a)(2).  Specifically, their claims "must depend upon a common contention," and "[t]hat common contention . . . must be of such a nature that it is capable of class-wide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." Wal-Mart, 564 U.S. at 350.  "Where plaintiffs allege widespread wrongdoing by a defendant[,] a uniform policy or practice that affects all class members" satisfies the commonality requirement. Thorpe v. District of Columbia, 303 F.R.D. 120, 145 (D.D.C. 2014).

The Supreme Court's holding in Wal-Mart changed the landscape that district courts must navigate when deciding whether a putative class action satisfies Rule 23(a)'s commonality requirement.  564 U.S. 338.  In Wal-Mart, a putative class of female Wal-Mart employees sought to sue the company under Title VII for sex discrimination in pay and promotion practices. See id. at 343.  Plaintiffs claimed that their local managers exercised their discretion over pay and promotions to favor male employees, leading to an unlawful disparate impact on—and disparate treatment of—female employees. See id. at 344-45.  Plaintiffs argued that the putative class satisfied Rule 23(a)'s commonality requirement because this discrimination was "common to all [of] Wal-Mart's female employees" and that a "uniform 'corporate culture' permit[ted] bias against women to infect, perhaps subconsciously, the discretionary decisionmaking of each one of Wal-Mart's thousands of managers." Id. at 345. The district court certified a class of "[a]ll women employed at any Wal-Mart domestic retail store at any time since December 26, 1998 who have been or may be subjected to Wal-Mart's challenged pay and management track promotions policies and practices." Id. at 346.

22

The Supreme Court reversed, holding that the class did not satisfy commonality. See Wal-Mart, 564 U.S. at 359-60.  The court explained that although resolution of each plaintiff's claim turned on a common question—that is, whether her gender was the reason she was paid less and/or passed over for a promotion, see id. at 343-45—"[w]hat matters to class certification . . . is not the raising of common 'questions,'" but rather "the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation."  Id. at 350. "That common contention, moreover, must be of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke."  Id.  In other words, the court found, the class must show that its "theory can be proved on a classwide basis."  Id. at 356.

In Brown v. District of Columbia ("Brown v. D.C."), 928 F.3d 1070 (D.C. Cir. 2019), the D.C. Circuit summarized Wal-Mart's teachings as follows:

> The problem with the Wal-Mart class action . . . was that there was no common proof leading to a common answer to the common question at the heart of each plaintiff's claim.  Indeed, local supervisors made all pay and promotion decisions; to prove that the reason for each pay and promotion decision was the same despite the diffuse decision-making structure, the plaintiffs had to show either (1) that each local supervisor used a particular company-wide decision-making procedure that incorporated sex as a consideration or (2) that Wal-Mart had a general company-wide policy of treating female employees worse than male employees. Wal-Mart, 564 U.S. at 352-53.  The plaintiffs could not show either. . . . Wal-Mart establishes that Rule 23(a)(2) is satisfied if resolution of each plaintiff's claim turns on a common question (or questions) and if common proof leads to a common answer (or answers) to that question for each plaintiff.

Id. at 1080 (emphasis in original).

The D.C. Circuit also interpreted Wal-Mart at several points during the DL litigation, a case brought under the IDEA.  See DL v. District of Columbia ("DL I"), 713

23

F.3d 120 (D.C. Cir. 2013); DL v. District of Columbia ("DL II"), 860 F.3d 713 (D.C. Cir. 2017).

The facts and teachings of DL I and DL II are summarized by the court of appeals as follows:

> [P]arents of children between the ages of three and five sued the District [of Columbia], alleging that it violated the [IDEA], 20 U.S.C. §§ 1400 et seq., which imposes on the District a number of different obligations with respect to students who require special education services. DL II, 860 F.3d at 717. The District's IDEA obligations include providing "an effective intake and referral process," offering "adequate and timely education placements to implement individual education plans" and ensuring "a smooth and effective transition from early intervention programs to preschool programs." DL I, 713 F.3d at 128. The district court originally certified a class of all three-to-five-year-olds with respect to whom the District failed to discharge any of these obligations. Id. at 124-25. [The D.C. Circuit] rejected the class certification in DL I because there was no "common 'tru[e] or fals[e]' question [that could] be answered for each of these three different claims of harm that would assist the district court in determining the District's liability as to each group." Id. [The D.C. Circuit] remanded the case "so the district court [could] determine whether subclasses would meet the requirements of Rule 23(a) commonality after Wal-Mart." Id. at 129.
>
> On remand, the district court certified four subclasses of three-to-five-year-olds denied a special education: (1) those whom the District failed to identify as disabled; (2) those whom the District failed to evaluate within 120 days of referral; (3) those to whom the District failed to provide an eligibility determination within 120 days of referral; and (4) those denied a smooth transition from an early intervention program to a preschool program. DL II, 860 F.3d at 724. In DL II, [the D.C. Circuit] held that three of the four subclasses satisfied the commonality requirement. Id. at 724-25. . . . [S]ubclass four was organized around a common question—did the District fail to provide certain individuals a smooth and effective transition from early intervention to preschool?—which was subject to a common answer—yes—based on common proof—evidence showing that 30 per cent of toddlers were denied a smooth transition from early intervention to preschool. Id. Thus, the DL litigation followed the holding of Wal-Mart: Rule 23(a)(2) is satisfied if resolution of each plaintiff's claim turns on a common question (or questions) and if common proof leads to a common answer (or answers) to that question for each plaintiff.

Brown v. D.C., 928 F.3d at 1080-81 (emphasis in original).

24

Outside of the D.C. Circuit's decisions in DL I and DL II, three other courts of appeals have addressed certification of an IDEA class post-Wal-Mart. See G.T. v. Bd. of Educ. of Cnty. of Kanawha ("G.T."), 117 F.4th 193 (4th Cir. 2024); Parent/Pro. Advoc. League v. City of Springfield, ("PPAL") 934 F.3d 13 (1st Cir. 2019); Jamie S. v. Milwaukee Pub. Schs. ("Jamie S."), 668 F.3d 481 (7th Cir. 2012). Those courts have unanimously held that in order to satisfy Rule 23(a)'s commonality requirement after Wal-Mart, plaintiffs must "identify[ ] a uniformly applied, official policy of the school district, or an unofficial yet well-defined practice, that drives the alleged violation." PPAL, 934 F.3d at 29; see also Jamie S., 668 F.3d at 498; G.T., 117 F.4th at 205. Making such a showing can be difficult since "[t]he typical IDEA lawsuit involves a highly individualized assessment of whether a child was denied a FAPE." G.T., 117 F.4th at 205. So when "challenging hundreds of individualized special education decisions, satisfying the commonality prerequisite requires proof of some common driver—the 'glue' holding all those decisions together in a way that suggests they can productively be litigated all at once." Id. (quoting Jamie S., 668 F.3d at 498). Simply asserting that the proposed class members "have all suffered a violation of the same provision of law" is insufficient to satisfy the commonality requirement. Id. at 202 (quoting Wal-Mart, 564 U.S. at 350).

