NOT YET SCHEDULED FOR ORAL ARGUMENT

No. 26-8001

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

IN RE:
DISTRICT OF COLUMBIA,
PETITIONER.

ON PETITION FOR PERMISSION TO APPEAL FROM AN ORDER OF THE
UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

**BRIEF FOR PETITIONER THE DISTRICT OF COLUMBIA**

BRIAN L. SCHWALB
Attorney General for the District of Columbia

CAROLINE S. VAN ZILE
Solicitor General

ASHWIN P. PHATAK
Principal Deputy Solicitor General

JEREMY R. GIRTON
Deputy Solicitor General

PERRY R. CAO
Assistant Attorney General
Office of the Solicitor General

Office of the Attorney General
400 6th Street, NW, Suite 8100
Washington, D.C. 20001
(202) 724-5528
perry.cao@dc.gov

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

A. *Parties and amici.*—Plaintiffs below and respondents here are Crystal Robertson, on behalf of herself and her minor child D.R., Elizabeth Daggett, on behalf of herself and her minor child H.D., Joann McCray, on behalf of herself and her minor child J.C., Veronica Guerrero, on behalf of herself and her minor child A.F., Marcia Cannon-Clark, on behalf of herself and her minor child B.R.C., David Clark, on behalf of himself and his minor child B.R.C., and the Arc of the United States.  Defendant below and petitioner here is the District of Columbia.  The United States was an interested party below but has not appeared in this Court.  Friendship Public Charter School participated as an amicus curiae in support of plaintiffs before the district court but has also not appeared in this Court.

B. *Rulings under review.*—The rulings of the district court (Friedman, J.) under review are the Opinion and Order dated January 16, 2026 (Dkt. Nos. 120, 121) granting plaintiffs' motion for class certification.  The Opinion is reported at 816 F. Supp. 3d 77.  The Order is unreported.

C. *Related cases.*—This case has not previously been before this Court or any other court.  Counsel is not aware of any other related cases within the meaning of Circuit Rule 28(a)(1)(C).

i

## TABLE OF CONTENTS

INTRODUCTION ....................................................................................................1

JURISDICTIONAL STATEMENT ........................................................................3

STATEMENT OF THE ISSUES.............................................................................3

STATEMENT OF THE CASE .................................................................................4

      1.     Statutory Background.................................................................4

      2.     Factual Background....................................................................5

      3.     Procedural History.....................................................................9

STANDARD OF REVIEW ....................................................................................14

SUMMARY OF ARGUMENT ..............................................................................14

ARGUMENT ..........................................................................................................16

      I.     This Court Should Grant The Rule 23(f) Petition Because The
District Court's Commonality Ruling Was Manifestly
Erroneous.................................................................................17

            A.     The class definition does not satisfy commonality...................19

            B.     Plaintiffs' contrary contentions are unpersuasive....................26

      II.     This Court Should Grant The Rule 23(f) Petition Because The
District Court's Rule 23(b)(2) Ruling Was Manifestly
Erroneous.................................................................................30

      III.    This Court Should Vacate The Certified Class In Light Of
Plaintiffs' Tacit Admission That It Is Overbroad .................35

CONCLUSION.......................................................................................................39

ii

# TABLE OF AUTHORITIES*

*Cases*

*Al-Tamimi v. Adelson*,
916 F.3d 1 (D.C. Cir. 2019) ...............................................................36

*Branham v. District of Columbia*,
427 F.3d 7 (D.C. Cir. 2005) ...............................................................23

*Brown v. District of Columbia*,
928 F.3d 1070 (D.C. Cir. 2019) .........................................................33

*\*D.L. v. District of Columbia ("D.L. I")*,
713 F.3d 120 (D.C. Cir. 2013) ..............................2, 14, 17, 19-20, 24-25, 30, 32

*\*D.L. v. District of Columbia ("D.L. II")*,
860 F.3d 713 (D.C. Cir. 2017) ..............................2, 14, 23-25, 31, 34

*D.L. v. District of Columbia*,
302 F.R.D. 1 (D.D.C. 2013) .......................................................... 31-33

*Faiella v. Fed. Nat'l Mortgage Ass'n*,
928 F.3d 141 (1st Cir. 2019) ..............................................................36

*Fry v. Napoleon Cmty. Schs.*,
580 U.S. 154 (2017) ............................................................................4

*G.T. v. Bd. of Educ. of Kanawha*,
117 F.4th 193 (4th Cir. 2024) ............................................................23

*Gen. Tel. Co. of Sw. v. Falcon*,
457 U.S. 147 (1982) ...........................................................................19

*In re District of Columbia*,
792 F.3d 96 (D.C. Cir. 2015) .............................................................18

*In re Johnson*,
760 F.3d 66 (D.C. Cir. 2014) .............................................................26

---

\*       Authorities upon which we chiefly rely are marked with asterisks.

*In re Lorazepam & Clorazepate Antitrust Litig.*,
   289 F.3d 98 (D.C. Cir. 2002) .................................................................14

*\*In re White*,
   64 F.4th 302 (D.C. Cir. 2023) ............................................. 14, 16-18, 23, 30, 35

*Jamie S. v. Milwaukee Pub. Schs.*,
   668 F.3d 481 (7th Cir. 2012) ............................................................4, 33

*New Hampshire v. Maine*,
   532 U.S. 742 (2001) ......................................................................36

*O.A. v. Trump*,
   404 F. Supp. 3d 109 (D.D.C. 2019) ....................................................... 13, 30

*Parent/Pro. Advoc. League v. City of Springfield*,
   934 F.3d 13 (1st Cir. 2019) ................................................................19

*Pierre-Noel ex rel. K.N. v. Bridges Pub. Charter Sch.*,
   113 F.4th 970 (D.C. Cir. 2024) ..........................................................4, 6

*Robertson v. District of Columbia* ("*Robertson I*"),
   762 F. Supp. 3d 34 (D.D.C. 2025) .......................................................9, 12

*\*Robertson v. District of Columbia* ("*Robertson II*"),
   816 F. Supp. 3d 77 (D.D.C. 2026) ................ 1, 6, 8-10, 12-13, 21, 26, 28-32, 36

*Steele v. Schafer*,
   535 F.3d 689 (D.C. Cir. 2008) .............................................................29

*United States v. Philip Morris USA Inc.*,
   566 F.3d 1095 (D.C. Cir. 2009) .......................................................... 32, 34

*Van Duyn ex rel. Van Duyn v. Baker Sch. Dist. 5J*,
   502 F.3d 811 (9th Cir. 2007) ..............................................................5

*\*Wal-Mart Stores, Inc. v. Dukes*,
   564 U.S. 338 (2011) .................................. 2, 12-14, 17-21, 23-24, 26, 28, 30, 34

iv

## *Statutes and Regulations*

D.C. Code § 2-1401.01 ...................................................................................8

20 U.S.C. § 1400 ............................................................................................4

20 U.S.C. § 1414 ............................................................................................4

20 U.S.C. § 1415 ............................................................................................5

28 U.S.C. § 1292 ............................................................................................3

28 U.S.C. § 1331 ............................................................................................3

29 U.S.C. § 794 ..............................................................................................8

42 U.S.C. § 12101 ..........................................................................................8

34 C.F.R. § 300.507 .......................................................................................5

## *Other*

Fed. R. Civ. P. 23 ......................................................................................3, 17

Richard A. Nagareda, *Class Certification in the Age of Aggregate Proof*,
    84 N.Y.U. L. Rev. 97 (2009) ..................................................................18