2. Plaintiffs Have Satisfied the Commonality Requirement

In view of Wal-Mart, DL I, and DL II, the Court finds that plaintiffs have proven commonality. The gravamen of plaintiffs' suit is that the entire transportation services system offered by the District is infirm, so much so that the District is effectively subverting the rights of all students with disabilities who require its transportation services. See Pls. Mot. at 8 (arguing that "[t]he District is failing to provide transportation services in conformity with . . . students' IEPs by failing to maintain a transportation system that enables students with disabilities to

attend school such that they can make meaningful progress towards their IEP goals."); Pls. Repl. at 7 (arguing that "[t]he District's uniform failure to provide an adequate transportation system to students with disabilities violates students' statutorily defined rights under the IDEA.").

The declarations offered by plaintiffs support these assertions. The declarations from parents of children with disabilities recount how the District's transportation system has caused their children to miss out on instructional time, access to their peers, and numerous therapies, such as physical therapy, occupational therapy, speech-language pathology, and behavioral therapies. See, e.g., Declaration of Jamie Davis Smith ("Davis Smith Decl.") [Dkt. No. 4-38] ¶ 13 (describing how inconsistent bus arrival and departure times caused their child to miss two hours of school per week, on average, in 2024, and the bus was once so late they had to file a missing person's report for their child when OSSE could not track the bus); Guerrero Decl. [Dkt. No. 4-9] ¶ 12 (stating that during the 2022-2023 school year, OSSE buses dropped their child off late to school 90 times); Clark Decl. [Dkt. No. 4-14] ¶¶ 14-16, 27-28 (describing how late bus arrivals in the mornings and afternoons caused their child to miss instructional time, time with their peers, and therapy sessions, and even when the bus came on time, there was often no nurse on board and no space for their child's wheelchair); McCray Decl. [Dkt. No. 4-18] ¶ 37 (describing how OSSE's repeated failure to pick up their child in the morning caused the child to repeatedly miss his morning classes, leading to lower grades in those classes); Declaration of Miryam Koumba ("Koumba Decl.") [Dkt. No. 4-41] ¶ 8 (describing how inconsistent bus service in the afternoons caused their child to miss therapy appointments recommended by his medical care team); Daggett Decl. [Dkt. No. 4-3] ¶¶ 30-35, 38 (describing how their child was regularly picked up and dropped off late by OSSE during the 2023-2024 school year, and their child often could not be transported to school because the bus would arrive without a safety harness).

26

Plaintiffs also offer two expert declarations, one from Dr. Paul Livelli and one from Dr. Linda Fran Bluth. See Declaration of Dr. Paul Livelli ("Livelli Expert Decl.") [Dkt. No. 4-26]; Declaration of Dr. Linda Fran Bluth, Ed.D. ("Bluth Expert Decl.") [Dkt. No. 4-28]. Dr. Livelli—who has 34 years of experience as a special educator and administrator and serves as a consultant to students with disabilities living in D.C.—observes that OSSE fails to provide reliable transportation to students with disabilities. See Livelli Expert Decl. ¶¶ 22-26. Dr. Livelli explains that students with disabilities are uniquely impacted by the District's transportation failures because their conditions make it difficult to follow a lesson when they arrive to school mid-class. See id. ¶¶ 29-30. He states that though the lack of consistent, appropriate, and safe transportation may impact students with disabilities in different ways, the overall lack of structure and routine inhibits students with disabilities' meaningful progress towards their IEP and their other educational and social-emotional goals. See id. ¶¶ 36-39; see also id. ¶ 21 ("Transportation is the key for these children to receive FAPE."). Dr. Livelli also explains that when students are late or miss school because of OSSE's transportation failures, those late days and absences cause cascading deviations from IEPs, see id. ¶¶ 28-30, and deny students the opportunity to socialize with their peers. See id. ¶¶ 28, 32, 44. According to Dr. Livelli, these deviations from students' IEPs deny them a FAPE. See id. ¶¶ 21, 27.

Dr. Bluth, for her part, has over 59 years of experience in the field of special education and related services, and 43 years of experience serving as an expert witness in the field of transportation, with a specialty in school transportation services for students with disabilities. See Bluth Expert Decl. ¶ 2. She states that OSSE's routing system "suffers significant deficiencies that impact OSSE's ability to provide safe and appropriate transportation for children with disabilities," id. ¶ 30, and that it lacks sufficient trained staff and specialized

equipment.  Id. ¶¶ 34-35; see also id. ¶ 21 ("Unreliable transportation related services deny children a FAPE and deprive[ ] them of an equal opportunity to access their public education.").

Plaintiffs also present data gathered from OSSE's public website, Daily DOT Updates, https://osse.dc.gov/page/dailydot-updates, which tracks daily bus delays and cancellations.  Based on that data, plaintiffs allege that in the first five months of the 2023-2024 school year, "there were over 1,000 delays and cancellations . . . [a]nd, over a period of approximately 110 days, there were approximately 3,200 instances of recorded bus route disruptions in the morning or in the afternoon."  Plaintiffs' Motion for a Preliminary Injunction [Dkt. No. 4] at 7.  Plaintiffs further allege that OSSE's data measurement practices are deficient because OSSE reports "on-time performance" by the time the bus leaves the bus terminal, regardless of whether the bus actually arrives at a child's home on time or whether the bus delivers the child to school on time.  See id. at 8; see also 2023 Performance Oversight Responses at 217 ("in January 2023, [OSSE] established a process to collect daily reportable data on whether a bus is 'late' based on a bus departing its terminal later than its scheduled time."); Bates White Decl. Am. ¶ 7 (explaining that there is "only a weak positive correlation between a bus leaving the terminal on time and arriving at or before the start of instruction.").

Lastly, plaintiffs offer statistical analyses from Mr. Benjamin M. Wolfert, a partner at Bates White Economic Consulting, LLC.  See Bates White Decl. [Dkt. No. 110-1]; Bates White Decl. Am. [Dkt. No. 115-1].  Recall that Bates White analyzed trip tickets generated in October 2024.  See Pls. Suppl. at 6.  Based on those trip tickets, Mr. Wolfert found that 14 of OSSE's bus routes had scheduled daily school drop-off times that were after the start of instruction.  See Bates White Decl. Am. ¶ 7.  That means that as of October 2024, 14 of OSSE's bus routes "were designed such that, if the route was running as planned, students would still be

dropped off after class began every day of the week." Id. ¶ 15. "Among these drop-offs, the typical expected drop-off was at least 10 minutes after the start of class." Id. Mr. Wolfert further found that about 300 students were assigned to bus routes that arrived after the start of instruction at least once a week on average, and about 160 students were assigned to bus routes that arrived after the start of instruction at least twice a week on average. See id. ¶ 7.