# GLOSSARY

ASL             American Sign Language

FAPE            Free Appropriate Public Education

IDEA            Individuals with Disabilities Education Act

IEP             Individualized Education Program

OSSE            D.C. Office of the State Superintendent of Education

**INTRODUCTION**

Every day, the District transports approximately 4,000 students with qualifying disabilities to and from school on roughly 550 twice-daily bus routes. Plaintiffs are a group of parents representing children who allege that they experienced problems with the District's school buses, problems which they contend violated the Individuals with Disabilities Education Act (IDEA) and other statutes. Those issues vary widely. One parent alleges that her child's bus once broke down on the way home from school in 2023. Another parent alleges that the bus lacked the correct equipment to transport her child a few times over the course of three years. A third alleges that, for approximately a month in 2024, her son's bus driver was replaced by someone who was not fluent in American Sign Language (ASL). Still others allege that buses were sometimes late for morning pickup, while others complain that buses were too early. Given the diversity of these problems, no single policy or practice can explain them all. Nevertheless, the trial court certified a sweeping class covering any student experiencing "unsafe, unreliable, or inappropriate transportation services." *Robertson v. District of Columbia* ("*Robertson II*"), 816 F. Supp. 3d 77, 107 (D.D.C. 2026).

That class certification is so broad that it is manifestly erroneous. More than a decade ago, this Court vacated an overbroad class certification order that attempted to unite similarly disparate IDEA claims. *D.L. v. District of Columbia* ("*D.L. I*"),

713 F.3d 120, 129 (D.C. Cir. 2013).  That decision carefully followed the Supreme Court's guidance in *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011), that class-action plaintiffs cannot "merely [allege] that they have all suffered a violation of the same provision of law," *id.* at 350.  And on remand, the trial court corrected its error and certified narrower IDEA subclasses based on actual common allegations and identifiable policies that could be corrected with workable injunctions.  *See D.L. v. District of Columbia* ("*D.L. II*"), 860 F.3d 713, 723-26 (D.C. Cir. 2017).

The Court should take the same approach here.  Rather than advance claims that can be resolved through "common answers," *Wal-Mart*, 564 U.S. at 350, plaintiffs allege a mix of transportation-related failures that admittedly "affect different students in different ways," *Robertson II*, 816 F. Supp. 3d at 98.  And instead of requiring plaintiffs to identify a "single or uniform policy or practice that bridges all their claims," the district court blessed an expansive class that defies cohesive resolution.  *D.L. I*, 713 F.3d at 127.  That holding was a manifest violation of *Wal-Mart*, flouts this Court's class-action jurisprudence, and puts this case on a path to years of unmanageable discovery and likely reversal.

Faced with these clear certification problems, plaintiffs have now effectively conceded that their "unsafe, unreliable, or inappropriate" class definition is too broad.  Instead of defending the class definition that they urged the trial court to adopt, they focus on a narrower definition limited to individuals who experienced

2

delayed morning buses that cut into students' instructional time. That concession is wise: the gravamen of plaintiffs' complaint is that their buses were frequently late, depriving them of important educational opportunities. Yet the district court certified a class that stretches far more broadly and sweeps in *any* conceivable problem with transportation. This disconnect all but confirms that the certification decision must be vacated.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. § 1331. This Court has jurisdiction to consider this interlocutory appeal under 28 U.S.C. § 1292(e) and Federal Rule of Civil Procedure 23(f).

## STATEMENT OF THE ISSUES

1. Whether the district court manifestly erred in concluding that the class satisfied commonality where plaintiffs have identified no uniform policy or practice linking their disparate claims.

2. Whether the district court manifestly erred in certifying a class under Rule 23(b)(2) where plaintiffs admitted that the classmembers would require individualized relief.

3. Whether, on the merits, this Court should vacate the district court's class certification in light of plaintiffs' tacit concession that the certified class is overbroad.

3

## STATEMENT OF THE CASE

**1.    Statutory Background.**

The IDEA requires that students with qualifying disabilities be provided with a free appropriate public education (FAPE), which includes "special education and related services"—such as transportation—"designed to meet their unique needs." 20 U.S.C. § 1400(d)(1)(A).  The primary mechanism for providing a FAPE is through a student's individualized education program (IEP).  *See Fry v. Napoleon Cmty. Schs.*, 580 U.S. 154, 158 (2017).  The IEP lays out a personalized plan to meet the student's specific "educational needs," 20 U.S.C. § 1414(d)(1)(A)(i)(II)(bb), including transportation and transportation-related services, *see id.* § 1414(d)(1)(A)(i)(IV).

An IEP's description of a student's transportation services can be quite detailed and specialized.  *See Pierre-Noel ex rel. K.N. v. Bridges Pub. Charter Sch.*, 113 F.4th 970, 981 (D.C. Cir. 2024) (finding that the scope of the "transportation" mandate is "dependent on the unique needs of a specific child"); *Jamie S. v. Milwaukee Pub. Schs.*, 668 F.3d 481, 485 (7th Cir. 2012) (explaining that a jurisdiction's obligations under the IDEA are "highly individualized because every child is unique").  Some IEPs, for example, will specify that a child cannot remain on the bus for longer than a certain period, or that a student must be the last one picked up on their daily route.  *E.g.*, JA 129 ¶ 9; JA 308 ¶ 3; JA 1308 ¶ 7.  Other

students require specialized equipment (such as a wheelchair, harness, or car seat), or particular staff (such as an aide or nurse). *E.g.*, JA 103-04 ¶¶ 7-8; JA 138-39 ¶ 6. IEPs may also include other bespoke requirements, depending on the student's individual needs. *See, e.g.*, JA 1281 ¶ 11 (student cannot sit next to a window); JA 1041 ¶ 5 (attendant or driver must know ASL); JA 1293 ¶ 4 (bus must be climate controlled with closed windows); JA 1330 ¶ 20 (parent must receive ten-minute arrival notice); JA 1289-90 ¶ 14 (student must have private transportation); JA 128-29 ¶ 8 (student must have additional five minutes of wait time).

Students and parents who believe that they have been denied a FAPE may file a formal complaint with an administrative hearing officer. 20 U.S.C. § 1415(b)(6); 34 C.F.R. § 300.507. If they are dissatisfied with the hearing officer's determination, they may seek judicial review in state or federal court. *See* 20 U.S.C. § 1415(i)(2)(A). Only "a *material* failure to implement an IEP violates the IDEA," meaning that "a minor discrepancy" between the IEP and the services provided does not deny the student a FAPE. *Van Duyn ex rel. Van Duyn v. Baker Sch. Dist. 5J*, 502 F.3d 811, 822 (9th Cir. 2007).