The Court finds that plaintiffs have provided strong evidence of persistent problems with the transportation services that the District provides—or fails to provide—to students with disabilities. The question nevertheless remains:  have plaintiffs shown that there are "questions of law or fact common to the class," FED. R. CIV. P. 23(a)(2), and that those questions are "capable of classwide resolution" such that "determination of [the questions'] truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke[?]" Wal-Mart, 564 U.S. at 350. Plaintiffs assert that their claims present the following common questions:  "(1) are Defendant's existing policies and practices related to transportation for students with disabilities deficient?; (2) how are they deficient?; (3) do those deficiencies deny class members a FAPE under the IDEA?; (4) do these deficiencies deny class members the opportunity to benefit from and participate in educational services equal to their non-disabled peers? (5) do these deficiencies deny class members the opportunity to receive educational services in the most integrated setting appropriate to their needs?; and (6) has Defendant failed to reasonably modify its educational programs and activities as needed to avoid discrimination?" Pls. Repl. at 5 (citing Pls. Mot. at 17-18). Plaintiffs say that a "true or false" answer to these questions will "generate common answers for the entire class and resolve issues that are central (and potentially dispositive) to the validity of each plaintiff's claim." Pls. Repl. at 5 (quoting

29

Thorpe v. District of Columbia, 303 F.R.D. at 146-47).  Plaintiffs further assert that "a single injunction can remedy the harm alleged in one stroke," further demonstrating commonality.  Id.

The Court finds that plaintiffs have satisfied Rule 23(a)'s commonality requirement.  Though "[m]any IDEA cases are suited to individualized assessments and relief," Robertson v. D.C., 762 F. Supp. 3d at 51, in cases where the crux of the complaint lies instead in "systemic defects" that will harm all similarly situated students, it is consistent with the purpose of the IDEA for courts to provide structural relief that serves all children with disabilities. DL II, 860 F.3d at 731 (collecting cases approving structural relief in the IDEA context); see also Robertson v. D.C., 762 F. Supp. 3d at 51.  Here, plaintiffs are not, for example, challenging eligibility for transportation services or the appropriateness of the transportation services authorized through their IEPs, or "the merits of individual, fact-specific IDEA claims."  Pls. Repl. at 7.  Rather, they claim that "[t]he District's uniform failure to provide an adequate transportation system to students with disabilities violates students' statutorily defined rights under the IDEA, regardless of why they were violated or the degree of harm they inflicted."  Id. at 11.  While the District's alleged transportation failures may affect different students in different ways, the Court finds that plaintiffs have demonstrated that those failures may stem from deficient procedures and practices that pervade the District's entire transportation system—including faulty bus route planning, untimely bus arrivals and departures, and insufficient driver, attendant, and aide staffing and training.  See Pls. Repl. at 8.[6]

---

[6]    The District repeatedly argues that, "[r]ather than a common harm, [p]laintiffs allege a smorgasbord of deviations" from their individual IEPs, including late buses, excessive travel times, missing safety equipment, absent aides and nurses, and inadequate training of busing staff.  Def. Opp. at 14.  But as plaintiffs persuasively argued at the hearing on January 6, 2026, the District's commonality objections would not be cured even if the Court divided the putative class into subclasses of students who suffered the same "type" of transportation harm, as the District seems to demand.  See Transcript of Record, Robertson v.

The Court also finds that plaintiffs' claims are organized around at least two common questions of fact, which are subject to common answers and common proof.  See DL I, 713 F.3d at 128 (explaining that to satisfy Rule 23(a)(2), identification of "even a single common question will do.").  First, concerning plaintiffs' IDEA claims:  does the District systematically fail to provide transportation services to class members?  This question is subject to a common answer—yes—based on common proof—for instance, statistics showing that the District in fact or constructively fails to provide transportation services to a certain percentage of students with disabilities who are entitled to those services.  See Wal-Mart, 564 U.S. at 350; Brown v. D.C., 928 F.3d at 1080.  Second, concerning plaintiffs' discrimination claims:  do the alleged deficiencies in the District's transportation system deny class members the opportunity to benefit from and participate in educational services equal to their non-disabled peers?  This question is subject to a common answer—yes—based on common proof—for instance, statistics showing that a certain percentage of students with disabilities who receive transportation services from the District are missing instructional time and socialization time with their peers due to the

---

D.C., Civil Action No. 24-0656 (January 6, 2026) [Dkt. No. 119] at 22:10-14.  Rather, plaintiffs assert that distinguishing between types of transportation harms—e.g., untimely buses, missing transportation supports, or absent aides—instead of treating the alleged harms as consequences of a deficient transportation system would result in a "subclass spiral."  Id. at 23:10.

To illustrate, suppose that the Court formed a subclass of students who have experienced missing transportation supports.  Under the District's theory that commonality under Rule 23(a)(2) requires identicality of harm, the District could return to this Court to argue that such a subclass still does not satisfy commonality because its members did not suffer from the absence of the same type of transportation support.  Some may have suffered from missing wheelchair harnesses, while others may have suffered from a missing ramp, while still others may have suffered from a missing car seat.  Taken to its logical conclusion, the District's approach effectively forecloses a finding of commonality in the IDEA context, where students' disabilities and the supports needed to address those disabilities are unique by design.

District's alleged transportation failures.  See DL II, 860 F.3d at 724-25 (discussing plaintiffs' statistical evidence showing a systemic failure to comply with specific IDEA requirements).

Plaintiffs have also identified a common question of law:  if the District is systematically failing to provide transportation services to class members, does that systemic failure deny those students a FAPE under the IDEA?  See Pls. Mot. at 17.  Recall that the IDEA requires that students with disabilities be provided with a FAPE, which includes providing both "special education and related services designed to meet their unique needs."  20 U.S.C. § 1400(d)(1)(A).  And "related services" includes "transportation" to and from schools and between schools, travel in and around school buildings, and any "specialized equipment (such as special or adapted buses, lifts, and ramps)" that "may be required to assist a child with a disability to benefit from special education."  Id. § 1401(26)(A); 34 C.F.R. § 300.34(c)(16); see Robertson v. D.C., 762 F. Supp. 3d at 46; Petties v. D.C., 888 F. Supp. 165, 171 (D.D.C. 1995).

But the IDEA does not outline the precise scope of "transportation services" that a state must provide in order to ensure that students with disabilities receive a FAPE.  See Pierre-Noel on behalf of K.N. v. Bridges Pub. Charter Sch., 113 F.4th at 974.  So in essence, plaintiffs ask:  what is the scope of "transportation services" that the District must provide to students with disabilities in order to ensure that they receive a FAPE under the IDEA?  See Pls. Mot. at 17; see also Transcript of Record, Robertson v. D.C., Civil Action No. 24-0656 (January 6, 2026) [Dkt. No. 119] at 41:17-20 (plaintiffs' counsel argued that the IDEA's mandate to provide "the related service of transportation . . . includes bus timeliness; it includes transportation supports; and it includes other accommodations, like aides."); id. at 43:3-5, 45:8-9 (the District's counsel disputed plaintiffs' framing of timeliness issues and a lack of transportation supports as general

32

"transportation injuries" under the IDEA, especially given the lack of "statutory, regulatory law" outlining what "safe, reliable, and appropriate transportation" necessitates under the IDEA).