## 2.    Factual Background.

The District provides students with qualifying disabilities transportation to and from school in accordance with their IEPs through the District of Columbia Office of the State Superintendent of Education (OSSE). *See Pierre-Noel*, 113 F.4th

at 975-76.  OSSE employs more than 1,000 drivers and attendants and operates a fleet of roughly 650 vehicles to transport children with disabilities to and from school.  *Robertson II*, 816 F. Supp. 3d at 82.  As of January 2024, OSSE provided transportation services to more than 4,000 students on approximately 550 twice-daily bus routes.  *Id.*  OSSE also contracts with private transportation companies to provide services to roughly 370 additional students.  *Id.*

The named plaintiffs are parents or guardians of five students with disabilities whose IEPs entitle them to transportation services from OSSE.  *Id.*  Although all the named plaintiffs' IEPs require OSSE to provide transportation to and from school, they differ from one another in the nature of the transportation services that they require.  For example, H.D.'s IEP "requires an aide to provide hand-to-hand assistance for H.D. to get on and off the bus," "limits his ride time to 60 minutes," and "requires that H.D. wear a safety harness when riding the bus."  JA 103-04 ¶¶ 7-8.  A.F.'s IEP requires "a vehicle equipped with a ramp lift and specialized seatbelt," "an adaptive stroller and a harness," "a dedicated aide [to] sit next to him throughout the duration of a bus trip," and that his bus ride be limited to one hour.  JA 128-29 ¶¶ 8-9.  B.R.C.'s IEP requires her to be transported in "a wheelchair accessible vehicle" and "requires a nurse to monitor her medical conditions" throughout the trip and to deliver medication, if necessary.  JA 138-39 ¶ 6.

Different types of disruptions can affect these transportation services in different ways, and with varying effects on each child. For instance, a bus that is five minutes late in the morning may have no effect on one child, but an unexpected change to J.C.'s schedule may cause him to "become agitated and harm himself or others by hitting or pinching." JA 149 ¶ 9. A bus route that becomes delayed may cause H.D. to miss regularly scheduled medication, which can affect his ability to sleep at night. JA 104 ¶ 10. And D.R., who ordinarily eats breakfast at school, "cannot easily reorient himself to eat breakfast at home when the bus is running late," so a late bus requires him to eat in the classroom during instructional time. JA 184 ¶ 34.

The named plaintiffs allege that they have experienced a variety of problems with OSSE's transportation services. All plaintiffs assert that buses were frequently late to pick up students in the morning, although the frequency, severity, and timing of these issues varied. *See* JA 106 ¶ 16; JA 129 ¶ 12; JA 140 ¶¶ 10-11; JA 150 ¶ 21; JA 181 ¶ 16. For example, H.D.'s parent alleges that he was picked up late from home on 57 out of 201 school days during the 2022-2023 school year but does not specify how late the bus arrived or whether any of those late pickups caused H.D. to arrive late to school. JA 106 ¶ 16. Several plaintiffs allege other issues related to bus timeliness, including that buses were frequently early to pick up students in the morning, JA 151 ¶ 26, or late to drop them off at home, JA 183 ¶ 27. But they also

allege problems not experienced by other students or not clearly connected to their IEPs.  For example, one student alleges that the bus "broke down" in the afternoon once in January 2023.  JA 106 ¶ 21.  Another student claims that the bus "did not always have a working air conditioner" in summer 2023.  JA 132 ¶ 25.  And several parents alleged issues with OSSE's systems of communicating with parents about transportation, which is not an element of any student's IEP.  *E.g.*, JA 109 ¶ 35.

In late 2023, each of the named plaintiffs filed an administrative complaint alleging that these transportation deficiencies had denied them a FAPE.  *Robertson II*, 816 F. Supp. 3d at 83.  They further alleged that OSSE had violated the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101 *et seq.*, Section 504 of the Rehabilitation Act, 29 U.S.C. § 794 *et seq.*, and the District of Columbia Human Rights Act (DCHRA), D.C. Code § 2-1401.01 *et seq.*  *Robertson II*, 816 F. Supp. 3d at 83.  In each case, the hearing officer granted the named plaintiff individualized relief for the denial of a FAPE.  *Id.*  That included awards of compensatory education where the student had missed required instruction due to transportation issues and reimbursement of personal travel expenses.  *Id.*; *see* JA 126 (ordering OSSE to reimburse or pay the cost of six weeks of summer camp, camp-related transportation, and $126.98 for 11 round trips to and from school); JA 198 (ordering OSSE to authorize 240 hours of one-on-one academic tutoring and six hours of speech language services).  In three of the cases, the hearing officer also

ordered prospective relief for that student in the form of an order directing OSSE to provide "consistent, reliable, and appropriate transportation" pursuant to that student's IEP. *Robertson II*, 816 F. Supp. 3d at 83. In all five cases, the hearing officers dismissed the named plaintiffs' non-IDEA claims and their claims for relief on behalf of others because they were not cognizable in an administrative forum. *Id.*

**3.    Procedural History.**

In March 2024, the named plaintiffs and the Arc of the United States, a disability-rights organization, sued the District under the IDEA, ADA, Rehabilitation Act, and DCHRA. *Id.* Plaintiffs' federal lawsuit raised the same claims as their original administrative complaints, including allegations that OSSE's communication regarding transportation issues and reimbursement procedures were inadequate. *See Robertson v. District of Columbia* ("*Robertson I*"), 762 F. Supp. 3d 34, 51 (D.D.C. 2025). Plaintiffs immediately sought a preliminary injunction, which the district court denied following a hearing. *Robertson II*, 816 F. Supp. 3d at 83.

In September 2024, the District moved to partially dismiss the complaint for lack of subject matter jurisdiction and failure to state a claim. *Robertson I*, 762 F. Supp. 3d at 51-53, 58. The district court granted the motion in part and dismissed plaintiffs' IDEA claims related to communications and reimbursement procedures, their claims for compensatory education, and their unjustified-isolation discrimination claims. *Id.* at 52-53, 58.

In May 2024, plaintiffs sought to certify a class comprised of:

> All students with disabilities aged 3-22 who, from March 7, 2022, until judgment is issued in this case, require transportation from the District of Columbia to attend school and have experienced and will continue to experience Defendant's failure to provide safe, reliable, and appropriate transportation.

*Robertson II*, 816 F. Supp. 3d at 84. In support, plaintiffs included declarations from several other potential classmembers who had experienced issues with transportation. Although several alleged, like the named plaintiffs, that they had experienced difficulties with late morning pickups, some contended that these problems had lessened in the current school year. *See* JA 1273-74 ¶¶ 7-9 (alleging that bus was frequently late between February and April 2025, but that this issue largely resolved after a complaint).

In addition to timeliness, the putative classmembers alleged a variety of other problems, most of which were unique to each student and only some of which they contended violated the student's IEP. One expressed frustration with changing bus routes once per month during the 2023-24 school year. JA 1068 ¶ 4. One student was injured during a physical altercation with another student in July 2025. JA 1282 ¶ 15. Some students alleged that there were problems with safety equipment or aides, but others required no specialized equipment or staff as part of their IEPs. *Compare* JA 309 ¶ 5, *and* JA 1329 ¶ 15, *with* JA 1046-49, *and* JA 1087-89. Some problems were allegedly persistent, while others happened only once or on a handful

10

of occasions. *See* JA 107-08 ¶ 25, 31-32 (alleging that equipment issue occurred three times over the course of an academic year). And like with timeliness, some parents alleged that their problems had resolved prior to participating in the lawsuit. *See, e.g.*, JA 315 ¶ 22 (attendant failed to use a harness, but this was later "resolved"); JA 1052-53 ¶¶ 7, 11 (student's bus driver and attendant "suddenly changed" in fall 2023, but the student's original "amazing bus driver returned in March 2024"); JA 1281 ¶ 11 (on first day of school, an attendant was unaware that the student required a car seat, but the parent explained the situation to the attendant and resolved the problem).