The Court's resolution of this question of law therefore "is central to the validity of each one of [plaintiffs' IDEA] claims in one stroke." Wal-Mart, 564 U.S. at 350. If the Court concludes that the mere provision of transportation to and from school is enough to satisfy the IDEA—regardless of bus timeliness in the mornings and afternoons or the presence of safety harnesses and dedicated staff—then plaintiffs' claims alleging untimely buses, missing safety supports, absent aides and nurses, and inadequate bus staff training are all undermined "in one stroke." Id. But if the Court concludes that the IDEA requires the District to provide something more than the bare minimum of "transportation services"—that is, if the quality of the District's transportation services matters—then that legal conclusion would lend some support to the "validity" of every plaintiffs' IDEA claims "in one stroke." Wal-Mart, 564 U.S. at 350.[7]

Comparing plaintiffs' claims to those at issue in Wal-Mart, DL I, and DL II is instructive. Recall that in Wal-Mart, plaintiffs sought to certify a nationwide class of approximately 1.5 million female Wal-Mart employees, but failed to point to any companywide policies, customs, or practices that might furnish the "glue" holding together the millions of decentralized employment decisions at issue. See 564 U.S. at 352. Here, by contrast, all of the policies and practices that plaintiffs seek to challenge—both written and unwritten—as well as

---

[7]    The Court is not without guidance in defining the upper and lower limits of the District's obligation to provide "transportation services." For example, in 2024, the D.C. Circuit held that the District's obligation under the IDEA to provide "transportation services" at minimum includes door-to-door transportation assistance—that is, moving a child to and from the door of their apartment to the vehicle that will transport them to and from school. See Pierre-Noel on behalf of K.N. v. Bridges Pub. Charter Sch., 113 F.4th at 978. And earlier this year, this Court found that some "auxiliary benefits," such as reimbursement for the costs of self-transportation when the bus is late, are beyond the scope of the District's obligation under the IDEA to provide "transportation services." Robertson v. D.C., 762 F. Supp. 3d at 51-52.

all of plaintiffs' alleged harms flow from decisions made by a single, centralized body:  the

District, through OSSE.  In addition, Wal-Mart is a Title VII case, and "the crux of the inquiry"

when adjudicating Title VII claims is "the reason for a particular employment decision."

DL II, 860 F.3d at 725 (quoting Wal-Mart, 564 U.S. at 352).  "The fact that Wal-Mart

supervisors might have had different reasons for 'literally millions of employment decisions'

therefore was fatal to the commonality of the plaintiffs' Title VII claims."  Id. (quoting

Wal-Mart, 564 U.S. at 352).  "By contrast, IDEA requires the District to find and serve all

children with disabilities as a condition of its funding," and "[u]nlike Title VII liability, IDEA

liability does not depend on the reason for a defendant's failure and plaintiffs need not show why

their rights were denied to establish that they were."  Id.  The D.C. Circuit found that Wal-Mart's

commonality analysis therefore had "limited relevance" to the IDEA case before it.  Id.

This Court similarly finds that Wal-Mart's commonality inquiry has limited

relevance here.  The key question is whether the District is systemically failing to provide

transportation services as required by the IDEA, "not why it has failed to do so in any particular

case or on a systemic level."  Garnett v. Zeilinger, 301 F. Supp. 3d 199, 208 (D.D.C. 2018).

"This question can be answered on a class-wide basis."  Id.; see also DL II, 860 F.3d at 725

(affirming certification of multiple subclasses of disabled children even though the school system

may have denied each class member special education for different reasons, such as

"insufficient outreach," "insufficient staff," or "documentation errors.").

Plaintiffs' proposed class is also distinguishable from the class the D.C. Circuit

decertified for lack of commonality in DL I.  There, parents of children between the ages of three

and five brought IDEA claims against the District, alleging that it violated a number of its IDEA

obligations.  See DL I, 713 F.3d at 122-23.  Specifically, to comply with the IDEA, the District

34

must:  (1) provide "an effective intake and referral process"; (2) offer "adequate and timely education placements to implement individual education plans"; and (3) ensure "a smooth and effective transition from early intervention programs to preschool programs."  DL I, 713 F.3d at 128.  These three obligations are collectively known as the "Child Find" obligations.  See 20 U.S.C. § 1412(a)(3)(A).  The district court originally certified a class of all three-to-five-year-olds with respect to whom the District failed to discharge any of these Child Find obligations, but the D.C. Circuit decertified the class in DL I.  See DL I, 713 F.3d at 129.  The court explained that the class failed to satisfy Rule 23(a)'s commonality requirement because "the harms alleged to have been suffered by the plaintiffs . . . involve[d] different policies and practices at different stages of the District's Child Find and FAPE process."  Id. at 127.  For example, for some children in the class, the alleged harm was due to an ineffective "intake and referral process" while for others, the alleged harm was caused by failure to adequately implement their IEPs, while for still others, the alleged harm was caused by "the absence of a smooth and effective transition" from one program to another.  Id. at 128.  The court of appeals reasoned that, "in the absence of a uniform policy or practice that affects all class members," plaintiffs had failed to show commonality because there was no common question that would assist the district court in determining liability under the IDEA for all class members.  Id.

Unlike the putative class in DL I, which challenged the District's implementation of several discrete statutory obligations under the IDEA, see DL II, 860 F.3d at 723 (citing DL I, 713 F.3d at 127), here plaintiffs present significant evidence that the District's allegedly deficient transportation practices result in a failure to satisfy a single required element of providing students with disabilities with a FAPE under the IDEA:  ensuring the provision of "special education and related services designed to meet their unique

35

needs." 20 U.S.C. § 1400(d)(1)(A). And "related services" include transportation services. Id. § 1401(26)(A); 34 C.F.R. § 300.34(c)(16). Plaintiffs' expert declarations, parent declarations, and statistical analyses all point to recurring, district-wide failures in transportation services—such as inadequate bus route design, insufficient staffing and training, and inadequate oversight—that allegedly harm putative class members irrespective of each individual members' disability, diagnosis, placement, or school. Plaintiffs challenge the District's practices as it relates to its transportation system, which functions as a gateway to the receipt of a FAPE and, plaintiffs allege, places each and every putative class member at risk of being denied a FAPE. DL I, 713 F.3d at 131 (Edwards, J., concurring) (explaining that the district court is "free to certify a class or subclass if it determines that a single policy or practice effectively forecloses disabled children in that class or subclass from pursuing IDEA benefits.").