The District opposed certification, arguing that the class definition could not satisfy any of the four requirements of Rule 23(a) or the requirements of Rule 23(b)(2), and that it was fail-safe. As relevant here, the District contended that the putative classmembers' problems were too varied to produce common answers capable of driving the resolution of the litigation, and that plaintiffs had not identified any common policy or practice that could be corrected through a unified injunction. Although the District acknowledged that a subset of the putative class had alleged similar problems related to late buses, the class definition would also encompass an endless list of unrelated issues, many of which were specific to a single student or happened only once.

The district court certified the class in January 2026. In response to the District's argument that the class definition was fail-safe, the court modified the class definition from students experiencing the District's "failure to provide safe, reliable, and appropriate transportation" to students experiencing "unsafe, unreliable, *or* inappropriate transportation services from the District of Columbia." *Robertson II*, 816 F. Supp. 3d at 88, 90 (emphasis added). It otherwise adopted plaintiffs' definition verbatim.

On commonality, the court acknowledged that "what matters to class certification is not the raising of common questions, but rather the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation." *Id.* at 93 (citation modified). "In other words, . . . the class must show that its 'theory [of the case] can be proved on a classwide basis.'" *Id.* (quoting *Wal-Mart*, 564 U.S. at 356). Although plaintiffs' allegations turned on "individualized assessments and relief," the court held that they had sufficiently alleged "systemic defects" with the District's transportation services that were conducive to classwide resolution. *Id.* at 97-98 (quoting *Robertson I*, 762 F. Supp. 3d at 51). It justified this conclusion on the grounds that plaintiffs were *not* challenging "the appropriateness of the transportation services authorized through their IEPs[] or the merits of individual, fact-specific IDEA claims." *Id.* at 98 (internal quotation marks omitted). Even though the purported transportation failures—like "faulty bus route planning,"

12

"untimely bus arrivals and departures," or "insufficient . . . staffing and training"—
"affect[ed] different students in different ways," the court believed it could resolve
whether the deficiencies denied all plaintiffs a FAPE "'in one stroke.'"  *Id.* at 98-99
(quoting *Wal-Mart*, 564 U.S. at 350).

The district court further found that plaintiffs had satisfied the requirements
of Rule 23(b)(2).  It reasoned that "if plaintiffs are correct that there are systemic
deficiencies in the District's transportation system, then the District's alleged
conduct . . . is 'generally applicable to the class.'"  *Robertson II*, 816 F. Supp. 3d at
105-06 (quoting *O.A. v. Trump*, 404 F. Supp. 3d 109, 157 (D.D.C. 2019)).  Although
plaintiffs themselves acknowledged that the District "may have to perform an
individualized inquiry to determine how best to individually accommodate class
members," the court nonetheless determined that it could issue injunctive relief
simultaneously remedying each of the classmembers' harms.  *Id.* at 106.

Following the court's certification of the modified class definition, the District
timely filed a Rule 23(f) petition seeking interlocutory review.  In June 2026, a
motions panel of this Court referred the petition to a merits panel and instructed the
parties to brief both "whether the petition should be granted" and "whether the
district court properly granted the plaintiffs' motion for class certification under
[Rule 23]."  6/4/26 Order.

13

## STANDARD OF REVIEW

A Rule 23(f) petition may appropriately be granted if the district court's "class certification decision is manifestly erroneous" or "involves an important and recurring issue of law." *In re White*, 64 F.4th 302, 307 (D.C. Cir. 2023) (quoting *In re Lorazepam & Clorazepate Antitrust Litig.*, 289 F.3d 98, 105 (D.C. Cir. 2002)). On the merits, this Court "review[s] class certification decisions for an abuse of discretion," but an "error of law is always an abuse of discretion." *Id.* at 312.

## SUMMARY OF ARGUMENT

1. The district court's commonality ruling fails *Wal-Mart*'s central test that classmembers must have all "suffered the same injury" and not merely "a violation of the same provision of law." 564 U.S. at 349-50. Plaintiffs have compiled a wide array of problems touching on transportation—some related to timeliness, others related to equipment, nurses, or aides—that lacks any common factual or legal contention except that they all involve District school buses. Rather than require plaintiffs to identify a "uniform policy or practice" responsible for these alleged shortcomings, *D.L. I*, 713 F.3d at 127, or present a way of establishing their claims through "common proof," *D.L. II*, 860 F.3d at 724, the district court aggregated multiple, diverse allegations of harm—some of which are unrelated to timeliness— to find commonality. The result is an expansive class definition encompassing children who may have experienced issues with safety *or* bus reliability *or* other

14

"inappropriate" services.  Such a varied class cannot satisfy the requirements of commonality.  This Court recognized the same problem in *D.L. I* and vacated a similar class certification order.

Plaintiffs' arguments in favor of commonality are all unpersuasive.  While they propose the common question of whether "deficiencies" in the District's transportation services deny classmembers educational opportunities, that simply rephrases the ultimate question of liability for each student.  Nor can plaintiffs establish that the District's entire system of transportation is fatally deficient because, at best, they have mustered evidence showing only a fraction of students experienced routine problems related to timeliness.  Finally, their only proposed common question of law—whether the "quality" of OSSE's transportation services "matters"—is far too vague to help resolve this litigation.

2.  For many of the same reasons, the district court also manifestly erred in concluding that a single, indivisible injunction could simultaneously remedy a mosaic of disparate problems unrelated to timeliness. The class definition currently encompasses those whose transportation services have been unsafe, unreliable, or inappropriate—presumably capturing those who are chronically late alongside those whose aide is occasionally absent, or who lack a specific piece of equipment that their IEP requires.  No one injunction could remedy each disparate kind of harm included in the class definition.  Instead, each student would need their own tailored

15

injunction. Plaintiffs conceded as much, acknowledging that any injunction could only create a system for identifying individualized relief for each classmember—not that it could actually resolve the classmembers' claims. Other than ordering the District to simply obey the law, no single injunction can remedy plaintiffs' allegations in one stroke.

3. Perhaps recognizing these significant problems, plaintiffs now retreat to defending a narrower class centered around timeliness. Whatever the merits of that subclass may be, this shift betrays the obvious conclusion that the class cannot stand as currently defined. To spare the parties from years of burdensome discovery and briefing under a flawed class definition, this Court should grant the petition and vacate the district court's certification.

## ARGUMENT

To obtain class certification in this case, plaintiffs needed to satisfy the requirements of both Rule 23(a) and (b)(2). Rule 23(a) requires "(1) numerosity, meaning that the 'class is so numerous that joinder of all members is impracticable,' (2) commonality in that the 'questions of law or fact' at issue in the case are 'common to the class,' (3) typicality, which requires that the 'claims or defenses of the representative parties [be] typical of the claims or defenses of the class,' and (4) adequacy in that the named representative parties 'will fairly and adequately protect the interests of the class.'" *White*, 64 F.4th at 307 (quoting Fed. R. Civ. P.

16

23(a)).  Rule 23(b)(2) permits class certification if "the party opposing the class has acted or refused to act on grounds that apply generally to the class" such that injunctive or declaratory relief is "appropriate respecting the class as a whole."  Fed. R. Civ. P. 23(b)(2).  Here, plaintiffs failed to establish commonality and failed to show that the District applied a uniform policy affecting the whole class.  The trial court thus manifestly erred in certifying a class of all individuals experiencing "unsafe, unreliable, or inappropriate transportation services."  This Court should grant the petition and vacate the certification order.