On remand after the decision in DL I, Judge Lamberth certified four subclasses of three-to-five-year-olds denied a special education: (1) those whom the District failed to identify as disabled; (2) those whom the District failed to evaluate within 120 days of referral; (3) those to whom the District failed to provide an eligibility determination within 120 days of referral; and (4) those denied a smooth transition from an early intervention program to a preschool program. DL v. D.C., 302 F.R.D. 1, 18 (D.D.C. 2013), aff'd, DL II, 860 F.3d 713.[8] The D.C. Circuit found that the fourth subclass satisfied commonality because it "was organized

_____

[8]    The fourth subclass certified in DL II maps onto one of the "Child Find" obligations—the "smooth and effective transition" obligation—which requires states to provide a seamless transition when three-year-olds move from "early intervention" programs (governed by Part C of the IDEA) to preschool (governed by Part B of the IDEA). See 20 U.S.C. §§ 1412(a)(9), 1435(a)(8)(A), 1437(a)(9); 34 C.F.R. § 303.209. A child's transition between these two programs is "smooth and effective" if, among other things, it begins at least ninety days before the child's third birthday, delivers "seamless" services, and involves both Part B and Part C personnel. See 20 U.S.C. § 1412(a)(9); 34 C.F.R. § 303.209.

36

around a common question—did the District fail to provide certain individuals a smooth and effective transition from early intervention to preschool?—which was subject to a common answer—yes—based on common proof—evidence showing that 30 per cent of toddlers were denied a smooth transition from early intervention to preschool." Brown v. D.C., 928 F.3d at 1081 (citing DL II, 860 F.3d at 724). The same is true here. Plaintiffs' claims raise common questions that are subject to common answers based on common proof. See supra at 31.

Having considered the effect of Wal-Mart, DL I, and DL II on the instant case and the District's arguments to the contrary, the Court finds that plaintiffs have sufficiently proven that their proposed class satisfies Rule 23(a)(2)'s requirement of commonality.

### C. Typicality

Next up is the issue of typicality, which "shifts the focus from the characteristics of the class to the preferred characteristics of the class representatives." DL v. D.C., 302 F.R.D. at 14. To show typicality, the named plaintiffs must prove that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." FED. R. CIV. P. 23(a)(3). The typicality requirement "is satisfied if each class member's claim arises from the same course of events that led to the claims of the representative parties and each class member makes similar legal arguments to prove the defendant's liability." Stephens v. Farmers Rest. Grp., 329 F.R.D. 476, 483 (D.D.C. 2019). Varying fact patterns "do[] not mandate a finding of a lack of typicality, as long as the claims arise out of the same legal or remedial theory." In re Lorazepam & Clorazepate Antitrust Litig., 202 F.R.D. 12, 27 (D.D.C. 2001). Commonality and typicality "tend to merge." Gen. Tel. Co. of Sw. v. Falcon, 457 U.S. 147, 157 n.13 (1982).

This standard is easily met here. As this Court explained in greater detail in its opinion granting in part and denying in part the District's partial motion to dismiss, "[t]he

37

putative class members have alleged the same claims and suffered the same injury as have the named plaintiffs:  the District of Columbia's [alleged] failure to provide safe, reliable, and appropriate transportation to students with disabilities, resulting in the deprivation of FAPE," denial of equal access to their education, and unnecessary segregation of plaintiffs.  Robertson v. D.C., 762 F. Supp. 3d at 54.  Because "each class member's claim arises from the same course of events that led to the claims of the representative parties and each class member makes similar legal arguments to prove the defendant's liability,"  Stephens v. Farmers Rest. Grp., 329 F.R.D. at 483, the Court finds that plaintiffs have satisfied Rule 23(a)'s typicality requirement.

The District advances two arguments for why plaintiffs cannot establish typicality.  See Def. Opp. at 21-24.  First, the District notes that plaintiffs' proposed class definition includes students with disabilities who "have experienced and will continue to experience" unsatisfactory transportation services.  Id. at 22 (quoting Pls. Mot. at 11).  But the District says that named plaintiffs cannot show that they "will continue to experience" unsatisfactory transportation services because each plaintiff "has already received a hearing officer determination that awarded them relief for their transportation-related harms."  Id.  Such relief included prospective relief in the form of an order that "OSSE shall provide consistent, reliable and appropriate transportation to and from Public School pursuant to [each] Student's IEP."  Id. (citing Robertson HOD at 11; Daggett HOD at 13; and Cannon-Clark HOD at 12-13).

The Court does not find this argument persuasive.  All five of the individual named plaintiffs allege that the harms they are experiencing as a result of the District's alleged transportation failures are ongoing, even after they received individualized relief at their administrative hearings.  See Robertson Decl. [Dkt. No. 4-22] ¶ 43; Daggett Decl. [Dkt. No. 4-3] ¶¶ 55-56; Declaration of Joann McCray [Dkt. No. 110-16] ¶¶ 6-21; Declaration of Veronica

38

Guerrero [Dkt. No. 45-2] ¶¶ 6, 11-18, 20; Declaration Marcia Cannon-Clark [Dkt. No. 110-17] ¶¶ 9-14.  In addition, the hearing officer determinations that each individual named plaintiff received did not afford them the systemic relief they seek here, as each hearing officer dismissed plaintiffs' systemic IDEA, Section 504, ADA, and DCHRA claims with prejudice.  See Robertson HOD [Dkt. No. 4-24] at 1-2; Dagget HOD [Dkt. No. 4-6] at 1-2; McCray HOD [Dkt. No. 4-20] at 2; Guerrero HOD [Dkt. No. 24-1] at 3; Clark HOD [Dkt. No. 24-2] at 1-2. Plaintiffs' proffered statistical analyses also indicate that the systemic issues alleged by the individual named plaintiffs and putative class members may still plague the District's transportation system.  See generally Bates White Decl.; Bates White Decl. Am. (analyzing bus trip tickets from the 2024-2025 school year and reporting ongoing timeliness issues).  The individual named plaintiffs' claims therefore remain typical of the putative class, notwithstanding the individualized relief previously awarded at their administrative hearings.

Second, the District argues that plaintiffs' claims are not typical to the class because plaintiffs "have exhausted their administrative remedies and putative class members (presumably) have not."  Def. Opp. at 23.  It is true that parties seeking relief under the IDEA must first exhaust their administrative remedies, unless an exception applies.  See Robertson v. D.C., 762 F. Supp. 3d at 46-48 (explaining the IDEA's exhaustion requirement).  But as this Court has previously held, the putative class members need not exhaust their administrative remedies because "[t]he named plaintiffs' exhaustion is sufficient under the doctrine of vicarious exhaustion."  Id. at 53.  Because "[b]oth the named plaintiffs and the putative plaintiffs have allegedly suffered the same injury . . . [i]t would be inefficient and irrational to require each similarly situated parent to individually raise their claims administratively."  Id. at 54.  "This

39

common claim serves to eliminate the utility of the exhaustion requirement," and the Court

therefore finds that each of the putative class members need not exhaust.  Id.

Having considered the District's arguments to the contrary, the Court concludes

that plaintiffs have sufficiently demonstrated by a preponderance of the evidence that their

proposed class satisfies Rule 23(a)(3)'s requirement of typicality.