**I.    This Court Should Grant The Rule 23(f) Petition Because The District Court's Commonality Ruling Was Manifestly Erroneous.**

To establish commonality, class-action plaintiffs must present "significant proof," *Wal-Mart*, 564 U.S. at 353, that they all suffered "a common harm . . . as a result of a policy or practice that affects each class member," *D.L. I*, 713 F.3d at 128. There must exist "a common contention . . . capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke."  *Wal-Mart*, 564 U.S. at 350.  In the simplest terms, plaintiffs must be able to show that they have all "suffered the same injury" such that "a class-wide proceeding [can] generate common answers apt to drive the resolution of the litigation."  *Id.* at 350-51 (citations omitted).  At a minimum, there must be a "specific thread [that] tie[s] [their] claims together." *White*, 64 F.4th at 314.  For this reason, "[d]issimilarities within the proposed class"

17

increase the chances that certification will fail. *Wal-Mart*, 564 U.S. at 350 (quoting Richard A. Nagareda, *Class Certification in the Age of Aggregate Proof*, 84 N.Y.U. L. Rev. 97, 132 (2009)).

At the same time, the common harm must be tightly circumscribed. Classmembers cannot allege a common link at a "30,000 foot" level. *White*, 64 F.4th at 314. It is not enough for plaintiffs to "merely [claim] that they have all suffered a violation of the same provision of law" because such an assertion "gives no cause to believe that all their claims can productively be litigated at once." *Wal-Mart*, 564 U.S. at 350. If that is all that ties the class together, it "obviously" cannot satisfy commonality. *Id.* Instead, plaintiffs must identify "specific deficiencies" that "are common" to the entire class. *In re District of Columbia*, 792 F.3d 96, 100 (D.C. Cir. 2015).

*Wal-Mart* illustrates these principles. There, the district court certified a class of employees who had all alleged that their supervisors had violated Title VII by denying them equal pay and promotions on the basis of sex. 564 U.S. at 343. Even though local managers exercised discretion over employment decisions, the plaintiffs claimed that Wal-Mart's discriminatory culture and "refusal to cabin its managers' authority" made each class member "the victim of one common discriminatory practice." *Id.* at 345. The Supreme Court held that this was insufficient to establish commonality. As the Court explained, "[w]ithout some glue

18

holding the alleged *reasons* for all those decisions together, it w[as] impossible to say that examination of all the class members' claims for relief w[ould] produce a common answer to the crucial question" of *why* a particular individual was disfavored. *Id.* at 352. In short, "one named plaintiff's experience of discrimination was insufficient to infer that 'discriminatory treatment is typical of [the defendant's] practices.'" *Id.* at 356-57 (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 158 (1982)).

### A.    The class definition does not satisfy commonality.

Applying *Wal-Mart*'s principles to the IDEA, commonality means that a group of plaintiffs must identify a "single or uniform policy or practice that bridges all their claims." *D.L. I*, 713 F.3d at 127. This uniformity provides the necessary "glue" to show that class treatment "will produce a common answer to the crucial question" of liability for every plaintiff. *Wal-Mart*, 564 U.S. at 352; *see Parent/Pro. Advoc. League v. City of Springfield*, 934 F.3d 13, 29 (1st Cir. 2019) (holding that IDEA plaintiffs must "identify[] a uniformly applied, official policy of the school district, or an unofficial yet well-defined practice, that drives the alleged violation"). If there is no common policy or practice at the root of plaintiffs' claims, then there cannot be any answers capable of resolving the alleged violations all at once. Plaintiffs cannot simply claim that "the District[] [has a] pattern and practice of failing to provide FAPEs . . . because [that] constitutes only an allegation that the

19

class members 'have all suffered a violation of the same provision of law.'" *D.L. I*, 713 F.3d at 126 (quoting *Wal-Mart*, 564 U.S. at 350).

Here, plaintiffs claim, at the broadest possible level, that there are various types of problems with OSSE's transportation system. To be sure, a subset of classmembers allege that they experienced late morning buses at some point in time. *See, e.g.*, JA 106 ¶ 16; JA 129-30 ¶ 14; JA 140 ¶ 10; JA 149 ¶ 12; JA 179 ¶ 9. But the current class definition covers far more than late buses. Multiple students allege non-timeliness deficiencies that are solely tied to the individualized provisions of their IEPs. As illustrated above, *see supra* pp. 4-8, 10-11, many of these problems are unique to just one or two students, some did not cause measurable harm, and a few have already been resolved. To give just a few examples, each of the following is an allegation of an "unsafe," "unreliable," or "inappropriate" transportation issue that plaintiffs contend could be adjudicated on a classwide basis in this case:

- A.F. alleges that, although his IEP limits his ride time to one hour, he is "frequently" dropped off late at home in the afternoon. JA 133 ¶ 35.

- L.M. contends that his bus was in several minor accidents in February 2023, and that there was a fire at the bus terminal in January 2024, each of which caused unforeseen delays. JA 300-02 ¶¶ 7, 9.

- C.S. alleges that OSSE drivers sometimes refused to assist with securing a safety harness provided by her school during the 2022-2023 school year, but that her complaint was resolved through the administrative hearing process. JA 315 ¶ 22.

- N.L. asserts that, in April 2024, his bus driver was switched with a new driver who did not know ASL, as required by his IEP. JA 1041 ¶ 5.

20

- O.W. alleges that, one afternoon in April 2024, a bus attendant walked him to his front door and left before O.W.'s mother reached the door to let him in.  JA 1070 ¶ 12.

- S.S. claims that the bus did not have working air conditioning "four or five times" during the 2024-25 school year, as required by his IEP.  JA 1293-94 ¶¶ 7, 9-10.

Each of these problems is different.  Plaintiffs presented no evidence—much less "significant proof," *Wal-Mart*, 564 U.S. at 353—that these problems are related to one another or stem from some unified OSSE policy.  And it is hard to imagine how one policy could ever explain all these issues at once.  Showing that one student's bus was frequently late does not prove that another student's harness was frequently missing or improperly secured.  At most, plaintiffs presented some statistical evidence showing some buses were frequently late dropping off students in the morning.  *See Robertson II*, 816 F. Supp. 3d at 91 (explaining that trip tickets from October 2024 showed that roughly 300 students were assigned to routes that arrived after the start of instruction at least once a week, and that roughly 160 students were assigned to routes that arrived after the start of instruction at least twice a week).  But even proving that does not necessarily show that lateness was caused by an OSSE policy or practice.  A bus could be delayed because the driver showed up late for work, because the route was poorly designed, because students were slow in getting on the bus, because of a traffic jam along the route, or any number of other reasons.

Some of these problems, if proved, *might* be IDEA violations, while others plainly would not be.  For most children, an early pick-up or an hourlong afternoon bus ride would not deny them a FAPE.  For others, though, it might.  Whether some of plaintiffs' alleged harms violate the IDEA depends entirely on whether each student's IEP says anything about the maximum length of time that student may be on a bus.

Determining the proper solution to each of these problems would also vary under the current class definition.  A de minimis problem with early buses, missing aides, or climate-control requirements likely generates no IDEA remedy, but a persistent issue might entitle the student to injunctive relief or a compensatory education award to make up for lost instructional time.  For those plaintiffs who seek compensatory education, the individualized administrative hearing process is designed to establish that award through a careful calculation of how much instruction or related service time was missed and how much compensatory education is needed to make the student whole.  *See, e.g.*, JA 954 (ordering OSSE to provide 108 hours of applied behavior analysis therapy and 22 hours of occupational therapy services); JA 966-67 (ordering OSSE to reimburse parents $401.96 for gas costs of transporting their child and authorize 111 hours of one-on-one instruction).