### D.  Adequacy

The final Rule 23(a) requirement is adequacy.  To demonstrate adequacy, the

representative parties must show they "will fairly and adequately protect the interests of the

class."  FED. R. CIV. P. 23(a)(4).  The adequacy requirement "embraces two components:  the

class representative (i) 'must not have antagonistic or conflicting interests with the unnamed

members of the class' and (ii) 'must appear able to vigorously prosecute the interests of the class

through qualified counsel.'"  J.D. v. Azar, 925 F.3d 1291, 1312 (D.C. Cir. 2019) (quoting

Twelve John Does v. District of Columbia, 117 F.3d 571, 575 (D.C. Cir. 1997)).  The first

criterion focuses on conflicts of interest, which "prevent named plaintiffs from satisfying the

adequacy requirement only if they are 'fundamental to the suit and . . . go to the heart of the

litigation.'"  Nat'l Veterans Legal Servs. Program v. U.S., 235 F. Supp. 3d 32, 41 (D.D.C. 2017)

(quoting Keepseagle v. Vilsack, 102 F. Supp. 3d 205, 216 (D.D.C. 2015)) (alteration in original).

The second criterion ensures that class counsel is qualified to represent the class.  See id. at 43.

Counsel for the named plaintiffs also request to be appointed counsel for the

plaintiff class pursuant to Rule 23(g) of the Federal Rules of Civil Procedure.  In appointing class

counsel, the Court must consider:  "(i) the work counsel has done in identifying or investigating

potential claims in the action; (ii) counsel's experience in handling class actions, other complex

litigation, and the types of claims asserted in the action; (iii) counsel's knowledge of the

applicable law; and (iv) the resources that counsel will commit to representing the class."  FED. R. CIV. P. 23(g)(1)(A).  The ultimate question is whether counsel for the named plaintiffs can "fairly and adequately represent the interests of the class."  FED. R. CIV. P. 23(g)(4).

The Court finds that plaintiffs have satisfied the adequacy requirement.  The named plaintiffs challenge the same conduct by the District that putative class members have been subjected to, and allege the same harms as putative class members.  See Pls. Mot. at 23-24. There is also no evidence in the record that the named plaintiffs "have antagonistic or conflicting interests with the unnamed members of the class."  J.D. v. Azar, 925 F.3d at 1312 (quoting Twelve John Does v. District of Columbia, 117 F.3d at 575); see also Pls. Mot. at 23.

The group of attorneys seeking to represent the class are also well-qualified to "fairly and adequately represent the interests of the class."  FED. R. CIV. P. 23(g)(4).  Plaintiffs' counsel include attorneys experienced in civil rights litigation in this district, attorneys with experience in disability rights litigation, and attorneys with experience in class litigation. See Pls. Mot. at 24-28; see also Declaration of Margaret Warner [Dkt. No. 29-2] (partner at McDermott Will & Emery LLP with significant trial and class action experience in this district); Declaration of Kaitlin Banner [Dkt. No. 29-3] (counsel for The Washington Lawyers' Committee for Civil Rights and Urban Affairs with significant experience litigating disability rights class actions in this district); Declaration of Katherine Zeisel [Dkt. No. 29-4] (counsel for The Children's Law Center with significant experience representing clients in special education cases in this district); Declaration of Shira Wakschlag [Dkt. No. 29-5] (counsel for The Arc of the United States with significant experience in litigating civil rights class actions).  Given their experience and knowledge of the applicable law, the Court concludes that counsel for the named plaintiffs will fairly and adequately represent the class.  See FED. R. CIV. P. 23(a)(4), (g).

The District argues that the named plaintiffs cannot prove adequacy because they "have all received relief in accordance with their identified transportation-related needs," so they "have no incentive" to seek "additional transportation-related services . . . when they themselves do not need them." Def. Opp. at 24-25. This is a repackaged version of the District's argument against typicality—that is, that the named plaintiffs cannot represent the putative class because they have already received some individualized relief through their administrative hearings. Because this argument rests on the same premise the Court rejected in addressing typicality, the Court rejects the District's argument against adequacy for the same reasons. See supra at 38-39.

Having considered the District's arguments to the contrary, the Court finds that plaintiffs have sufficiently demonstrated by a preponderance of the evidence that their proposed class satisfies Rule 23(a)(4)'s requirement of adequacy. The Court also finds that counsel for the named plaintiffs will fairly and adequately represent the interests of the class, and therefore appoints them as class counsel pursuant to Rule 23(g).

## IV. RULE 23(b) FINDINGS AND CONCLUSIONS

Having satisfied all of Rule 23(a)'s requirements, plaintiffs now must satisfy one of the three provisions of Rule 23(b). Plaintiffs are seeking both injunctive and declaratory relief and compensatory education, so they seek "hybrid certification" under Rules 23(b)(2) and (b)(3).

Where, as here, plaintiffs seek both compensatory education awards and injunctive and declaratory relief, courts have approved a hybrid certification under Rules 23(b)(2) and (b)(3). See Barnes v. District of Columbia, Civil Action No. 24-750 (RCL), 2025 WL 947684, at *26 (D.D.C. Mar. 28, 2025) (citing A.R. v. Conn. State Bd. of Educ., 5 F.4th 155, 159 (2d Cir. 2021)). But because the Court dismissed plaintiffs' claims for compensatory education, see Robertson v. D.C., 762 F. Supp. 3d at 52-53, there is no need to

42

address plaintiffs' claims related to Rule 23(b)(3). See id. at 53 (holding that "[t]here is no basis upon which it would be appropriate for the Court to award compensatory education for IDEA violations accruing after the issuing of the plaintiffs' original hearing officer determinations."). The Court therefore will only consider plaintiffs' Rule 23(b)(2) class certification arguments.

Under Rule 23(b)(2), "[a] class action may be maintained if Rule 23(a) is satisfied and if . . . the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." FED. R. CIV. P. 23(b)(2). "The key to the (b)(2) class is the indivisible nature of the injunctive or declaratory remedy warranted—the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them." Wal-Mart, 564 U.S. at 360 (quoting Richard A. Nagareda, Class Certification in the Age of Aggregate Proof, 84 N.Y.U. L. REV. 97, 132 (2009)) (internal quotation marks omitted). Courts have interpreted Rule 23(b)(2) as imposing two requirements: "(1) that defendant's actions or refusal to act are generally applicable to the class and (2) that plaintiffs seek final injunctive relief or corresponding declaratory relief on behalf of the class." O.A. v. Trump, 404 F. Supp. 3d 109, 157 (D.D.C. 2019) (quoting Bynum v. District of Columbia, 214 F.R.D. 27, 37 (D.D.C. 2003)) (internal quotation marks omitted).

As to the first requirement, plaintiffs challenge systemic deficiencies in the District's transportation system for students with disabilities, and argue that those deficiencies violate the students' rights under the IDEA, the ADA, Section 504 of the Rehabilitation Act, and the DCHRA. See Pls. Mot. at 30-32. And as discussed, the putative class includes students with disabilities who "require transportation from the District of Columbia to attend school and have experienced and will continue to experience" deficient transportation services from the District.