Entitlement to such a plaintiff-specific award cannot be determined on a classwide basis or ordered through a unified injunction.[1]

That exposes the fatal flaw in the certified class: plaintiffs have not demonstrated any feasible way to show, through "common proof," how *every* individual student's complaint can be addressed "'in one stroke.'" *D.L. II*, 860 F.3d at 723-24 (quoting *Wal-Mart*, 564 U.S. at 350). Each student's IEP is uniquely tailored to that student and can be "highly individualized," meaning that they have different requirements for a FAPE—many of which have little to do with the timeliness or reliability of buses. *G.T. v. Bd. of Educ. of Kanawha*, 117 F.4th 193, 205 (4th Cir. 2024). Because the denial of a FAPE is often a "child-specific inquiry," *Branham v. District of Columbia*, 427 F.3d 7, 12 (D.C. Cir. 2005), a proposed class of IDEA plaintiffs can fall apart if it tries to sweep in too many disparate issues without a cohesive "thread," *White*, 64 F.4th at 314. The lack of any single thread is fatal to plaintiffs' class as currently defined. By combining students who

---

[1]    As the District noted in its petition, Pet. 15 n.1, the inability of the trial court to fashion classwide relief that could address these disparate problems may actually prevent some classmembers from obtaining individualized remedies through the ordinary IDEA complaint process. The student who needs an attendant fluent in ASL, for example, may not be able to prove that this problem was caused by a uniform policy that also caused other students' buses to be late. Yet that student might have been successful in obtaining individualized relief from a hearing officer if there was a material deviation from his IEP. The class device cannot provide that type of tailored relief to anyone.

experienced late morning pickups with students who experienced discrete issues with equipment or staff, the class is unlikely "to generate common *answers* apt to drive the resolution of the litigation." *Wal-Mart*, 564 U.S. at 350 (citation omitted).

For these exact reasons, this Court correctly denied certification when faced with similarly discordant allegations in *D.L. I*. There, numerous plaintiffs alleged that the District had failed to identify, locate, evaluate, and offer special education services to preschoolers with learning disabilities—four distinct types of IDEA violations related to the District's "Child Find" system. *D.L. I*, 713 F.3d at 121-22. The district court initially found commonality satisfied because it papered over the plaintiffs' "differing allegations" on the belief that they "only represent[ed] the differing ways in which the District ha[d] caused class members' common injury." *Id.* at 124 (citation modified). This Court firmly rejected that logic on appeal, clarifying that the plaintiffs had to do more than assert that they "all suffered a violation of the same provision of law," because the same law "can be violated in many different ways." *Id.* at 126 (quoting *Wal-Mart*, 564 U.S. at 350). Without common answers to the plaintiffs' "different claims of harm," certification was impossible. *Id.* at 128.

On remand, the trial court cured its original commonality error by certifying subclasses "defined by reference to a 'uniform policy or practice' governing a specific stage of the special education process." *D.L. II*, 860 F.3d at 724 (quoting

24

*D.L. I*, 713 F.3d at 127).　Those subclasses and their claims each "allege[d] a common harm," were "subject to common proof," and could be "remedied by a single order." *Id.* For example, one subclass was defined as children who did not receive eligibility determinations within the statutory timeframe. *Id.* The precise number of students who experienced this injury was ascertainable, the students' injuries were similar, and the court could remedy them through a uniform injunction setting numerical targets for improvement in meeting the statutory deadline. *Id.*

The lessons of *D.L. I* and *D.L. II* preclude the class definition here. Plaintiffs have collected a variety of complaints about "different policies and practices [in] different [aspects]" of the District's massive school transportation system. *D.L. I*, 713 F.3d at 127. Some of those problems could potentially affect discrete groups of students, like issues with late arrivals to school. *E.g.*, JA 286-87 ¶ 4. But many others are idiosyncratic, like complaints that a bus once broke down, JA 302 ¶ 10, or that a student was bullied on the bus, JA 293 ¶ 5, or that a bus driver fluent in ASL was replaced by a driver not fluent in ASL, JA 1041 ¶ 5. All these concerns may be legitimate—and some may even rise to a violation of the IDEA—but none of them is connected to a "single or uniform policy or practice that bridges *all* their claims." *D.L. I*, 713 F.3d at 127 (emphasis added). It is entirely unclear how the reason for frequent lateness could also be the reason why one student's harness was missing just three times over the course of two entire school years. *See* JA 107-08

¶¶ 25, 31-32.  In sum, under the current class definition, the class's allegations are so "varied" that they simply "[can]not be resolved together."  *In re Johnson*, 760 F.3d 66, 73 (D.C. Cir. 2014).

### B.     Plaintiffs' contrary contentions are unpersuasive.

Attempting to rescue certification, plaintiffs argued in their answer to the District's petition that the district court had identified "at least two" common questions of fact and one of law.  Answer 11.  Their arguments are unpersuasive.

First, plaintiffs contend that their case presents the common factual question of whether the "deficiencies in the District's transportation system deny class members the opportunity to benefit from and participate in educational services equal to their non-disabled peers[.]"  Answer 11 (quoting *Robertson II*, 816 F. Supp. 3d at 98-99).  This does not establish commonality.  As *Wal-Mart* explained, raising these types of generic "common questions—even in droves" means nothing if plaintiffs cannot "generate common *answers*" capable of resolving central issues "in one stroke."  564 U.S. at 350 (citation modified).  Asking whether all classmembers were denied opportunities equal to their peers is no different than asking "whether all the classmembers were discriminated against in violation of the ADA," or "whether all the classmembers were denied a FAPE"—in other words, the exact type of questions *Wal-Mart* and *D.L. I* rejected.

26

Plaintiffs also provide no information about how they would propose to answer such a question for the entire class, which encompasses thousands of students alleging various transportation-adjacent issues. Although plaintiffs have grouped their allegations together using the phrase "unsafe, unreliable, or inappropriate" transportation, that phrase that has no defined meaning under the IDEA or other law, and plaintiffs do not explain what yardstick they would use to measure whether transportation qualifies as "inappropriate." Plaintiffs' proffered statistical evidence on how often buses are late cannot supply *any* answers for questions that have nothing to do with timeliness. Nor can it show how the same or different transportation problems will (or will not) impact the education of separate students who have entirely different needs.

To illustrate, consider student C.S. C.S.'s IEP does not permit her to spend more than one hour on the bus in each direction and requires her to be transported in a safety harness or wheelchair. JA 308-09 ¶ 4. C.S.'s parent asserts that, in early 2023, C.S. would often remain on the bus too long in the afternoons, in violation of her IEP. JA 310 ¶ 7. There were also issues with ensuring that C.S.'s safety harness was properly secured and with drivers who would change without notice. JA 310-12 ¶¶ 8-11. At the start of the 2023 school year, those problems were resolved, but a new issue arose when drivers began picking C.S. up from school *too early*. JA 312-13 ¶¶ 12-15. These problems are unique to her. *See* JA 313 ¶ 17 ("C.S. . . . is

traumatized when her routine is altered."). Accordingly, "common proof" applicable to the entire class (if any exists) cannot establish that *C.S.* was deprived of educational opportunities. *D.L. II*, 860 F.3d at 724. Even if another student experienced some of the *same* problems, plaintiffs would need individualized proof to demonstrate that the second student's education was so affected that it rose to the level of an IDEA or ADA violation.