43

See Pls. Mot. at 11.  So if plaintiffs are correct that there are systemic deficiencies in the District's transportation system, then the District's alleged conduct—including its alleged refusal to remedy those systemic deficiencies—is "generally applicable to the class." O.A. v. Trump, 404 F. Supp. 3d at 157; see also Pls. Mot. at 30; FED. R. CIV. P. 23(b)(2).  The Court therefore finds that plaintiffs have satisfied Rule 23(b)(2)'s first requirement.

As to Rule 23(b)(2)'s second requirement—that "final injunctive relief or corresponding declaratory relief [must be] appropriate respecting the class as a whole," FED. R. CIV. P. 23(b)(2)—plaintiffs contend that their requested relief would "affect the entire class at once."  Pls. Repl. at 17 (quoting Wal-Mart, 564 U.S. at 362).  This is so, they say, because an injunction addressing the deficiencies in the District's transportation system would "increase class members' opportunity to receive the transportation services to which they are entitled."  Id. at 17-18.  Plaintiffs argue that, while the District "may have to perform an individualized inquiry to determine how best to individually accommodate class members across a wide geographic area to get them to and from school," if plaintiffs are granted injunctive relief, the Court "need not do the same in issuing broad injunctive and declaratory relief to ensure [the District] complies with federal law."  Pls. Mot. at 31.

The District counters that plaintiffs have "fail[ed] to show that a class-wide injunction would remedy their alleged disparate injuries without 'relief specifically tailored to each class member.'"  Def. Opp. at 27 (quoting Shook v. Bd. of Cnty. Commissioners of Cnty. of El Paso, 543 F.3d 597, 604 (10th Cir. 2008)).  The District argues that given plaintiffs' "theory of injury"—that is, that they have not been receiving transportation services in conformity with their IEPs—"[n]o injunction . . . could remedy their injuries without accounting for each student's individual needs."  Id.  The District points to plaintiffs' proposed order as proof that

"each individual class member would be entitled to a different injunction," making certification under Rule 23(b)(2) improper.  Id. at 28 (quoting Wal-Mart, 564 U.S. at 360).[9]

The Court finds that plaintiffs have satisfied the second requirement of Rule 23(b)(2).  As the D.C. Circuit explained in DL II, "Rule 23(b)(2) exists so that parties and courts, especially in civil rights cases like this, can avoid piecemeal litigation when common claims arise from systemic harms that demand injunctive relief."  860 F.3d at 726; see also Brown v. D.C., 928 F.3d at 1083 (noting that "civil rights cases against parties charged with unlawful, class-based discrimination . . . [are] prime examples of what [Rule 23](b)(2) is meant to capture.") (quoting Wal-Mart, 564 U.S. at 361) (internal quotation marks omitted).  Contrary to the District's framing of plaintiffs' theory of injury, plaintiffs are not challenging individualized determinations regarding their personal IEPs.  Rather, they allege that the District's transportation system is plagued by systemic deficiencies that deprive plaintiffs and similarly situated individuals of adequate transportation to and from school, in violation of D.C. and federal law.  See Pls. Repl. at 19; see also DL v. D.C., 302 F.R.D. at 16 (explaining that because members of each of plaintiffs' subclasses "allege[d] a uniform harm . . . injunctive relief requiring the district to perform its statutory duty [would] 'settl[e] the legality of the behavior

---

[9]     The District also argues that Rule 23(b)(2) certification is improper because plaintiffs' requested injunction is "fatally vague," and thus fails to satisfy Rule 65(d)(1) of the Federal Rules of Civil Procedure.  See Def. Opp. at 25-27.  Rule 65(d)(1) requires that any injunction issued by the Court must "state its terms specifically" and "describe in reasonable detail" the acts restrained or required.  FED. R. CIV. P. 65(d)(1).  But whether plaintiffs' requested injunction satisfies Rule 65(d)(1) is not a question the Court must resolve at the class certification stage.  Instead, the Court must ask whether the putative class is "sufficiently cohesive [such] that any classwide injunctive relief can satisfy the limitations of [Rule 65(d)]." Shook v. Board of County Commissioners of County of El Paso, 543 F.3d at 604.  In the Court's view, plaintiffs have set forth facts suggesting that the District's conduct regarding its transportation system is generally applicable to the class as a whole, making injunctive relief appropriate.

with respect to the class as a whole.") (quoting FED. R. CIV. P. 23(b)(2)).  The aim of plaintiffs'

suit therefore is to "rectify the District's systemic failure to comply" with a "specific statutory

dut[y]" to all class members," which "fits the prototype of [a] (b)(2) class."  DL v. D.C., 302

F.R.D. at 16 (quoting Baby Neal ex rel. Kanter v. Casey, 43 F.3d 48, 58-59 (3d Cir. 1994)).

Having addressed the District's arguments to the contrary, the Court finds that

plaintiffs have satisfied Rule 23(b)(2)'s requirements and are entitled to class certification.

## V.    CLASS DEFINITION

With the requirements of Rule 23 satisfied, the Court must define the class being

certified.  See FED. R. CIV. P. 23(c)(1)(B).  Recall plaintiffs' proposed class definition:

> All students with disabilities aged 3-22 who, from March 7, 2022,
> until judgment is issued in this case, require transportation from
> the District of Columbia to attend school and have experienced and
> will continue to experience Defendant's failure to provide safe,
> reliable, and appropriate transportation.

Pls. Mot. at 11.  As previewed above, the Court largely adopts this class definition but modifies

it as follows to avoid any fail-safe issues, to the extent they may exist:

> All students with disabilities aged 3-22 who, from March 7, 2022,
> until judgment is issued in this case, require transportation from
> the District of Columbia to attend school and have experienced and
> will continue to experience unsafe, unreliable, or inappropriate
> transportation services from the District of Columbia.

The Court certifies this class pursuant to Rule 23(b)(2) and with respect to plaintiffs' existing

claims under the IDEA, ADA, Section 504 of the Rehabilitation Act, and DCHRA.

For the reasons explained in this opinion, the Court will GRANT plaintiffs' Motion to Certify Class [Dkt. No. 29], as amended by plaintiffs' Supplemental Brief on Class Certification [Dkt. No. 110]. A separate order consistent with this opinion will issue this same day.