Second, plaintiffs contend that their case presents the common question of whether the District "systematically fail[s] to provide transportation services to class members." Answer 11 (quoting *Robertson II*, 816 F. Supp. 3d at 98). This question also fails the commonality test. To establish that this question affects the entire class, plaintiffs would need to proffer "significant proof" that the District was failing to operate a working transportation system at all, or that it was otherwise operating "under a general policy of discrimination" toward students with disabilities. *Wal-Mart*, 564 U.S. at 353. Such proof "is entirely absent here." *Id.* Plaintiffs do not contend that OSSE is generally failing to operate a working transportation system, or even that the system is not successfully transporting the vast majority of OSSE's 4,000 students to and from school each day in accordance with their IEPs. Instead, plaintiffs identified several dozen students who have experienced problems— sometimes significant ones—with different aspects of the transportation system.

28

There is no evidence—much less "significant proof"—that these problems are linked to a general policy of discrimination by OSSE.

Finally, plaintiffs also contend that their case presents one common question of law: whether "the quality of the District's transportation services matters" under the IDEA. Answer 11 n.4 (quoting *Robertson II*, 816 F. Supp. 3d at 99). This question is no more apt to help resolve this litigation than asking whether "the quality of the workplace experience" matters in a Title VII discrimination suit. Of course, there is a point where a consistently missing safety harness will go from a de minimis IEP deviation to a violation of the IDEA, just as there is a point where stray remarks cross over into a "severe or pervasive" hostile work environment. *Steele v. Schafer*, 535 F.3d 689, 694-95 (D.C. Cir. 2008). Determining whether that threshold has been crossed—i.e., determining whether the "quality" of a student's transportation is so subpar as to violate the law—is a quintessentially individualized inquiry that requires individualized proof.[2]

---

[2] Plaintiffs also contend that the District did not "specifically address the district court's conclusion that plaintiffs identified a common question of law specific to their discrimination claims under the ADA and similar statutes." Answer 15 n.5. But no such finding exists; the only common question of law the district court identified was specific to the IDEA. *See Robertson II*, 816 F. Supp. 3d at 99 ("Plaintiffs have also identified *a* common question of law: if the District is systematically failing to provide transportation services to class members, does that systemic failure deny those students a FAPE under the IDEA?" (emphasis added)).

All these problems point to an obvious conclusion: outside of timeliness, plaintiffs have no prospect of establishing that they have all "suffered the same injury," *Wal-Mart*, 564 U.S. at 350, that their harms are the "result of a policy or practice that affects each class member," *D.L. I*, 713 F.3d at 128, or that a "specific thread . . . tie[s] [their] claims together," *White*, 64 F.4th at 314. The district court's certification despite these problems manifestly contravenes the Supreme Court's and this Court's jurisprudence, and it must be reversed.

## II. This Court Should Grant The Rule 23(f) Petition Because The District Court's Rule 23(b)(2) Ruling Was Manifestly Erroneous.

The district court's manifest error extends beyond commonality. Because the expansive class encompasses students whose transportation services have been "unsafe, unreliable, *or* inappropriate," it groups together every conceivable deficiency. By combining students who experience late buses with those who have missing aides and those who need specific equipment, the court dashed any hope of resolution through a single injunction.[3] An order concerning "one-to-one aides" and "nurses," for example, *see* JA 99, does nothing for the vast majority of students who

---

[3] Indeed, the district court seemed to recognize that its Rule 23(b)(2) ruling hinged on the correctness of its commonality ruling, such that the former necessarily falls with the latter. It framed part of its Rule 23(b)(2) decision as a conditional: "*if* plaintiffs are correct that there are systemic deficiencies in the District's transportation system, then the District's alleged conduct . . . is 'generally applicable to the class.'" *Robertson II*, 816 F. Supp. 3d at 105-06 (emphasis added) (quoting *O.A.*, 404 F. Supp. 3d at 157).

do not require this type of assistance.  Plaintiffs admitted as much in their briefing below, acknowledging that their various harms would require "an individualized inquiry to determine how best to individually accommodate class members across a wide geographic area to get them to and from school." *Robertson II*, 816 F. Supp. 3d at 106 (quoting JA 998).  That concession is fatal to certification under Rule 23(b)(2).

The district court nonetheless concluded that class-wide relief was possible because "[t]he aim of plaintiffs' suit . . . is to rectify the District's systemic failure to comply with a specific statutory duty to all class members, which fits the prototype of a (b)(2) class." *Robertson II*, 816 F. Supp. 3d at 107 (citation modified).  It relied on *D.L. v. District of Columbia*, 302 F.R.D. 1 (D.D.C. 2013), for support, but that portion of *D.L.* addressed the *subclasses* that the district court established on remand, each of which could receive a targeted injunctive remedy because it was centered on a "common harm" uniting that subclass.  *D.L. II*, 860 F.3d at 724.  Those remedies were tailored and specific: for instance, to correct the failure to evaluate referred students within the statutory deadline, the court set annual requirements to improve the District's performance on that particular metric.  *See id.* at 719.

That logic does not work here, where plaintiffs allege disparate kinds of harms stemming from different aspects of the transportation system that cannot be remedied with a single injunction or measured by the same metrics.  The trial court's

31

amendment of the class definition to encompass students experiencing either "unsafe," "unreliable," or "inappropriate" transportation, *Robertson II*, 816 F. Supp. 3d at 90, essentially admits that the class's injuries are not the same and could not be remedied through an "indivisible" injunction, *D.L. I*, 713 F.3d at 125.

The only way to conceivably sweep in the full range of plaintiffs' desired relief is to define the injunction so expansively that it requires non-specific improvements to the District's transportation services. Tellingly, that is exactly what plaintiffs ask for: "broad injunctive and declaratory relief" requiring the District "to comply with the requirements of [the IDEA, ADA, Rehabilitation Act, and DCHRA]." JA 997-98. But this amounts to nothing more than a "generalized injunction to obey the law," which is not sufficiently specific to guide the District's actions. *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1137 (D.C. Cir. 2009).

Plaintiffs argue that this same criticism was raised and rejected in *D.L.*, Answer 18, but that is incorrect. On remand, the district court in that case held that an injunction *for each subclass* would not "merely establish[] a system for eventually providing individualized relief" because "each of the subclasses . . . s[ought] declaratory and injunctive relief that w[ould] apply *equally*" to its members. *D.L.*, 302 F.R.D. at 16 (emphasis added). That is a far cry from the situation here, where plaintiffs seek injunctions that must be different if they are to provide any relief to

32

portions of the class. Indeed, the district court in *D.L.* expressly contrasted its own order with an injunction that "would be determined based upon the *unique needs and circumstances of each class member*." *Id.* (emphasis added) (internal quotation marks omitted). It acknowledged that this latter type of remedy—exactly what plaintiffs request in this case—would be "fundamentally incompatible with Rule 23(b)(2)'s requirement of indivisible injunctive relief." *D.L.*, 302 F.R.D. at 16. Rule 23(b)(2) simply does not permit creating an "intricate remedial scheme" that essentially provides "each class member [with] 'a different . . . judgment against the defendant.'" *D.L.*, 302 F.R.D. 16 (quoting *Jamie S.*, 668 F.3d at 499).