PAUL L. FRIEDMAN
United States District Judge

DATE: 1/16/26

# EXHIBIT B

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
---

CRYSTAL ROBERTSON on behalf )
of herself and her minor )
child D.R., et al., )
) CIVIL NO. 24-656
)
     Plaintiffs, )
) Tuesday, January 6, 2026
v. )
)
DISTRICT OF COLUMBIA, )
)
)
     Defendant. )
_____ )

TRANSCRIPT OF HEARING ON CLASS CERTIFICATION

BEFORE THE HONORABLE JUDGE PAUL L. FRIEDMAN
UNITED STATES SENIOR DISTRICT JUDGE
---

APPEARANCES:       MCDERMOTT WILL & SCHULTE LLP
                BY:  MARGARET WARNER
                   CHRISTOPHER SHOEMAKER
                   EUGENE I. GOLDMAN
                500 North Capitol Street, N.W.
                Washington, DC 20001
                202-756-8228
                Email: Mwarner@mwe.com

                WASH.LAWYERS' CMTE FOR CIVIL RIGHTS &
                URB.AFFAIRS
                BY:  KAITLIN R. BANNER
                700 14th Street NW, Ste Fourth Floor
                Washington, DC 20005
                202-319-1000
                Email: Kaitlin_banner@washlaw.org

                For the Plaintiffs
                ---

COURT REPORTER:    CHANDRA R. KEAN, RMR, FCRR
                Official Court Reporter
                333 Constitution Avenue, NW
                Washington, DC 20001

APPEARANCES CONTINUED:

> CHILDREN'S LAW CENTER
> BY: KATHERINE I. ZEISEL
> 250 Massachusetts Avenue NW, Suite 350
> Washington, DC 20001
> 202-728-5597
> Email: Kzeisel@childrenslawcenter.org


> ARC OF THE UNITED STATES
> BY: EVAN MONOD
> 2000 Pennsylvania Avenue, NW, Ste. 500
> Washington, DC 20006
> 802-349-9348
> Email: Monod@thearc.org

> For the Plaintiffs


> OFFICE OF THE ATTORNEY GENERAL FOR THE
>  DISTRICT OF COLUMBIA
> BY: GREGORY KETCHAM-COLWILL
>     MATEYA B. KELLEY
>     DAVID WASSERSTEIN
>     CAROL EPSTEIN, OSSE Agcy. Counsel
> 400 6th Street NW
> Washington, DC 20001
> 202-735-7572
> Email: Gregory.ketcham-colwill@dc.gov

> For the Defendant

appear to be. The District didn't do that.

The District has not disputed Mr. Wolfert's underlying analysis of the trip tickets, and the District has not provided any evidence of its own indicating that the transportation issues have been resolved.

Instead, the District has lodged a series of formalistic objections to plaintiffs' proposed class definition. Each of these are meritless.

Plaintiffs' class definition is simple. They include students in the District of Columbia who have experienced -- who receive special education transportation and who have experienced and will continue to experience the District's failure to provide safe, reliable, and appropriate transportation.

THE COURT: Let me ask you a question about that.

It's also been proposed, I think by the District or in some of the -- something that I read that one of the things they object to is the language "failure to provide."

And that may or may not relate, I'm not sure, to the -- what's it called -- the fail-safe argument that was discussed in Judge Millett's opinions.

And it's been suggested that part of the problem,

maybe all of the problem, could be resolved if one were simply to redact the words "District's failure to provide," and instead say something like, "The class is defined as all students with disabilities, age 3 through 22, who from March 7, 2022, until the judgment is issued in this case, require transportation from the District of Columbia to attend school and have experienced and will continue to experience" -- and here's the change -- "unsafe, unreliable, or inappropriate transportation services from the District of Columbia."

Why doesn't that accomplish what you need to accomplish and perhaps deal with the fail-safe argument that the District raises?

MR. SHOEMAKER: Your Honor, I think that would be an appropriate change to plaintiffs' proposed class definition.

The fail-safe concern in re *White* doesn't concern us, actually, because the Court in that case reversed the District Court's denial of certification based on fail-safe grounds. The D.C. Circuit said there is no freestanding bar to a fail-safe class definition.

And that's because with respect to B-2 classes, where there's a general practice or policy, the fail-safe concerns fall away. It's because those concerns are based on ascertainability of the

there, Child C, they don't help with the wheelchair to get him to the bus? And you can go on and on.

And why is -- why are not those distinct harms unique to each child? Why don't those unique -- those harms unique to each child undercut, if not your common issue, at least the argument that you use common proof to prove that they didn't get what they were entitled to?

You don't use common proof. You use proof that is unique to that child as opposed to some other child, don't you?

MR. SHOEMAKER: Your Honor, a couple things.

The trip tickets that address transportation are one source of common proof that encompass all the things like bus timeliness, whether aids were present, whether equipment was present. And so that's a source of common proof for all of these issues.

To your broader point, though, the issue with the District's argument that there are distinct harms here is that the District is demanding identicality of harms when Rule 23 only demands commonality.

This is an argument that the District raised in *D.L.*, and Judge Tatel expressly rejected this argument. Because Judge Tatel recognized that there may be different reasons that a person did not receive, for

That is fundamentally what distinguishes that *D.L.* subclass from this one.

And, again, we are not contesting numerosity as to timeliness, and on class certification, plaintiffs do have to show some evidence to support each one of the elements of Rule 23.

They have not shown commonality because they are seeking to litigate claims that are different, that are not shared by all class members, and that's really the fundamental defect, even if you cast this case as about the District's policies and whether they are deficient.

If the Court were to find the District policies with respect to safety harnesses are deficient, that finding does nothing for the many class members who do not require a safety harness; that is the defect that the Court identified in *D.L.-1*, the defect that the Court -- that the Fourth Circuit recently identified in *G.T.*, a case that plaintiffs rely on in their briefing. They relied on the District Court's decision. And since that briefing, the Fourth Circuit reversed that grant of class certification for this reason.

All class members have to share the same injury. By the terms of plaintiffs' own class definition, it's impossible to tell, if you just look at the class definition, whether they share the same injury because

they define it in terms of safe, reliable, and appropriate.

So by its own terms, it includes students who receive safe transportation but not reliable transportation and vice versa. Those aren't the same harms.

I'll also note that -- my colleague mentioned a few common questions. I think they were: Are there deficiencies in the District's transportation policies, writ large? And, if so, what are those deficiencies, and do those deficiencies deprive students of a FAPE?

Those are the same common questions that the District Court was presented with in *Thorpe* which is an *Olmstead* class action that is cited in plaintiffs' briefing.

That decision was reviewed on a petition for interlocutory review by the D.C. Circuit, and the D.C. Circuit said, "If those were truly the only common questions, we would have serious doubts about whether class certification was appropriate."

But the Circuit then went on to find other common questions that it found were sufficient for that stage of the litigation for -- to deny the petition for interlocutory review, and that standard of review is quite deferential.

includes timely buses and each of these different transportation supports that are found in various class members.

THE COURT: But you're trying to argue there can be no class because the lack of commonality of the wheelchair-bound child with the autistic child with the deaf child with the child on dialysis, and that's the end of your analysis.

MR. KETCHAM-COLWILL: Different transportation supports are provided to different children.

The -- plaintiffs' class as defined includes any child having any sort of difficulty with transportation, but those difficulties have to be defined by reference to each child's IEP. Each child has a different IEP.

And if the Court finds that the District has some deficiency with respect to safety harnesses, that does nothing for a child that does not need safety harnesses. And that is -- that was the point in *D.L.-1* and in *G.T.* and in other cases.

The point I was trying to make -- well, first, let me just say, an easier way to distinguish *Thorpe* and its appeals is just that there, again, you have one harm. The same injury shared by all plaintiffs. In an *Olmstead* claim the harm is unjustified isolation. Every class member in that case was saying, I am eligible to