*Brown v. District of Columbia*, 928 F.3d 1070 (D.C. Cir. 2019), does not help plaintiffs either. *Contra* Answer 19. While this Court remarked that "the perfect need not be the enemy of the good" in the context of injunctive relief, it referred only to the numerical metrics mandated for each subclass in *D.L. II*: "we found Rule 23(b)(2) satisfied even though the injunction required the District to satisfy each of [its] obligations with respect to 95 per cent, rather than 100 per cent, of each subclass." *Brown*, 928 F.3d at 1082-83. Plaintiffs entirely fail to explain how the same parameters could work here. The district court would need to issue an order requiring the District to provide specific equipment for one student X% more often, an aide for another student Y% more frequently, and ensure that air conditioning functions Z% more consistently, to name just a few complaints. The eventual *D.L.*

33

injunctions satisfied Rule 23(b)(2) because they used clear metrics to remedy discrete injuries uniformly experienced by the entire subclass. *See D.L. II*, 830 F.3d at 724 (subclass one received an injunction "requiring the District to identify 0.5 percent more children each year until it reaches 8.5 percent enrollment"; subclass three received an injunction "requir[ing] the District to meet its statutory deadline 95 percent of the time and to improve its performance by 10 percent in the first year and 5 percent each year thereafter"). But here, the injuries, effects, and harms of the District's alleged failings vary from student to student.

As the District has maintained throughout this petition and appeal, had plaintiffs sought to certify a narrower class (like one centered only on morning bus timeliness), perhaps they could overcome their commonality and Rule 23(b)(2) shortcomings. *See* Pet. 18-19; Pet. Reply 9. Plaintiffs' petition-stage briefing seemed to agree. *See infra* Part III. But their efforts to cling to a one-size-fits-all injunction that applies to countless unique deficiencies is nothing more than an absolute "injunction to obey the [IDEA]." *Philip Morris*, 566 F.3d at 1137. Because a single injunction is incapable of "provid[ing] relief to each member of the class," the district court's Rule 23(b)(2) ruling was manifestly erroneous. *Wal-Mart*, 564 U.S. at 360.

**III.    This Court Should Vacate The Certified Class In Light Of Plaintiffs' Tacit Admission That It Is Overbroad.**

Given the manifest errors discussed above, this Court should vacate the class certification order on the merits. *See White*, 64 F.4th at 312 ("A material error of law is always an abuse of discretion."). If that were not enough, plaintiffs now appear to admit that the current class is overbroad. Instead of trying to defend the class as certified, they retreat to a narrower class focused on bus timeliness. Their answer to the District's petition conspicuously omitted *any* discussion about alleged harms beyond timing. *See* Answer 4-8 (recounting facts and procedural history but only discussing "bus delays," "routes that arrived [late]," and—for only some students—late "drop[] off[s] at home"). Plaintiffs' only reference to a non-timeliness issue is a one-off assertion that a single student missed school because of malfunctioning air conditioning—obviously not a problem common to the class as a whole. Answer 6 (citing JA 1293-94 ¶ 7).

Plaintiffs' arguments underscored this concession. For example, they asserted that they could prove the denial of FAPEs through "statistics" showing that the District "fails to provide transportation services to a certain percentage of students with disabilities," or that "a certain percentage of students with disabilities who receive transportation services . . . are missing instructional time and socialization time . . . due to the District's alleged transportation failures." Answer 11-12 (citation omitted). But outside of problems with timeliness, it is unclear how this could be

35

so. Showing that buses are consistently late and that late buses result in missed instructional time may go hand in hand. But not all failures to provide specific transportation services actually cause delays, nor do all such failures impede instruction or affect a student's FAPE. *See supra* pp. 4-8, 10-11.

The Court should accept these tacit concessions. By retreating to defend a narrower subclass at the initial petition stage, plaintiffs cannot now "assume a contrary position." *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001) (citation omitted); *Faiella v. Fed. Nat'l Mortgage Ass'n*, 928 F.3d 141, 146 (1st Cir. 2019) (explaining that a party, "having staked out [a] position" at an earlier stage of the case, "cannot [subsequently] repudiate that position"); *cf. Al-Tamimi v. Adelson*, 916 F.3d 1, 7 (D.C. Cir. 2019) ("A party forfeits an argument by failing to raise it in [its] opening brief" or by "[m]entioning an argument [only] in the most skeletal way." (internal quotation marks omitted)). At most, the Court should remand to the trial court to define a narrower class related to timeliness.[4]

---

[4]    The district court declined to entertain the idea of "divid[ing] the putative class into subclasses of students who suffered the same 'type' of transportation harm" because it would create *too many* subclasses—what it termed "a 'subclass spiral.'" *Robertson II*, 816 F. Supp. 3d at 98 n.6. But that only proves the District's point. If the district court had created a more cohesive class—like one focusing only on children whose buses were actually late to school and who missed non-negligible instructional time—it may well have been possible to satisfy *Wal-Mart* and *D.L. I*.

36

That said, although a narrower timeliness class might cure the manifest commonality and 23(b)(2) problems, it is not without its own difficulties. There is a material difference between a bus that is a minute late and one that is an hour late, and those problems may be unrelated to one another. For example, while many students allege that late morning pickups would cause them to arrive at school after the start of classes, C.S. alleged that she was consistently picked up *too early* during the first week of the 2025-26 school year and that some other cause (perhaps route length, traffic, or a different unspecified issue) would cause her to arrive at school a few minutes past the first bell. JA 1297-98 ¶ 6. These time-based idiosyncrasies are not limited to her. *See* JA 1276 ¶¶ 12-13 (alleging early afternoon drop offs but not late afternoon drop offs). Even proving through statistical evidence that some group of students experienced late buses does not necessarily establish *why* buses were delayed such that the trial court could craft a meaningful injunction to remedy the problem.

But even if a narrower timeliness class were plaintiffs' best chance of demonstrating commonality or obtaining an indivisible injunction, one thing is clear: the *current* class as defined by the district court is plainly overbroad and must be vacated. The current definition sweeps in an assortment of unrelated problems that lack uniform causes or effects. And it will not help drive this case toward resolution. Rather than focusing this litigation on issues where multiple plaintiffs might actually

have harms caused by a common problem, the case will proceed to discovery and trial on an endless list of issues, many of which may be unique to a single student. The court will need to devote significant time to fleshing out the undefined terms "unsafe," "unreliable" and "inappropriate." Those issues cannot possibly be resolved on a class-wide basis because there are infinite ways (material or not) that a transportation service could deviate from a child's IEP, and the resulting injunction would have to address them all. Multiply that by 4,000 students being transported across the District and nearby states, and the result is unworkable. The district court's decision should be corrected now so that this litigation can proceed surely and swiftly on the right track.

## CONCLUSION

This Court should grant the District's Rule 23(f) petition and vacate the district court's class certification order.

Respectfully submitted,

BRIAN L. SCHWALB
Attorney General for the District of Columbia

CAROLINE S. VAN ZILE
Solicitor General

ASHWIN P. PHATAK
Principal Deputy Solicitor General

JEREMY R. GIRTON
Deputy Solicitor General

/s/ Perry R. Cao
PERRY R. CAO
Assistant Attorney General
Bar Number 1736160
Office of the Solicitor General

Office of the Attorney General
400 6th Street, NW, Suite 8100
Washington, D.C. 20001
(202) 724-5528
perry.cao@dc.gov

August 2026

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the type-volume limitation in Federal Rule of Appellate Procedure 32(a)(7)(B) because the brief contains 9,323 words, excluding exempted parts.  This brief complies with the typeface and type style requirements of Federal Rule of Appellate Procedure 32(a)(5) and (6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 365 in Times New Roman 14-point font.

/s/ Perry R. Cao
PERRY R. CAO